QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Bruce E. Van Dalsem (Bar No. 124128)
  brucevandalsem@quinnemanuel.com
  David W. Quinto (Bar No. 106232)
  davidquinto@quinnemanuel.com
  B. Dylan Proctor (Bar No. 219354)
  dylanproctor@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for American Rena International
Corp., WanZhu "Kathryn" Li, and Robert
M. Milliken

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| American Rena International Corp., a California corporation; WanZhu "Kathryn" Li, an individual; and Robert M. Milliken, an individual,<br><br>            Plaintiffs,<br><br>      vs.<br><br>Sis-Joyce International Co. Ltd., a California corporation; Alice "Annie" Lin, an individual; Virginia Wu, an individual; and DOES 1-10,<br><br>            Defendants. | CASE NO. CV-12-06972-DMG (JEMx)<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: October 12, 2012<br>Time: 9:30 a.m.<br>Room: Courtroom 7 |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on Friday, October 12, 2012, at 9:30 a.m., or as soon thereafter as this matter may be heard, in courtroom 7 of the above-entitled court, located at 312 N. Spring St., Los Angeles, CA 90012, plaintiffs American Rena International Corp. ("Rena"), WanZhu ("Kathryn") Li, and Robert M. Milliken ("Milliken") (collectively, "plaintiffs") will, and hereby do, move for a preliminary injunction prohibiting defendants Sis-Joyce International Corp. ("Sis-Joyce"), Alice "Annie" Lin, Virginia Wu, their agents and all others acting in concert with them, from doing the following:

(i) referencing, mentioning and/or using in any way plaintiffs' RENA or RENA BIOTECHNOLOGY marks in connection with the sale of products;

(ii) referencing, mentioning and/or using in any way the purported "ARëna," "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM" marks or any other mark confusingly similar to the RENA or RENA BIOTECHNOLOGY marks in connection with the sale of products;

(iii) copying or reproducing, in whole or in part, any text, photographs, graphics, source code or other copyrighted expression from the www.americanrena.com website or from any other any Rena work;

(iv) selling, advertising, or making any other use of a bottle and/or label that is confusingly similar to Rena's bottles and labels, including the 0.51 ounce bottle currently used by Defendants to sell purported "ARëna," "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM" products;

(v) advertising, marketing, or describing "ARëna," "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM" products in any manner likely to mislead consumers as to the source of such products and/or their affiliation with Rena;

1      (vi) interfering with Rena's relationships with its leaders, members,

2   distributors, customers and marketers, including, without limitation, by contacting

3   Rena's existing leaders, members, distributors, customers and marketers for the

4   purpose of soliciting business or making false or misleading statements or otherwise

5   discussing Rena or its products with such leaders, members, distributors and

6   marketers;

7      (vii) using or referring to the Plaintiffs' names and/or likenesses for any

8   commercial purpose; and

9      (viii) posting, maintaining, displaying or performing promotional videos or

10   advertisements for genuine RENA products or defendants' purported "ARëna,"

11   "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM"

12   products, including without limitation those posted under the name tvstripe1 on

13   YouTube.com.

14      Plaintiffs further seek a preliminary injunction requiring Sis-Joyce, Lin and

15   Wu, their agents and all others acting in concert with them to:

16      (i) turn over and deposit with the Court or Plaintiff's counsel all existing

17   products in their possession, custody or control that bear the RENA or RENA

18   BIOTECHNOLOGY marks or the purported "ARëna," "aRena," "aRENA," or

19   "NEW! ARËNA ACTIVATION ENERGY SERUM" marks; and

20      (ii) post a notice on the home pages of the www.sisjoyce.com,

21   www.RenaSkin.com and www.ArenaSkin.com websites stating, in both English and

22   Chinese, that:

23         "Sis-Joyce has been required to the United States District Court for the

24         Central District of California to post this notice in order to avoid further

25         confusion in the marketplace.  Sis-Joyce and the "ARëna" products

26         formerly sold through this website have no affiliation, and have never

27         had any affiliation, with genuine American Rena products that bear

28         RENA or RENA BIOTECHNOLOGY trademarks.  The Court has

ordered that Sis-Joyce may no longer sell "ARёna" products in order to avoid confusion between those products and those sold by American Rena."

This motion is based on this Notice of Motion and Motion, the accompanying memorandum of points and authorities, the concurrently filed declarations of B. Dylan Proctor; WanZhu "Kathryn" Li, Margaux Cheng, Chris Reynolds, Sally Zhou, Yiqun Zhang, Fengjuan Xia, Jingmei Wang, and Zhengtao Zhou, all other papers and arguments submitted in connection with this matter and any matters of which the Court may take judicial notice.

DATED: August 22, 2012      QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____

Bruce E. Van Dalsem
Attorneys for American Rena International Corp., WanZhu "Kathryn" Li, and Robert M. Milliken

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 3

     A.    Rena's Products and Intellectual Property ................................. 3

     B.    Defendants Commence Their Counterfeiting ........................... 4

     C.    Defendants' Scheme To Misappropriate Rena's Business ................... 5

     D.    Infringing Websites and Advertisements for ARëna Products ............... 7

     E.    The Consequences Of Defendants' Illegal Conduct ........................... 11

ARGUMENT ........................................................................................................ 12

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ........................................................................................ 13

     A.    Trademark Infringement and False Designation of Origin .................. 13

          1.    Plaintiffs Own Protectable Marks ................................ 13

          2.    There Is a Likelihood of Confusion .............................. 14

     B.    Copyright Infringement ................................................. 17

     C.    Trade Dress Infringement ............................................. 18

     D.    Right of Publicity .......................................................... 19

     E.    Intentional Interference with Prospective Economic Advantage ......... 19

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION ...................................................... 20

     A.    Harm to Goodwill and Reputation ............................... 21

     B.    Loss of Market Share, Customers and Sales ................. 22

III.    THE BALANCE OF HARDSHIPS FAVORS AN INJUNCTION .............. 23

IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION ....................... 23

