1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN RENA INTERNATIONAL CORP, et al.,<br><br>                              Plaintiff,<br><br>          v.<br><br>SIS-JOYCE INTERNATIONAL CO. LTD., et al.,<br><br>                              Defendants. | Case No. CV 12-06972 DMG (JEMx)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

This matter is before the Court on Plaintiffs American Rena International Corp ("Rena"), Wanzhu "Kathryn" Li, and Robert Milliken's Motion for Preliminary Injunction. Plaintiffs seek an injunction requiring Defendants, *inter alia*, to cease using Plaintiffs' protected RENA and RENA BIOTECHNOLOGY marks, to cease use of the "Arena," "aRena," "ARëna," "NEW! ARËNA ACTIVATION ENERGY SERUM" marks (collectively the "Arena marks") and other confusingly similar marks, to cease use of Plaintiff's expressive works on each of Defendants' websites, to cease use of Plaintiffs' likenesses in connection with sales of their products, to cease interfering with Plaintiffs' business, to turn over to the Court remaining stock of their allegedly infringing products, and to post a notice of the Court's requirement that they disassociate

themselves from Plaintiffs' business.  For the reasons set forth below, Plaintiff's Motion is GRANTED.

# I.
## PROCEDURAL HISTORY

On August 13, 2012, Plaintiffs filed a complaint [Doc. # 1] against Defendants Sis-Joyce International Co. Ltd. ("Sis-Joyce"), Alice "Annie" Lin, Virginia Wu, and Does 1 through 50.  On September 11, 2012, Plaintiffs substituted Defendant Robert Simone for the fictitious name "Doe 1."  [Doc. # 22.]  Plaintiffs assert sixteen causes of action: (1) federal trademark infringement under 15 U.S.C. § 1114; (2) common law trademark infringement; (3) trademark cancellation under 15 U.S.C. § 1064; (4) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (5) copyright infringement; (6) violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (7) misappropriation of trade secrets; (8) interference with prospective economic advantage; (9) trade libel; (10) false light; (11) violation of the right of publicity, Cal. Civ. Code § 3344; (12) violation of Cal. Bus. & Prof. Code § 17200 *et seq*.; (13) common law unfair competition; (14) violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964(c); (15) conspiracy to violate RICO, 18 U.S.C. §§ 1962(d) and 1964(c); and (16) unjust enrichment.

On August 22, 2012, Plaintiffs filed a motion for preliminary injunction against Defendants Sis-Joyce, Lin, and Wu.  [Doc. # 8.]  On September 22 2012, Defendants Sis-Joyce and Lin filed an opposition to the motion.  [Doc # 28.]  Defendant Wu has not opposed the motion.  On September 28, 2012, Plaintiffs filed their reply.  [Doc. # 31.]

# II.
## FACTUAL BACKGROUND

**A.    The Parties, Products, and Marks**

Plaintiff Li is the owner and founder of Plaintiff Rena, and Plaintiff Milliken is its chief executive officer.  (Decl. of Wan Zhu "Kathryn" Li ("Li Decl.") ¶¶ 1, 17 [Doc. ## 8-10].)  Rena was incorporated in 2006 and since then has been making and selling

skincare products, such as its Activation Energy Serum, Activation Mist, and Activation Energy Elixir.  (*Id*. ¶ 2.)  Since June 2006, Rena has sold and advertised its products using the registered RENA and RENA BIOTECHNOLOGY marks.  (*Id*. ¶ 6; RENA, Registration No. 85,718,685; RENA BIOTECHNOLOGY, Registration No. 3,332,867.) A stylized version of the latter is shown here:



(Li Decl. ¶ 6.)  Rena uses a variety of distinctive packaging for its products, as shown below:

(*Id*. ¶ 7.)

Defendant Lin is the owner and founder of Defendant Sis-Joyce.  Like Rena, Sis-Joyce also sells skincare products.  These product lines are variously referred to as "Arena" (Decl. of Margaux Cheng in Support of Plaintiffs' Motion for Preliminary Injunction ("Cheng Decl."), Ex. A [Doc. # 8-8]), "aRena" (Li Decl., Ex. C), "ARëna" (Reply Decl. of Sally Zhou ("Zhou Reply Decl.") ¶ 5, Ex. B [Doc. # 31-5]), and "NEW!