V.    THE COURT SHOULD NOT REQUIRE A BOND ............................... 24

CONCLUSION ................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Advertise.com, Inc. v. AOL Advertising, Inc.*,
 616 F.3d 974 (9th Cir. 2010)............................................................14

*Alliance for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011)..........................................................12

*AMF, Inc. v. Sleekcraft Boats*,
 599 F.2d 341 (9th Cir. 1979).................................................14, 15, 16

*Apple Computer, Inc. v. Franklin Computer Corp.*,
 714 F.2d 1240 (3d Cir. 1983)...........................................................23

*Apple Inc. v. Psystar Corp.*,
 673 F. Supp. 2d 943 (N.D. Cal. 2009)..............................................22

*Apple, Inc. v. Samsung Elecs. Co.*,
 2012 WL 2572037 (N.D. Cal. July 01, 2012)...................................22

*Art Attacks Ink, LLC v. MGA Entm't*,
 581 F.3d 1138 (9th Cir. 2009)..........................................................18

*Barahona-Gomez v. Reno*,
 167 F.3d 1228 (9th Cir. 1999)..........................................................24

*Brookfield Comm'cns, Inc. v. W. Coast Entm't Corp.*,
 174 F.3d 1036 (9th Cir. 1999).....................................................14, 17

*Cadence Design Sys. v. Avant! Corp.*,
 125 F.3d 824 (9th Cir. 1997)............................................................23

*California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*,
 766 F.2d 1319 (9th Cir. 1985)..........................................................25

*Century 21 Real Estate Corp. v. Sandlin*,
 846 F.2d 1175 (9th Cir. 1988)..........................................................13

*Church of Scientology Int'l v. Elmira Mission of Church of Scientology*,
 794 F.2d 38 (2d Cir. 1986)...............................................................17

*CytoSport, Inc. v. Vital Pharms., Inc.*,
 617 F. Supp. 2d 1051 (E.D. Cal. 2009).......................................21, 23

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
 11 Cal. 4th 376 (1995).....................................................................20

*Disc Golf Ass'n v. Champion Discs*,
 158 F.3d 1002 (9th Cir. 1998)..........................................................18

*Dreamwerks Prod. Grp. v. SKG Studio,*
142 F.3d 1127 (9th Cir. 1998) ..................................................................15

*Envtl. Planning & Info. Council v. Super Ct.,*
36 Cal. 3d 188 (1984) ..............................................................................20

*Exctropix v. Liberty Livewire Corp.,*
178 F. Supp. 2d 1125 (C.D. Cal. 2001) ....................................................16

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
499 U.S. 340 (1991) ..................................................................................17

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns Inc.,*
198 F.3d 1143 (9th Cir. 1999) ..................................................................14

*Flynt Distrib. Co. v. Harvey,*
734 F.2d 1389 (9th Cir. 1984) ..................................................................12

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,*
618 F.3d 1025 (9th Cir. 2010) ..................................................................15

*GoTo.com, Inc. v. Walt Disney Co.,*
202 F.3d 1199 (9th Cir. 2000) ..................................................................15

*Grocery Outlet, Inc. v. Albertson's, Inc.,*
497 F.3d 949 (9th Cir. 2007) ....................................................................13

*i4i Ltd. P'ship v. Microsoft Corp.,*
598 F.3d 831(Fed. Cir. 2010) ...................................................................22

*Intel Corp. v. Americas News Intel Pub., LLC,*
2010 WL 2740063 (N.D. Cal. July 12, 2010) ..........................................13

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (2003) ...........................................................................20

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.,*
676 F.3d 841 (9th Cir. 2012) ....................................................................17

*Lahoti v. VeriCheck, Inc.,*
586 F.3d 1190 (9th Cir. 2009) .............................................................14, 15

*Louis Vuitton Malletier, S.A. v. 1854louisvuitton.com,*
2012 WL 2576216 (D. Nev. July 03, 2012) .............................................24

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH,*
571 F.3d 873 (9th Cir. 2009) ....................................................................12

*Maxim Integrated Prods., Inc. v. Quintana,*
654 F. Supp. 2d 1024 (N.D. Cal. 2009) ....................................................21

*Michaels v. Internet Entm't Grp., Inc.,*
5 F. Supp. 2d 823 (C.D. Cal. 1998) ..........................................................19

*Montana Silversmiths, Inc. v. Taylor Brands, LLC*,
   2012 WL 405631 (D. Mont. Feb. 08, 2012) .............................................21

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
   22 F.3d 546 (4th Cir. 1994) ..................................................................22

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011) ...............................................................15

*Orthopedic Sys., Inc. v. Schlein*,
   202 Cal. App. 4th 529 (2011) ..............................................................19

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ................................................................21

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) ............................................................23

*Sardi's Restaurant Corp. v. Sardie*,
   755 F.2d 719 (9th Cir. 1985) ................................................................13

*Seed Servs., Inc. v. Winsor Grain, Inc.*,
   2012 WL 1232320 (E.D. Cal. Apr. 12, 2012) .................................16, 22

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*,
   96 F.3d 1217, *as modified*, 97 F.3d 1460 (9th Cir. 1996) ...............14

*Starcom Mediavest Grp., Inc. v. Mediavestw.com*,
   2010 WL 3564845 (N.D. Cal. Sept. 13, 2010) ....................................25

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ...........................................................21, 22

*University of Texas v. Camenisch*,
   451 U.S. 390 (1981) .............................................................................12

*V.L. v. Wagner*,
   669 F. Supp. 2d 1106 (N.D. Cal. 2009) ...............................................12

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................12

## **Statutes**

15 U.S.C. § 1125(a) ...................................................................................13

17 U.S.C. § 502(a) .....................................................................................17

Cal. Civ. Code § 3344(a) ...........................................................................19

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

This motion for a preliminary injunction seeks to prevent the complete theft of a business. Plaintiff WanZhu "Kathryn" Li is an entrepreneur who began making skincare products in Los Angeles, California in 2005. The company she founded, plaintiff American Rena International Corporation ("Rena"), quickly grew to employ 20 people in California. By 2010, it generated $30 million in annual sales, the bulk of which resulted from exports to China and other Asian countries.