ARëna Activation Energy Serum" (Lin Decl. ¶ 7).   In 2010, Lin registered the "Sis-Joyce" and "NEW! ARëna Activation Energy Serum" marks shown below:





(*Id.* ¶ 6-7; SIS-JOYCE, Registration No. 85194681; NEW! ARËNA ACTIVATION ENERGY SERUM, Registration No. 85194674.)   Some Arena products are packaged in similar types of containers as Rena products.   A comparison between the packaging of Rena Activation Energy Serum and NEW! ARëna Activation Energy Serum is shown here (Zhou Reply Decl. ¶ 5, Ex. B):



Rena is organized as a "multi-level sales organization," which enlists "members" to sell products. (*Id.* ¶ 9.)  Low ranking sales agents report to a smaller number of higher ranking members, who in turn report to a smaller number of "leaders," and so on.  (*Id.*)  Sis-Joyce is organized similarly, if not identically.   (*See* Cheng Decl., Exs. A-D)

-4-

1    (referring to "members," members' "customers," and "Top Leader, Annie Lin").
2    Plaintiffs assert that Defendant Lin was, until 2010, a leader of Rena (Li Decl. ¶ 9; Cheng
3    Decl. ¶ 5), but Lin denies this.  (Lin Decl. ¶¶ 21-22.)  Lin states that she merely attended
4    Rena's informational conferences in 2008 and 2009.  (*Id.* ¶ 22.)

5            Defendant Wu was, until 2010, a leader of Rena (Li Decl. ¶ 11) and is currently a
6    member of Sis-Joyce.  (Decl. of Virginia Wu ("Wu Decl.") ¶ 2 [Doc. # 31-4].)  Plaintiffs
7    assert that Wu is a leader of Sis-Joyce, but Lin denies this.  (Lin Decl ¶ 11.)  Wu refers to
8    herself as an "Arena product specialist/instructor" (Cheng Decl., Ex. D), and sells Arena
9    products to customers on behalf of Sis-Joyce.  (*Id.* at Exs. A-D.)  Wu has access to Sis-
10   Joyce's financial information, and has given customers this information in order to make
11   bank deposits.  (*Id.*, Ex. A.)  Defendant Lin denies any contact with Wu in the past two
12   years (Lin Decl. ¶ 11), but Wu states that this is untrue and they have spoken about six
13   times in the past year.  (Wu Decl. ¶ 4)  The record also contains an email Wu forwarded
14   that originated with Annie Lin, dated June 12, 2011.  (Cheng Decl., Ex. D).

15           Lin denies that she has ever used the name "Annie" (*Id.* ¶ 10), and is thus not the
16   same person who corresponded with Wu by email or the person allegedly misleading
17   customers about Rena.  Annie and Alice Lin, however, share the same phone number.
18   (*Compare* Decl. of David W. Quinto in Support of Plaintiff's Opposition to Defendants'
19   Motion to Dismiss or Transfer ("Quinto Decl."), Ex. P [Doc. # 27-1] *and* Decl. of
20   Margaux Cheng in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss or
21   Transfer ("Cheng MTD Decl."), Ex. C (showing Alice and Annie Lin respectively with
22   the same phone number) [Doc. # 27-3]).  They also share the same addresses.  (Decl. of
23   Chris Reynolds in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss or
24   Transfer ("Reynolds MTD Decl.") ¶¶ 10-12 [Doc. # 27-2]).[1]  The Court therefore finds
25   Lin's denials of her use of the alias "Annie" are not credible.

26
27   _____
28   [1] As Mr. Reynolds describes the content of public documents, this evidence would normally be
     excluded as hearsay, *see* Fed. R. Evid. 801, but for the purpose of resolving this motion for preliminary

In 2010, Lin and Wu began watering down Rena products they were selling.  (Li Decl. ¶ 10.)  At the same time, they began manufacturing counterfeit RENA labels to affix to generic bottles.  (*Id.*)  Li terminated both Lin and Wu when she found out about these actions.  (*Id.* at 11.)