Defendants Lin and Wu were independent sales agents for Rena's products who embarked on a brazen scheme to compete unfairly with Rena and, ultimately, steal its business altogether. Initially, Lin and Wu engaged in straightforward counterfeiting—they manufactured counterfeit labels using Rena's proprietary RENA and RENA BIOTECHNOLOGY marks, applied them to generic bottles, and then packaged in those bottles and sold, in competition with Rena, diluted and adulterated versions of products they had purchased from Rena. When Rena learned of this in late 2010 it cut off Lin's and Wu's supply of RENA products to put a stop to this misconduct—but Lin and Wu were not deterred.

Rather than cease their unlawful activities, Lin and Wu embarked on a secret campaign to co-opt the market for RENA products entirely, and to hijack Rena's entire business. Lin, Wu and a company they formed, defendant Sis-Joyce, secretly started telling Rena's consumers that Rena was going out of business and that defendant Sis-Joyce—a Lin and Wu entity—was the "2nd generation of Rena." Lin, Wu and Sis-Joyce released a competing product called "ARëna" which they label as "new" and "improved," claiming in marketing materials that "Arena" is the "**New Rena product**" and on websites that "***Rena is Now aRena!***" To maximize consumer confusion, defendants chose to use the same description for "ARëna" that Rena uses for its product—each is described as an "Activation Energy Serum"—and

to sell their "ARëna" products in bottles that precisely mimic the highly distinctive .51 oz bottle custom designed by Rena for its product.

Defendants also continued and continue to use Rena's trademarks and other intellectual property directly. Lin and Wu sent existing Rena members presentations that used *Rena's* products and *Rena's* trademarks in an effort to solicit business for *ARëna* products. Defendants or those acting in concert with them, hiding behind fake names and addresses, launched websites that sell only ARëna products – yet use the RENA and RENA BIOTECHNOLOGY marks and the American Rena name, copy vast quantities of copyrighted materials from Rena's website, and even include the names and photographs of *Rena's* founders. Defendants launched YouTube videos displaying and advertising Rena's products at length—but directing the public to Lin and Wu's knockoff websites selling ARëna products. And even today, when one purchases ARëna products from such sites, defendants' shipments bear labels and come with brochures that use the proprietary RENA marks.

Since Lin and Wu launched their infringing ARëna products and engaged in their campaign to steal Rena's business and customers, Rena's worldwide sales have plummeted—from an average of approximately $2.5 million a month as of 2010 and early 2011 to less than $500,000 a month now. Defendants have stolen virtually the entirety of Rena's U.S. sales and are cutting substantially into its foreign sales, threatening Rena's very existence. Rena first discovered the cause of its losses after July 4, 2012, when it was notified by a sales agent in China of an overture she received from Lin and Wu. Plaintiffs promptly filed their complaint on August 13, 2012, and now respectfully urge the Court to enter a preliminary injunction to prevent defendants from destroying Rena's business entirely.

**A.    Rena's Products and Intellectual Property**

Based in Los Angeles, Rena is an internationally-known manufacturer of high-end skin care, healthcare, and anti-aging products.  Declaration of WanZhu "Kathryn" Li ("Li Decl."), ¶ 2.  In June 2006, Rena began selling its products using its RENA and RENA BIOTECHNOLOGY trademarks.  *Id.* ¶ 6.  Rena currently manufactures and sells a suite of various health-related products, including Activation Energy Serum, Activation Mist, and Activation Energy Elixir.  Li Decl., ¶ 2.  Consumers have responded favorably to genuine RENA merchandise, which are known in the marketplace for reducing wrinkles, inflammation, and pain while moisturizing skin and promoting skin health.   Declaration of Margaux W. Cheng ("Cheng Decl."), ¶ 3; Li Decl., ¶ 2.

To protect the valuable goodwill associated with Rena's products, Rena and its founder obtained a U.S. trademark registration for the RENA BIOTECHNOLOGY word mark, and have applied to register a stylized RENA BIOTECHNOLOGY mark.  Li Decl., ¶6.  The stylized RENA BIOTECHNOLOGY mark, used on all RENA products since June 2006, is shown below:



In addition, Rena applied in April 2012 to register various other stylized RENA and RENA BIOTECHNOLOGY marks, using both English letters and Chinese characters, including the stylized RENA mark standing alone.  These applications are pending.  Li Decl., ¶ 8.  The authentic products sold by Rena prominently display the RENA and RENA BIOTECHNOLOGY marks, as shown:

1
2
3
4
5
6
7
8
9
10
11
12



13 Li Decl., ¶ 7.

14      **B.**     <u>**Defendants Commence Their Counterfeiting**</u>

15      Defendants Lin and Wu knew of the sales and marketing success achieved by

16 Rena because, as of 2010, they served as "leaders" within Rena's multi-level sales

17 organization; as sales agents they were authorized to solicit orders for genuine

18 RENA products which would then be filled by Rena itself. Li Decl., ¶ 9. Envious

19 of Rena's achievements, Lin and Wu decided to try to appropriate Rena's success

20 for themselves.

21      In or about late 2010, Rena discovered that Lin and Wu were purchasing

22 RENA products not simply to fill orders they had solicited, which they were

23 permitted to do at that time, but in fact to counterfeit them by apparently diluting

24 genuine RENA products with tap water and selling them in generic bottles using

25 counterfeit RENA labels. Li Decl., ¶ 10. The photograph below depicts two such

26 bottles bearing counterfeit RENA labels, both of which were actually sold by the

27 defendants to customers.