Between February and June 2011, Wu sent out emails to members of Rena, stating that a new company called Sis-Joyce had launched selling Rena products.  (Cheng Decl. ¶ 4.)  The emails also stated that Arena was a "new" version of Rena.  (*Id.*)  Rena's member lists are secret, not known to anyone outside the organization.  (Li Decl. ¶ 22.)  In May 2012, one or more Arena salespeople in China told Rena customers that Rena was leaving the Chinese market and licensing all of its products to Arena.  (Decl. of Jingmei Wang ("J. Wang Decl.") ¶ 4 [Doc. # 8-7]; Declaration of Fengjuan Xia ("Xia Decl.) ¶ 4 [Doc. # 8-9].)

**B.    The Websites**

As part of its advertising and product promotion, Rena operates a company website, located at www.americanrena.com.  (Li Decl. ¶ 16.)  Sis-Joyce also operates a website, at www.sisjoyce.com.  (*Id.* ¶ 19.)  Another website, renaforever.com, appears to be controlled by Wu, with the email address virgina4rena@yahoo.com appearing in the copyright notice, and Wu's name appearing as a contact.  (Li Decl. Ex. E at 1055.)  Defendant Robert Simone controls two other websites, renaskin.com and arenaskin.com, both registered under his aliases.  (Quinto Decl., Exs. F, I).

Each of these websites, with the exception of sisjoyce.com, displays Plaintiff's protected marks.  (Li Decl. ¶¶ 17-20, Exs. B-E.)  Each, with the exception of

---

injunction, the Court is not strictly bound by the rules of evidence.  *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984.)  This evidence is not central to the outcome of this motion, but it helps connect Lin and Wu, because "Annie" Lin was named in Wu's email.  (Cheng Decl. Ex. B.)

renaforever.com and sisjoyce.com,[2] also uses some quantity of text identical to that on Plaintiff's website.  Renaskin.com contains a letter from Milliken, as well as a picture of Li and Milliken with the caption, "Who performs research and development[?] Where does manufacturing take place?"  (*Id.* ¶ 17, Ex. B.)  Renaskin.com also receives referrals from advertisements of the YouTube user "tvstripe1," which advertises Rena products before directing customers to renaskin.com.  Renaskin.com and arenaskin.com are currently offline.  (Decl. of Ryan Q. Keech ("Keech Decl.") ¶ 2 [Doc # 31-3]).

Defendant Simone is the owner of the Paypal account associated with renaskin.com.  He has registered with Paypal as "Rena Corp," with the login alias "AMERICANRENA."  (Keech Decl., Ex. C) (Paypal account record).  The email addresses associated with Simone's Paypal account are "renausa1@gmail.com," "robsimonetalks@yahoo.com," and "robmlb@excite.com."  (*Id.*)  Simone received Wu's forwarded emails about the new Arena products (Cheng Decl., Ex. B).  Simone can be found at the phone number registered to Renaskin, in Los Angeles, CA.  (Reynolds MTD Decl. ¶ 9.)  Simone is also known by the aliases David Simms, Damon Roth, and it is likely the alias Damon Rith is a misspelling or alteration of Damon Roth as well.  (Quinto Decl. ¶¶ 6-9, Exs. E-I.)  Simone has not been served with this motion and will not be affected by it.  There is some evidence that Lin is aware of and had some connection with the renaskin.com website, but it is unclear what degree of control she exercised over that website.  (Reply Decl. of Wan Zhu "Kathryn" Li ("Li Reply Decl.") ¶ 4 [Doc. # 31-2].)

Plaintiff employed Chris Reynolds, an experienced private investigator, *inter alia*, to order products from Sis-Joyce and the other allegedly infringing websites.  An order placed at renaskin.com arrived from Sis-Joyce bearing products and brochures with both

---

[2] Li asserts that sisjoyce.com uses copyrighted text, but has offered as evidence only a printout of the entire website, in Chinese, and has not identified any text that has been copied.  There is no other evidence of copied text on sisjoyce.com

1   Sis-Joyce and Rena's marks.  (Reynolds MTD Decl. ¶¶ 8-12.)  Reynolds discovered that

2   "Sis-Joyce is the sole provider" for products sold at renaskin.com.  (*Id.* ¶ 15.)