28

*Id.*

When Rena discovered this counterfeiting, it immediately terminated Lin and Wu as "leaders" and sales representatives for RENA products in the belief that Lin and Wu's illicit activities extended only to selling adulterated RENA products, and that cutting off their supply of those products would force an end to their unlawful activities. Li Decl., ¶ 11. In fact, Lin and Wu's illicit activities then got worse.

**C.**    **Defendants' Scheme To Misappropriate Rena's Business**

In October 2010, around the time that Rena terminated Lin and Wu as authorized sales agents, Lin incorporated defendant Sis-Joyce. Declaration of B. Dylan Proctor ("Proctor Decl."), ¶ 2. A few months later, in February 2011, Wu sent an e-mail – to a concealed list of recipients that included at least one Rena member who has been willing to come forward – advising that "**New Rena product has arrived. The product name [is] called Arena. Company will open on the end of February. Member[s] can reorder their product now**." Cheng Decl., ¶ 4 and Ex. A (emphasis in original). The message's subject heading was "New Rena Company is l[a]unched," and the message contained instructions for how to send money for purchases to Sis-Joyce. *Id.*

Later that same month, Wu sent another e-mail to Rena members and customers, on behalf of the "Top Leader Annie Lin," advising that two "meetings"

had been scheduled and that all "members" would receive "complementary gifts" and would be eligible to participate in a raffle to win "the patented micro-molecular Activation energy bottle" – a reference to Rena's unique and distinctive 0.51 ounce Activation Energy Serum bottle. Cheng Decl., ¶ 5 and Ex. B. Rena's members and customers understood that Lin, Wu and Sis-Joyce were selling genuine RENA products. *Id.* On March 16, 2011, Wu then notified Rena members and customers that "Arena (*2nd generation of Rena*) is finally open for our members," and provided instructions for how to activate their Sis-Joyce accounts. Cheng Decl., ¶ 7 and Ex.C (emphasis added).

Defendants' illegal conduct did not stop once Sis-Joyce and ARëna were up and running. On June 12, 2011, Wu and Lin sent an email to Rena members and customers asking them to "forward the enclosed attachment to all your distributors, customers and friends," obviously in order to sell ARëna products – yet the attached presentation contained photographs of ***Rena's*** products bearing the RENA and RENA BIOTECHNOLOGY marks. Cheng Decl., ¶ 8 and Ex. D. Later, in May 2012, an ARëna salesman purported to inform an existing Rena member and customer that Rena's business in Asia was failing and that Rena was considering leaving the Chinese market and licensing its products to ARëna – all of which would be part of "a forthcoming official announcement on American Rena's website announcing" as much. Declaration of Jingmei Wang ("Wang Decl."), ¶ 4. None of this was true. Li Decl., ¶ 13. Rena members were actually confused into believing "that American Rena, including its whole product line, had been acquired by ARena." S. Zhou Decl., ¶ 5.

Defendants' business model plainly is to associate themselves with Rena in order to misappropriate its business, members and customers. It was no accident, therefore, that defendants chose a name for their products—"ARena" or "ARëna"— that promotes consumer confusion with genuine RENA products. Indeed, aside from using a name that merely adds an "A" in front of "Rena," defendants expressly

label their "New!" product as an "Activation Energy Serum"—the precise description used by Rena for its well-known product, Li Decl., ¶14, and sell their product in a bottle that is identical in size and shape to the distinctive, custom-designed 0.51 ounce bottle used by Rena for its product, as shown below.



Li Decl., ¶ 15. Witnesses have testified that they purchased ARëna products in the belief they were genuine RENA products. Cheng Decl., ¶ 4-6, 8; Z. Zhou Decl. ¶ 3.

**D.** **Infringing Websites and Advertisements for ARëna Products**

To further their efforts to misappropriate plaintiffs' business and maximize consumer confusion, defendants have committed, and are continuing to commit, a wide variety of additional illegal acts.

*Infringing Websites.* Defendants or those acting in concert with them have created a number of infringing websites designed to confuse consumers into purchasing "ARëna" goods instead of genuine RENA goods. On October 13, 2008, defendants registered www.RenaSkin.com using a made-up name, "Damon Rith," and giving a non-existent address for the contact information. Proctor Decl., ¶ 4 and Ex. D. This site sells only ARëna products, Li Decl. Ex. B; Reynolds Decl. ¶ 8, yet has been crafted to cause maximum confusion with Rena's genuine products and the

genuine www.AmericanRena.com website. Virtually every page of it shows the

following header: "***Genuine American Rena Anti-Aging Activation Serum***," Li

Decl. Ex. B, and the site describes itself, on the Internet Explorer bar at the top of

the screen, as the "Official American Rena . . . ." *Id*. Aside from these headers on

every page, the site contains at least 130 other references to "American Rena,"

"American RENA," and "RENA." *Id*. For example, in the "Q&A" section the site

declares that "American RENA external use products . . . do not contain alcohol or

preservatives" in response to a question about the "American RENA Activation

Spray external spray products" *Id*. The RenaSkin.com website even has a large

reprint of *Rena's* stylized trademarks and *Rena's* products on brochures, as shown in

the images below:



*Id.*

    Defendants' website also copies substantially all the designs, graphics,

photographs and text of the AmericanRena.com website. Li Decl., ¶ 18. Indeed, the

site reproduces a letter authored by Mr. Milliken – *Rena's* CEO – and even displays

a photograph, shown below, of *Rena's* founder, Kathryn Li, alongside Mr. Milliken,

with the caption, "Who performs research and development[?]  Where does manufacturing take place?"



*Id.*  Showing the knowing nature of the misappropriation, the renaskin.com site expressly disclaims, in its "terms and conditions," "ANY WARRANTIES OF ANY KIND INCLUDING WARRANTIES OF . . . NON-INFRINGEMENT OF INTELLECTUAL PROPERTY."  Li Decl., ¶ 17.