3   **C.**    **Rena's Financial Trouble**

4       During calendar year 2009, Rena's sales totaled just under $17 million.  (Li Decl.,

5   ¶ 4.)  During calendar year 2010, Rena's sales were approximately $30 million and

6   Rena's revenues exceeded $1 million during each month of the year.  (*Id.*)  By August

7   2011, Rena's sales had decreased to approximately $2.2 million, but that was the last

8   time Rena achieved seven-figure sales.  (*Id.*)  Since then, its monthly sales have steadily

9   declined, dropping to just $271,000 in June of 2012.  (*Id.*)  Li predicts that, absent relief,

10   Rena will be forced to go out of business in the near future.  (*Id.*)

11                                          **III.**

12                          **<u>LEGAL STANDARDS</u>**

13       A plaintiff seeking injunctive relief must show that (1) it is likely to succeed on the

14   merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3)

15   the balance of equities tips in its favor; and (4) an injunction is in the public interest.

16   *Toyo Tire Holdings Of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir.

17   2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365,

18   172 L.Ed.2d 249 (2008)).  An injunction is also appropriate when a plaintiff raises

19   "serious questions going to the merits," demonstrates that "the balance of hardships tips

20   sharply in the plaintiff's favor," and "shows that there is a likelihood of irreparable injury

21   and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*,

22   632 F.3d 1127, 1135 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981,

23   987 (9th Cir. 2008)).  An injunction is an exercise of a court's equitable authority, which

24   should not be invoked as a matter of course, and "only after taking into account all of the

25   circumstances that bear on the need for prospective relief." *Salazar v. Buono*,

26   559 U.S. __, 130 S.Ct. 1803, 1816, 176 L.Ed.2d 634 (2010).

27       A prohibitory injunction does not change the *status quo*, which is "the last

28   uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt*

*Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)).  A mandatory injunction, on the other hand, "goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotations omitted).  Mandatory injunctions should be denied unless the facts and law clearly favor the moving party.  *Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa County,* 550 F.3d 770, 776 (9th Cir. 2008) (citing *Stanley v. University of Southern California,* 13 F.3d 1313, 1320 (9th Cir. 1994)).  Nonetheless, the Court is empowered to grant mandatory injunctions, especially when prohibitory orders may be ineffective or inadequate.  *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1156-57 (9th Cir. 2007).

## IV.

## DISCUSSION

Plaintiffs easily satisfy the requirements for a preliminary injunction.  Moreover, the only substantive argument Defendants Sis-Joyce and Lin make against Plaintiffs' motion is that they do not control renaskin.com or arenaskin.com.  (Decl. of B. Dylan Proctor, Ex. F) [Doc. # 8-2].  They do not attempt to argue that the injunction should not issue as to their conduct or Sis-Joyce's website.

**A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

      **1. Trademark Infringement**

To prove trademark infringement, a plaintiff must prove (1) that it is "the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark."  *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007).

      **a. The Marks are Valid, Strong, and Owned by Rena**

A valid mark must not be generic, and it must not name or describe the product. *Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F.3d 974, 977 (9th Cir. 2010) (quoting *Filipino Yellow Pages Inc. v. Asian Journal Publ'ns Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999)).  A mark that is "arbitrary" or "fanciful" is "inherently distinctive," and not

generic or descriptive.  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1197 (9th Cir. 2009).
RENA and RENA BIOTECHNOLOGY are valid, protectable marks, because they do not
describe any product.  Because the marks are fanciful – that is, they do not have any
dictionary meaning apart from the products with which they are associated – they are
distinctive, strong marks.  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d
1036, 1058 (9th Cir. 1999); *see also Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304
F.3d 936, 943 n.6 (9th Cir. 2002).

Ownership of a mark is determined by priority of use, rather than date of
registration.  *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219, *as modified*, 97
F.3d 1460 (9th Cir. 1996).  Plaintiffs have been using the RENA and RENA
BIOTECHNOLOGY MARKS since 2006.  (Li Decl. ¶ 6.)  Sis-Joyce first incorporated in
2010, and began using the Arena marks at that time.  (Lin Decl. ¶¶ 6-7.)  To the extent
that the marks are confusingly similar such that only one should be in use, that one is
owned by Rena.

### b.  Consumers are Likely to be Confused

The evidence in the record reflects that Sis-Joyce has used the RENA and RENA
BIOTECHNOLOGY marks without permission to advertise and label its own similar
products.  The evidence also reflects customer confusion generated by Sis-Joyce's own
registered marks, on similar and similarly packaged products.  Each of these is likely a
separate infringement.