On November 24, 2010, defendants registered a second website, www.ArenaSkin.com, again through the use of a made-up name, "Dave Simms," and a made-up address.  Proctor Decl., ¶ 4 and Ex. C.  The ArenaSkin.com site is very similar to the RenaSkin.com site, and is equally infringing of Rena's rights.  Li Decl., ¶ 20.  The header at the top of each page has been modified to proclaim, "*Genuine American aRena Anti-Aging Activation Serum*," but is accompanied by the explanation that, "*Rena is Now aRena!*"  Li Decl. Ex. C.  The "*aRena*" products sold on the site are described as having a "*New Improved Formula*" in an effort to persuade consumers that they are related to the original, genuine RENA products. *Id.*  The ArenaSkin.com site, too, copies without authorization a letter authored by Rena's CEO, Mr. Milliken, and copies extensively from Rena's website. *Id.*

In an e-mail dated August 17, 2012, a representative of Sis-Joyce purported to inform plaintiffs that it is not associated with the renaskin.com and arenaskin.com sites.  Proctor Decl., Ex. F.  But plaintiffs have confirmed through their pre-filing investigation that these sites sell *only* ARena products, Reynolds Decl., ¶ 8, which renders Sis-Joyce's claim implausible – as does the history of defendants' misconduct set forth above.  The transparency of the defendants' denial is further evidenced by the fact that on August 15, 2012, ***the day after*** plaintiffs initially served this lawsuit, the registration information for the www.RenaSkin.com site was updated to replace the reference to "Damon Rith" as registrant for the site to now reflect "Domains By Proxy, LLC" as registrant, a domain registration service that advertises that "Your identity is nobody's business but ours.®"  Proctor Decl., ¶ 6 and Ex. E.  Moreover, Sis-Joyce does not deny that it controls the www.sisjoyce.com website, and that too copies paragraphs of text from plaintiffs' www.americanrena.com website verbatim.  Li Decl., ¶ 19; Proctor Decl., Ex. F.  Finally, defendants also operate a fourth website, www.renaforever.com, which purports to sell – without any authorization from Rena – genuine RENA products.  Li Decl., ¶ 21.  Wu's name is listed on this site.  Li Decl., Ex. E at 5.

***Advertisements and Brochures.***  Defendants have also attempted to trade directly on the goodwill and popularity of genuine RENA products in advertisements for ARena products.  Using the name "tvstripe1," defendants have posted a number of YouTube videos that *appear* to promote genuine RENA products—and display those products, and even Rena's place of business in Los Angeles—but then direct consumers to the bogus RenaSkin.com website that sells defendants' infringing goods.  Li Decl., ¶ 21.  These videos can be found at http://www.youtube.com/user/tvstripe1.  Screen shots of one include the following:







*Id.*

## E.    The Consequences Of Defendants' Illegal Conduct

Defendants' efforts to hijack Rena's business have, to a large extent, been successful. Rena members and customers believed "that American Rena, including its whole product line, had been acquired by ARena," S. Zhou Decl., ¶ 5, purchased ARëna products in the belief they were genuine RENA products, Cheng Decl., ¶ 4-6, 8, and purchased ARëna "because I thought it was RENA." Z. Zhou Decl. ¶ 3.

The dramatic fall in Rena's sales reveals the damage that defendants' illegal actions have caused, and are causing. During calendar year 2009, Rena's sales totaled just under $17 million. Li Dec., ¶ 4. During calendar year 2010, Rena's sales were approximately $30 million and Rena's revenues easily exceeded $1 million during each month of the year. *Id.* By August 2011, Rena's sales were approximately $2.2 million,, but that was the last time Rena achieved seven-figure sales. *Id.* Since then, its monthly sales have steadily declined, dropping to just $271,000 in June of 2012. *Id.* Absent immediate relief, Rena, which less than one

Case No. CV-06972-DMG (JEMx)

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

year ago had a very successful and growing business, will be out of business altogether. *Id.*, ¶¶ 5, 24.

## ARGUMENT

A preliminary injunction is required to prevent defendants from destroying plaintiffs' business. To obtain preliminary injunctive relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH*, 571 F.3d 873, 877 (9th Cir. 2009), quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Alternatively, "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor," and if the irreparable harm and public interest factors are also met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation and quotation and editing marks omitted). The rules of evidence are relaxed when these factors are considered; the Court has discretion to consider even inadmissible evidence in ruling on a motion for preliminary injunction. *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1115 n.8 (N.D. Cal. 2009) ("[O]n a motion for a preliminary injunction, the Court may consider inadmissible evidence, giving such evidence appropriate weight depending on the competence, personal knowledge, and credibility of the declarants."); *see also University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits").

# I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

Although plaintiffs are likely to succeed on the merits of all the claims asserted in their complaint, plaintiffs' motion is based on their claims for trademark infringement, false designation of origin and trade dress infringement, copyright infringement, intentional interference with prospective economic advantage, and violation of the right of publicity.

## A. Trademark Infringement and False Designation of Origin

To establish a likelihood of success on the merits of a trademark infringement claim, the plaintiff must establish that it is "(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark." *Grocery Outlet, Inc. v. Albertson's, Inc*., 497 F.3d 949, 951 (9th Cir. 2007); *see also Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir. 1985) ("[T]o show a probability of success in the causes of action for trademark infringement, false designation of origin and unfair competition, [the plaintiff] need show that a likelihood of confusion exists.") (citations omitted).

"The elements of a false designation of origin claim under 15 U.S.C. § 1125(a) are identical, with the exception that the plaintiff's trademark need not be registered." *Intel Corp. v. Americas News Intel Pub., LLC*, 2010 WL 2740063, *2 (N.D. Cal. July 12, 2010) (citing 15 U.S.C. § 1125(a)). The "ultimate test" for either claim is the same: "whether the public is likely to be deceived or confused by the similarity of the marks." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (citation omitted).

Plaintiffs are highly likely to prevail on these claims as to both defendants' counterfeit use of plaintiffs' RENA and RENA BIOTECHNOLOGY marks and their confusingly similar "ARëna," "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM" marks.