### i.  Counterfeit Use of Rena's Marks

Defendants have marketed their own products as identical to Rena's.  Customers
have been led to believe that Rena as a company was acquired by Sis-Joyce.  (J. Wang
Decl. ¶ 4; Xia Decl. ¶ 4.)  Packages ordered online, at websites for which Sis-Joyce is the
sole distributor, have arrived bearing Rena's marks.  (Reynolds Decl., Exs. D, E, G, M,
O).  Items bearing both Rena's and Sis-Joyce's marks have arrived in the same package.
(*Id.* ¶ 14.)  In one instance, a single brochure used both company's marks on back to back
pages.  (*Id.*, Ex. G).  There can be no doubt that a consumer would "assume there is an

association between the producers of the related goods, though no such association exists." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 350 (9th Cir. 1979), abrogated on other grounds by *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792 (9th Cir. 2003).

### ii.  Sis-Joyce's Arena Marks are Confusingly Similar

Confusing similarity is an issue of fact.  *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012).  Whether a mark is confusingly similar is determined by the eight-factor "likelihood of confusion" test from the Ninth Circuit's decision in *AMF Inc. v. Sleekcraft Boats*.  *Id.* (citing *Sleekcraft,* 599 F.2d at 348-49). "The eight factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines."  *Id.* These factors "are intended as an adaptable proxy for consumer confusion, not a rote checklist."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011).  "[S]ome factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important," but the relative importance of each individual factor will be case-specific.  *Brookfield Commc'ns*, 174 F.3d at 1054.

As discussed above, Rena's marks are strong.  *Sleekcraft*, 599 F.2d at 348 ("A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be afforded the widest ambit of protection from infringing uses.").

The goods are related, both in substance and in packaging (*see* Zhou Reply Decl., Ex. B) (picture comparison), and Rena and Sis-Joyce are direct competitors, so the goods have high proximity.  *Sleekcraft*, 599 F.2d at 348 ("When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected.")

The Arena marks are similar to Rena's in "sight, sound and meaning." *Sleekcraft*, 599 F.2d, 351.  Only an additional letter is added to the Arena marks, making them visually similar.  In fact, in one version, "aRena," the initial letter is lowercase and the second letter uppercase, further emphasizing the similarity.  The marks are pronounced almost the same, with only an unemphasized initial vowel sound separating them.  The Arena marks are not in any way associated with the English word "arena," a fact made obvious by Sis-Joyce's spelling of ARëna.  Thus the only meaning attributable to Sis-Joyce's Arena marks is the association with Rena's products.

There is evidence of actual consumer confusion.  Sally Zhou thought the products were the same.  (Zhou Reply Decl. ¶ 4 ("Based on the similarity between RENA and ARena . . . I believed . . . that American Rena, including its whole product line, had been acquired by ARena.").)  Margaux Cheng attempted to use Arena products, thinking they were Rena's.  (Cheng Decl. ¶ 9.)[3]

The marketing channels used by Rena and Arena are primarily word-of-mouth, through their leaders and sales force, and their website.  Wu's emails to current Rena members (Cheng Decl. ¶ 4) and the sales agents in China approaching Rena customers (J. Wang Decl. ¶ 4; Xia Decl. ¶ 4) are both uses of the same word-of-mouth marketing channels.  The websites are all at different destinations, but in the Internet context, it is "the simultaneous use of the Web as a marketing channel" that matters.  *Interstellar Starship Services*, 304 F.3d at 942.

Consumers are likely not discerning enough to tell the difference between these two products.  Where, as here, the parties' marks are nearly identical, it "is irrational to expect that even the most sophisticated consumer will exercise the kind of scrupulous

_____

[3] Defendants have submitted several declarations of customers who claim that they were not confused by the similarity of the Rena and Arena products.  (Decl. of Sufeng Lin ¶ 10; Decl. of Joyce Robinson ¶ 10; Decl. of Ariel Wang ¶ 4; Decl. of Haoyue Ou ¶ 5; Decl. of Siyu Lin ¶ 5) [Doc. # 28-3 to -7].)  These declarations, however, to not disprove a "likelihood of confusion" for some customers.  Plaintiffs need not prove that *every* customer was confused, only that there is a likelihood of confusion, which they have established.