### 1. Plaintiffs Own Protectable Marks

"It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219, *as modified*, 97 F.3d 1460 (9th Cir. 1996). Plaintiffs used their RENA and RENA BIOTECHNOLOGY marks before defendants used their confusingly similar "ARëna" marks. Indeed, it was only after plaintiffs stopped selling genuine RENA products to the defendants that they launched their knock-off "ARëna" products.

Nor can there be any dispute that plaintiffs' marks are protectable (and, in fact, strong). Because plaintiffs' RENA BIOTECHNOLOGY word mark is registered, "a presumption of validity places the burden of proving genericness upon" defendants. *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999). "Generic terms are those that refer to 'the genus of which the particular product or service is a species,' *i.e.*, the name of the product or service itself." *Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F.3d 974, 977 (9th Cir. 2010), quoting *Filipino Yellow Pages,* 198 F.3d at 1147. "RENA BIOTECHNOLOGY" does not "name" the "product" itself. The mark is not generic; it is therefore valid and protectable.

Likewise, while a registration for it has not yet issued, plaintiffs' RENA word mark is also plainly valid and protectable because it is fanciful, or at least arbitrary or suggestive. *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1198 (9th Cir. 2009). "'Suggestive,' 'arbitrary,' or 'fanciful' marks are inherently distinctive" and entitled to trademark protection. *Id.* Accordingly, plaintiffs' marks are protectable.

### 2. <u>There Is a Likelihood of Confusion</u>

The second factor is whether there is "a likelihood of confusion." *Brookfield Comm'cns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999). Likelihood of confusion is determined by the eight factor "*Sleekcraft*" test: "1.

strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines." *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). These factors "are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011); *see Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) ("This eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts."); *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) ("The factors should not be rigidly weighed; we do not count beans."). The similarity of the marks, proximity of the goods and marketing channels used are "the controlling troika in the *Sleekcraft* analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).

Here, there is a high likelihood of confusion resulting from both defendants' counterfeit uses of the RENA and RENA BIOTECHNOLOGY marks and their use of their purported "ARëna," "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM" marks.

*First*, plaintiffs' marks are strong. As noted, RENA and RENA BIOTECHNOLOGY are fanciful, or at least suggestive or arbitrary, and therefore strong and distinctive marks. *See Lahoti*, 586 F.3d at 1198.

*Second*, the parties' goods are related and there is a likelihood that consumers will "assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. Defendants' products are marketed as identical to those of the plaintiffs and plainly are intended to supplant plaintiffs' goods in the marketplace.

*Third*, defendants' purported marks are confusingly similar to plaintiffs' marks, with the only differences being defendants' addition of an "A" in front of the dominant "Rena" term and the occasional addition of a dieresis over the letter "e" (*i.e.*, "ë"). Moreover, by capitalizing the "R" in "ARëna," and occasionally putting the "a" in lower case in "aRena," defendants have emphasized the dominant "Rena" term in their purported mark—plainly an attempt to maximize consumer confusion.

*Fourth*, there is substantial evidence of actual confusion, as discussed. Even if there were not, "[b]ecause of the difficulty in garnering such evidence," particularly at such an early stage of the lawsuit, the failure to prove instances of actual confusion is not dispositive." *Sleekcraft*, 599 F.2d at 353.

*Fifth*, the parties use the same marketing channels, including primarily their websites and commissioned sales agents or "leaders" to compete for the same customers. Defendants' highly deceptive and misleading marketing efforts further show that confusion is likely. *See id.* ("Convergent marketing channels increase the likelihood of confusion.").

*Sixth*, the relevant consumers are direct purchasers who are likely to be confused because even the most discerning eye would likely be misled by defendants' counterfeiting and copying. Where, as here, the parties' marks are "nearly identical," it "is irrational to expect that even the most sophisticated consumer will exercise the kind of scrupulous examination that would enable him or her to discern the difference." *Exctropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1134 (C.D. Cal. 2001). Moreover, that defendants themselves used to be authorized sellers of plaintiffs' products further contributes to the likelihood of confusion since defendants had a known association with Rena. Indeed, defendants operate a website purporting to market Rena's goods to this day – the www.renaforever.com site. *See Seed Servs., Inc. v. Winsor Grain, Inc.*, 2012 WL 1232320, *3 (E.D. Cal. Apr. 12, 2012) ("The fact that Cook used to sell American 'California Gold' brand alfalfa seed in the past adds to the likelihood of confusion

notwithstanding the fact that the buyers are assumed to be sophisticated parties."); *see also Church of Scientology Int'l v. Elmira Mission of Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) ("When [a former licensee], as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer.").

*Seventh*, there can be no question defendants chose their marks to create maximum confusion, and not for any valid, independent reason. "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark," *Brookfield*, 174 F.3d at 1059, which plainly happened here.

*Eighth*, to the extent expansion of product lines is at all relevant, the parties are likely to expand similarly as their base products are similar.

In sum, defendants deliberately chose their brand and marks to associate their products with the plaintiffs. An injunction is required to prevent further and ongoing infringement of plaintiffs' marks.

### B.     Copyright Infringement

Under the Copyright Act, the Court may grant injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). To state a *prima facie* claim for copyright infringement under 17 U.S.C. § 501, a plaintiff must prove two elements: 1) ownership of a valid copyright and 2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The plaintiff can establish copying by showing that 1) the defendant had access to the plaintiff's work and 2) that the two works are substantially similar. *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846–47 (9th Cir. 2012).

Plaintiffs are very likely to prevail on this claim. Plaintiffs own a valid and subsisting copyright in the expression on their website, and defendants have literally duplicated, verbatim, vast quantities of such expression. This includes the entirety

of several web pages and many other images, designs and textual elements on the renaskin.com and arenaskin.com websites, as well as several paragraphs of the sisjoyce.com website. Li Decl., ¶¶ 16-19. Such wholesale copying of original expression for purposes of financial gain is plainly copyright infringement.