1   examination that would enable him or her to discern the difference" between the two
2   product lines.  *Exctropix v. Liberty Livewire Corp*., 178 F. Supp. 2d 1125, 1134 (C.D.
3   Cal. 2001).

4          Defendant's intent in selecting the Arena mark was almost certainly to create
5   consumer confusion.  "This factor favors the plaintiff where the alleged infringer adopted
6   his mark with knowledge, actual or constructive, that it was another's trademark."
7   *Brookfield Commc'ns*, 174 F.3d at 1059.  Lin and Wu were former members of Rena,
8   knew of the product and trademark, and still created a quite similar mark.

9          There is no evidence in the record regarding planned expansion of either Rena or
10  Sis-Joyce's product lines, so this factor is irrelevant.

11         The seven relevant factors *all* point to a likelihood of confusion on the part of
12  consumers, and thus it is likely Plaintiffs will be able to prove trademark infringement.

13  **2.  Copyright Infringement**

14         To establish copyright infringement, a plaintiff must prove two elements:  "(1)
15  ownership of a valid copyright, and (2) copying of constituent elements of the work that
16  are original."  *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir.
17  2012), as amended on denial of reh'g and reh'g *en banc* (June 13, 2012) (quoting *Feist
18  Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358
19  (1991)).  A plaintiff can establish copying by showing that (1) the defendant had access
20  to the plaintiff's work and (2) that the two works are substantially similar.  *Id*. at 846-47.
21  Defendant Wu had access, as did anyone with an Internet connection, to the text and
22  pictures on Rena's website.  Where Wu's website contains precisely the same content
23  (*see* Li Decl, Ex. E), it certainly infringes Rena's copyrights.[4]
24  //
25  //
26
27  ────────────────────
28  [4] This claim applies to the two websites controlled by Simone, but as he is not a party to this
    motion, he cannot be enjoined.

-13-

### 3.  Trade Dress Infringement

"Trade dress protection applies to 'a combination of any elements in which a product is presented to a buyer,' including the shape and design of a product." *Art Attacks Ink, LLC v. MGA Entm't*, 581 F.3d 1138, 1145 (9th Cir. 2009) (citation omitted). "To prove trade dress infringement, a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Id*. (citing *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1005 (9th Cir. 1998)).

A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Disc Golf Ass'n*, 158 F.3d at 1006 .  The bottles used by Rena's Activation Energy Serum are functionally just like any other bottle; their purpose is to hold liquid.  But the distinctive shape and size of and placement of lettering on the bottle are nonfunctional.

"Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages*, 198 F.3d  at 1151.  "To show secondary meaning, a plaintiff must demonstrate a mental recognition in buyers' and potential buyers' minds that products connected with the mark are associated with the same source." *Art Attacks* Ink, 581 F.3d at 1145 (internal quotation omitted).  Here, Plaintiffs submit evidence of the history of marketing their product and that at least one consumer was indeed confused by the similarity in packaging.  (Li Decl. ¶¶ 2, 4; Zhou Reply Decl. ¶ 9.)  The phrase "Activation Energy Serum" appears on both bottles and the shape of the bottles are identical, implying intentional copying.  (Li Decl. ¶ 15; Zhou Reply Decl. ¶ 5, Ex. B.)

The third element of trade dress infringement is discussed above, in connection with the trademark infringement claims.  Consumers are likely to confuse the two

1  products.  Therefore, on the current record, Plaintiffs are likely to prevail on their trade

2  dress infringement claim.

3         **4.  Right of Publicity**

4         "California law has long recognized "the right to profit from the commercial value

5  of one's identity as an aspect of the right of publicity." *Orthopedic Sys., Inc. v. Schlein*,

6  202 Cal. App. 4th 529, 544, 135 Cal. Rptr. 3d 200, 210-11 (2011), review denied (Mar.

7  14, 2012), reh'g denied (Jan. 23, 2012) (internal quotations omitted) .  "There are two

8  vehicles a plaintiff can use to protect his right of publicity:  a common law cause of

9  action for commercial misappropriation and [claim under California Civil Code Section

10 3344]." *Id.*  To prove the common law cause of action, the plaintiff must establish:  "(1)

11 the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or

12 likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4)

13 resulting injury.  To prove the statutory remedy, a plaintiff must present evidence of "all

14 the elements of the common law cause of action" and must also prove "a knowing use by

15 the defendant as well as a direct connection between the alleged use and the commercial

16 purpose." *Id.* (internal quotations omitted).