### C. Trade Dress Infringement

Plaintiffs are also likely to succeed on their trade dress infringement claim. "Trade dress protection applies to 'a combination of any elements in which a product is presented to a buyer,' including the shape and design of a product." *Art Attacks Ink, LLC v. MGA Entm't*, 581 F.3d 1138, 1145 (9th Cir. 2009) (citation omitted). "To prove trade dress infringement, a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Id.* (citing *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1005 (9th Cir. 1998)).

Rena typically sells its RENA Activation Energy Serum product in a distinctive, lavender-colored .51 fluid-ounce bottle. RENA's trade dress and merchandise have acquired secondary meaning in the marketplace for reducing wrinkles, inflammation, and pain while moisturizing skin and promoting skin health. Cheng Decl., ¶ 3; Li Decl., ¶ 2. To further feed off of plaintiffs' reputation, ingenuity and goodwill, defendants sell their product in a bottle that is identical or confusingly similar in size, shape and color to plaintiffs' bottle, using the infringing "ARëna" mark and the same "Activation Energy Serum" description that appears on the genuine RENA product. Li Decl., ¶ 15. The visual similarities between the parties' respective product bottles is striking, and creates a high likelihood that even discerning consumers will be confused as to the origin of defendants' infringing product. And as noted, there is substantial evidence of actual confusion between Rena's genuine and defendants' knock-off products. Cheng Decl., ¶ 4-6, 8; Z. Zhou Decl. ¶ 3.

### D.    Right of Publicity

Plaintiffs are also likely to succeed on the merits of their right-of-publicity claims. California law provides for the right to control the use of one's likeness for commercial advantage. *Orthopedic Sys., Inc. v. Schlein*, 202 Cal. App. 4th 529, 544 (2011). The elements of the common-law cause of action for violation of the right of publicity are (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. *Id*. The statutory cause of action requires all these elements with the addition of (1) a knowing use by the defendant as well as (2) a direct connection between the alleged use and the commercial purpose. *Id*.; *see also* Cal. Civ. Code § 3344(a). Injunctive relief is an appropriate remedy for a violation of the right of publicity, which infringes the property right of the plaintiffs. *See Michaels v. Internet Entm't Grp., Inc.*, 5 F. Supp. 2d 823, 837–38 (C.D. Cal. 1998).

Each of the required elements is satisfied. Defendants are currently using plaintiff Milliken's name and Li's and Milliken's images on the ArenaSkin.com website, and Milliken's name on the RenaSkin.com website, to suggest that *plaintiffs* are the source of defendants' infringing products. Li Decl., ¶ 16. Defendants have even reproduced, in paraphrased form, a letter written by Milliken to prospective customers. Such appropriation of plaintiffs' identities without their consent, and for commercial gain, is a flagrant violation of law that should be enjoined.

### E.    Intentional Interference with Prospective Economic Advantage

Last, the elements of a claim for intentional interference with prospective economic advantage are "(1) the existence of at least one specific economic relationship between plaintiffs and third parties that may economically benefit plaintiffs; (2) knowledge by the defendants of this relationship; (3) intentional and wrongful acts by the defendants designed to disrupt the relationship; (4) actual

disruption of the relationship; and (5) proximately caused damages to plaintiffs. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1163 (2003). A formal contractual relationship with the third party in question is not necessary, *Envtl. Planning & Info. Council v. Super Ct.*, 36 Cal. 3d 188, 193 (1984), but interference is only actionable if it "was wrongful 'by some measure beyond the fact of the interference itself.'" *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995).

Defendants' conduct meets this standard. Plaintiffs have worked for years to build valuable economic relationships with their customers, both in the U.S. and overseas, resulting in sales of over $30 million annually in 2010. As sales agents for Rena, Lin and Wu knew of the relationships that Rena had built with its customers. They then intentionally committed *scores* of wrongful acts in furtherance of their efforts to misappropriate the economic advantages that such relationships offered, including trademark and copyright infringement, as well as their repeated statements, both orally and in writing, that Sis-Joyce was the "2nd generation" of Rena, that Rena was going out of business and that ARëna *was* Rena. Cheng Decl., ¶ 7, Li Decl., ¶ 13, Wang Decl., ¶ 4. These acts have disrupted and continue to disrupt Rena's relationships with its customers and sales agents. Rena has already lost a substantial portion of the tens of thousands of sales agents it once had, Li Decl., ¶ 9, and is likely to lose more absent an injunction. Sales of Rena's products have declined over 80 percent, and Rena is now threatened with extinction. Defendants' ongoing interference with plaintiffs' beneficial business relationships should be enjoined.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

If the injunction is not granted, plaintiffs will suffer substantial irreparable harm that will be impossible to compensate with an award of monetary damages. Irreparable harm "is not difficult to establish" because of the difficulty of adequately

compensating a plaintiff for the harm to its reputation and goodwill resulting from trademark or copyright infringement. *See Montana Silversmiths, Inc. v. Taylor Brands, LLC*, 2012 WL 405631, *14 (D. Mont. Feb. 08, 2012) (citation omitted).

This requirement is met. Plaintiffs have suffered, and will continue to suffer, immediate and serious irreparable harm in the absence of injunctive relief.

### A.    Harm to Goodwill and Reputation

"Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm"). In the trademark context, even the loss of control over one's reputation or goodwill is irreparable harm. *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009) ("In trademark cases, irreparable harm is typically found in a plaintiff's loss of control over their business reputation, loss of trade and loss of goodwill."); *see CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) ("If another person infringes the marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control. A trademark owner's loss of the ability to control its marks, thus, creates the potential for damage to its reputation.") (citation omitted).