17        Here, renaskin.com has a picture of Plaintiffs Milliken and Li on its website, as

18 well as a letter from Milliken, with the caption "Who performs research and

19 development[?] Where does manufacturing take place?"  (Li Decl. ¶ 17, Ex. B.)  This is a

20 direct commercial use of Li and Milliken's identity to sell Defendants' products.

21 Defendants do not have permission for such a use.  (*Id.* ¶ 17.)  While it is difficult to

22 isolate the particular injury stemming from this particular use, separate from the rest of

23 Defendants' apparent misconduct, Plaintiffs have already lost business as a result of

24 Defendants' conduct, of which this is a part.  Plaintiffs are thus likely to succeed on the

25 merits of this claim, provided that they can demonstrate the requisite links between

26 Simone and the other defendants such that a clearer picture emerges as to who controls or

27 controlled the renaskin.com website.

28

1  Nonetheless, there is no evidence on the current record that any defendant other

2  than Simone has infringed Plaintiffs' publicity rights.  Because Simone is not a party to

3  this motion, the request for injunctive relief fails as to this claim.

4  **5.  Intentional Interference with Prospective Economic Advantage**

5  The elements of a claim for intentional interference with prospective economic

6  advantage are "(1) the existence of at least one specific economic relationship between

7  plaintiffs and third parties that may economically benefit plaintiffs; (2) knowledge by the

8  defendants of this relationship; (3) intentional and wrongful acts by the defendants

9  designed to disrupt the relationship; (4) actual disruption of the relationship; and (5)

10  proximately caused damages to plaintiffs.  *Korea Supply Co. v. Lockheed Martin Corp.*,

11  29 Cal. 4th 1134, 1163 (2003).  A formal contractual relationship with the third party in

12  question is not necessary, *Envtl. Planning & Info. Council v. Super. Ct.*, 36 Cal. 3d 188,

13  193 (1984), but interference is only actionable if it "was wrongful by some measure

14  beyond the fact of the interference itself."  *Della Penna v. Toyota Motor Sales, U.S.A.,*

15  *Inc.*, 11 Cal. 4th 376, 392-93 (1995).

16  Plaintiffs have cultivated economic relationships with customers and their

17  members, who are not employees, but independent salespeople.  Lin and Wu knew of

18  these relationships, and have been deceiving Plaintiffs' customers, stating that Arena

19  products are Rena replacements and Rena was going out of business.  (Cheng Decl., Exs.

20  A-D (Wu's emails); J. Wang Decl. ¶ 4, Xia Decl. ¶ 4 (salespeoples' deception in China)).

21  Rena has already lost many of the tens of thousands of sales agents it once had.  (Li

22  Decl., ¶ 9.)  The proximately caused damage is reflected in the significant decline in sales

23  and sales force over a relatively short period of time.  (Li Decl. ¶¶ 4, 9)  Therefore,

24  Plaintiffs are likely to succeed on the merits of this claim as well.

25  **B.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction**

26  Plaintiffs will suffer harm to their reputation and goodwill, lose customers, and

27  potentially be put out of business if a preliminary injunction is not granted.  "Evidence of

28  threatened loss of [] customers or goodwill certainly supports a finding of the possibility

-16-

of irreparable harm." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001). "Irreparable injury exists where a court reasonably concludes that continuing infringement will result in loss of control over the plaintiff's reputation and good will." *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035-36 (N.D. Cal. 2009).

Defendants are or have been actively recruiting Plaintiffs' customers. Defendants are also selling a product under the Rena name that customers find does not work as well. (Declaration of Sally Zhou in Support of Plaintiffs' Motion for Preliminary Injunction ("Zhou Decl.") ¶ 6 [Doc. #8-5].) If a customer decides a product no longer works, that customer is unlikely to continue buying the product, and may tell her friends that the product is ineffective. This certainly qualifies as loss of control over Plaintiffs' business reputation. Plaintiff Rena is also threatened with extinction as a result of all of Defendants' unlawful activities. (*See* Li Decl. ¶ 5.) There can be no doubt that the "threat of being driven out of business is sufficient to establish irreparable harm. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).