Likewise, irreparable harm arises in a copyright case if the defendant's infringement co-opts the plaintiffs' sweat-of-the-brow efforts and innovation in the design or development of an original work, such as plaintiffs' copyrighted website here. *See*, *e.g.*, *Montana Silversmiths, Inc.*, 2012 WL 405631 at *14 (finding irreparable harm where plaintiff "has devoted 'years of hard work, investment, innovation, market and product research and development . . .' to earn 'significant consumer goodwill, brand recognition, [and] a business reputation as an innovated

and producer of affordable, quality Western design products and a corresponding competitive market share' which are crucial to its viability and success"); *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009) (finding irreparable harm where to allow defendants to continue copyright infringement "[w]ould irreparably harm the competitive position and market share of" the plaintiff's product).

Plaintiffs have devoted years of time and investment into developing and promoting their product and brand, and developed a reputation as a supplier of reliable and effective health and beauty products. By co-opting plaintiffs' entire business, including their marks, products, website and customers, defendants have assumed control over plaintiffs' goodwill and reputation, misled customers and taken substantial steps toward destroying the value of the Rena brand. Such harms are ongoing and irreparable and not remediable through money damages. *Seed Servs.*, 2012 WL 1232320, at *4 ("If Defendants are permitted to go ahead with their plan to sell 'California Gold' alfalfa seeds to Seed Services's customers, Seed Services will have lost control of its business reputation. The likelihood of irreparable harm is established.").

**B.     Loss of Market Share, Customers and Sales**

A permanent loss of customers or market share to a competitor constitutes irreparable harm. *See*, *e.g.*, *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841; *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor . . . the irreparable injury prong is satisfied.") (citation omitted). "[C]ourts are most likely to grant an injunction when the plaintiff and defendant are direct competitors in the same market, because in that context, the potential harm in allowing the defendant to continue its infringing conduct may be the greatest." *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 2572037, *45 (N.D. Cal. July 01, 2012) (citing *i4i Ltd. P'ship v.*

*Microsoft Corp.*, 598 F.3d 831, 861(Fed. Cir. 2010); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1153 (Fed. Cir. 2011)).

Here, Rena's market share, customers and sales have declined precipitously just as the defendants' infringing product has been aggressively marketed to Rena's customers. Li Decl., ¶ 5. If defendants' infringing conduct is allowed to continue unabated, plaintiffs will be faced with a permanent loss of market share, customers and sales—injuries that are not remediable by an award of monetary damages, particularly if they drive plaintiff out of business altogether.

## III.   THE BALANCE OF HARDSHIPS FAVORS AN INJUNCTION

The equities fall firmly in plaintiffs' favor. Defendants have employed virtually every unlawful method imaginable to attempt to hijack plaintiff's business. Plaintiffs promptly sought injunctive relief as soon as defendants' actions were revealed. Other than losing their ability to infringe plaintiffs' trademarks, copyrights and other rights, defendants will suffer no "harm" at all from an injunction. In these circumstances, "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing," no equitable considerations support defendants. *Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) ("a defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities"); *see CytoSport*, 617 F. Supp. 2d at 1080 (balance of equities favors plaintiff where "the injunction only asks that [defendant] refrain from using a mark and trade dress for its products which is confusingly similar to [plaintiff's] trademark and trade dress").

## IV.   THE PUBLIC INTEREST FAVORS AN INJUNCTION

"[T]he public receives a benefit when the legitimate rights of copyright holders are vindicated." *Apple Inc.*, 673 F. Supp. 2d at 950; *see Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) ("it is virtually axiomatic that the public interest can only be served by upholding copyright

protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work"). Likewise, the public interest in avoiding confusion in the marketplace "favors issuance of a preliminary injunction in order to protect Plaintiff's trademark interests and to protect the public from being defrauded by the palming off of counterfeit goods as genuine goods of the Plaintiff." *Louis Vuitton Malletier, S.A. v. 1854louisvuitton.com*, 2012 WL 2576216, *3 (D. Nev. July 03, 2012).

The public interest here favors an injunction. The defendants are engaging in conduct that confuses consumers and that therefore strikes at the heart of the consumer protection purpose of the federal trademark laws. They are misappropriating for their own benefit plaintiffs' copyrighted original expression in order to further their consumer confusion scheme and defraud the public. By contrast, there is no countervailing public interest consideration that countenances the brazenly infringing conduct in which the defendants are currently engaged.

## V. THE COURT SHOULD NOT REQUIRE A BOND

The Federal Rules of Civil Procedure afford district courts discretion in setting the amount of security, if any, to be posted by a party that seeks and receives a preliminary injunction. *See* FED. R. CIV. P. 65(c) (requires posting of security "[i]n an amount that the court considers proper"); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (Rule 65(c) invests district court "[w]ith discretion as to the amount of security required, *if any*" in connection with a preliminary injunction) (emphasis added).

As discussed above, the proposed injunction would compel defendants to comply with the law. The only hardship they would suffer from an injunction is the enjoinment of their bad faith infringing conduct; no equitable considerations support defendants' desire to continue infringing plaintiffs' rights. The plaintiffs have made a very strong showing of likely of success on the merits. Under the circumstances of this case, no bond should be required for an injunction to issue. *See California ex*

*rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985) (a strong likelihood of success on the merits favors "[a] minimal bond or no bond at all."); *Starcom Mediavest Grp., Inc. v. Mediavestw.com*, 2010 WL 3564845, *1 (N.D. Cal. Sept. 13, 2010) ("Because SMG has made such a strong showing of likelihood of success on merits and because the [defendant trademark] Registrant's activities have evinced fraudulent intent and bad faith, the Court shall not require a bond at this time."). Should the Court nevertheless find a bond to be necessary in these circumstances, plaintiffs respectfully request that a bond be set for an amount that does not exceed $50,000.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this motion for a preliminary injunction be granted.


DATED: August 22, 2012                    QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                          By_____
                                              Bruce E. Van Dalsem
                                              Attorneys for American Rena International
                                              Corp., WanZhu "Kathryn" Li, and Robert
                                              M. Milliken