**C.     The Balance of Hardships Favors Plaintiffs**

Defendant will suffer no unwarranted hardship by the issuance of a preliminary injunction, while the harm to Plaintiffs without one is great. "Where the only hardship that the defendant[s] will suffer is lost profits from an activity which has been shown likely to be infringing," no equitable considerations support defendants. *Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) ("[A] defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities.").

**D.     The Public Interest Favors an Injunction**

The public interest is served in trademark cases by preventing consumer confusion. *Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 993 (9th Cir. 2009). Here, Defendants are attempting to pass off their products as Plaintiffs' and

are deliberately confusing the public.  Therefore, the public interest is strongly served by an injunction.

**E.      A Bond Is Not Required**

Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Notwithstanding the seemingly mandatory language, "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks omitted).  The burden of establishing the amount of bond necessary to secure against the wrongful issuance of an injunction rests with defendants.  *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 724 n.14 (M.D.N.C. 2009) (citing *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  Defendants have not addressed the amount of the bond and have failed to respond to Plaintiffs' contention that no bond is required.  Moreover, such a high likelihood of success on the merits favors a "minimal bond or no bond at all."  *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 amended, 775 F.2d 998 (9th Cir. 1985).

Based on the record before it and Defendants' failure to meet its burden regarding the amount of the bond, the Court waives the requirement of a bond.

**V.**

**CONCLUSION**

In light of the foregoing, Plaintiff's Motion for Preliminary Injunction is **GRANTED** as follows:

1. Defendants Sis-Joyce, Lin, and Wu are enjoined from:

(i)      referencing, mentioning and/or using in any way Plaintiffs' RENA or RENA BIOTECHNOLOGY marks in connection with the sale of products;

-18-

(ii)  referencing, mentioning and/or using in any way the purported Arena marks or any other mark confusingly similar to the RENA or RENA BIOTECHNOLOGY marks in connection with the sale of products;

(iii) selling, advertising, or making any other use of a bottle and/or label that is confusingly similar to Rena's bottles and labels, including the 0.51 ounce bottle currently used by Defendants to sell "ARëna," "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM" products;

(iv) advertising, marketing, or describing "ARëna," "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM" products in any manner likely to mislead consumers as to the source of such products and/or their affiliation with Rena;

(v)  interfering with Rena's relationships with its leaders, members, distributors, customers and marketers, including, without limitation, by contacting Rena's existing leaders, members, distributors, customers and marketers for the purpose of making false or misleading statements or otherwise discussing Rena or its products with such leaders, members, distributors and marketers;

(vi) posting, maintaining, displaying or performing promotional videos or advertisements for genuine RENA products or Defendants' "ARëna," "aRena," "aRENA," and "NEW! ARËNA ACTIVATION ENERGY SERUM" products.

2.  Defendant Wu is further enjoined from copying or reproducing, in whole or in part, any text, photographs, graphics, source code or other copyrighted expression from americanrena.com or from any other Rena work;

3.  Defendants are further required to turn over and deposit with Plaintiffs' counsel all existing products in their possession, custody or control that bear the RENA or RENA BIOTECHNOLOGY marks or any of the Arena marks.

4.  Defendants Lin and Sis-Joyce are further required to: post a notice on the home page of sisjoyce.com, in both English and Chinese, that:

Sis-Joyce and the "ARëna" products formerly sold through this website have no affiliation, and have never had any affiliation, with genuine American Rena products that bear RENA or RENA BIOTECHNOLOGY trademarks.   In order to avoid confusion between those products and those sold by American Rena, Sis-Joyce will no longer sell "ARëna" products.

5.  Defendant Wu is further required to:

(i)     post a notice on the home page of renaforever.com, in both English and Chinese, that:

Sis-Joyce and the "ARëna" products formerly sold through this website have no affiliation, and have never had any affiliation, with genuine American Rena products that bear RENA or RENA BIOTECHNOLOGY trademarks.   In order to avoid confusion between those products and those sold by American Rena, Sis-Joyce will no longer sell "ARëna" products.

(ii)    remove from renaforever.com any copies or reproduction, in whole or in part, any text, photographs, graphics, source code or other copyrighted expression from americanrena.com or from any other any Rena work.

Defendants shall implement this order by October 25, 2012 and shall file a notice of compliance by November 1, 2012.

**IT IS SO ORDERED.**

DATED:     October 15, 2012

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE