1
2
3
4
5
6
7
8       **UNITED STATES DISTRICT COURT**
9       **CENTRAL DISTRICT OF CALIFORNIA**
10

11   AMERICAN RENA INTERNATIONAL          )   Case No. CV 12-6972 FMO (JEMx)
     CORP., et al.,                       )
12                                        )
                     Plaintiffs,          )
13                                        )   **ORDER Re:  MOTION FOR TERMINATING**
                  v.                      )   **SANCTIONS**
14                                        )
     SIS-JOYCE INTERNATIONAL CO.,         )
15   LTD., et al.,                        )
                                          )
16                   Defendants.          )
17   _____  )

18        Having reviewed and considered all the briefing filed with respect to plaintiffs' Renewed

19   Motion for Full Terminating and Other Sanctions ("Motion," Dkt. No. 195), and the oral argument

20   presented to the court, the court concludes as follows.

21                              **BACKGROUND**

22        On August 13, 2012, plaintiffs filed this action against defendants Sis-Joyce International

23   Co. Ltd. ("Sis-Joyce"), Alice "Annie" Lin ("Alice Lin" or "defendant Lin"), Virginia Wu ("Wu"),[1] and

24   Does 1 through 10.  On September 11, 2012, plaintiffs named defendant Robert Simone

25   ("Simone") in place of Doe No. 1.

26

27   _____

28        [1] On January 2, 2013, plaintiffs voluntarily dismissed without prejudice Wu from this action. (See Court's Order of January 16, 2013, Dkt. No. 82).

On March 27, 2013, plaintiffs filed a First Amended Complaint ("FAC," Dkt. No. 108) and substituted Christine "Nina" Ko ("Ko") in place of Doe No. 2.[2]  The FAC asserts 16 causes of action against Sis-Joyce and Alice Lin (collectively, "defendants") for: (1) federal trademark infringement, 15 U.S.C. § 1114; (2) common law trademark infringement; (3) trademark cancellation, 15 U.S.C. § 1064; (4) unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (5) copyright infringement, 17 U.S.C. § 501; (6) violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (7) misappropriation of trade secrets; (8) interference with prospective economic advantage; (9) trade libel; (10) false light; (11) violation of the right of publicity, Cal. Civ. Code § 3344 and common law; (12) violation of California Business & Professions Code §§ 17200, et seq.; (13) common law unfair competition; (14) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964(c); (15) conspiracy to violate RICO, 18 U.S.C. §§ 1962(d) and 1964(c); and (16) unjust enrichment.  (See FAC at ¶¶ 44-148).

On October 15, 2012, the court issued a preliminary injunction enjoining defendants Sis-Joyce, Alice Lin, and Wu from using plaintiffs' protected trademarks and other confusingly similar marks.  (See Court's Order of October 15, 2012, Dkt. No. 45, at 18-20).  In granting the injunction, the court held that plaintiffs were likely to succeed on their claims for trademark infringement, copyright infringement, trade dress infringement, right of publicity, and intentional interference with prospective economic advantage.  (See id. at 9-16).  Defendants appealed the preliminary injunction, and the Ninth Circuit affirmed on July 24, 2013.  See Am. Rena Int'l Corp. v. Sis-Joyce Int'l. Co., 534 Fed.Appx. 633 (9th Cir. 2013).

In its order granting the preliminary injunction, the court noted the well-known rule that "[o]wnership of a mark is determined by priority of use, rather than date of registration."  (Court's Order of October 15, 2012, at 10) (citing Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219, as modified, 97 F.3d 1460 (9th Cir. 1996), cert. denied 521 U.S. 1103 (1997)).  The court reviewed plaintiffs' claim of first use and determined that "Plaintiffs have been using the RENA and

---

[2]  The court granted plaintiffs' Motion for Default Judgment Against Robert Simone and Christine "Nina" Ko on February 14, 2014.  (See Court's Order of February 14, 2014, Dkt. No. 159).

RENA BIOTECHNOLOGY MARKS since 2006[,]" and were the first to use the "confusingly similar" marks at issue. (See Court's Order of October 15, 2012, at 10). Although the question regarding first use of the subject marks was squarely at issue in plaintiffs' preliminary injunction motion, defendants did not raise a first-use defense in opposing the motion. (See, generally, Defendants Sis-Joyce International Co., Ltd. and Alice Lin's Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp'n to Prelim. Inj.," Dkt. No. 28)).

On November 30, 2012, approximately six weeks after the preliminary injunction was issued, defendants alleged for the first time that they were the first to use the trademarks. (See Answer and Counterclaims of Defendants Alice Lin and Sis-Joyce International Co. Ltd., Dkt. No. 69, § III at ¶ 10). Specifically, they alleged that defendant Lin "started using the mark Arëna in 1999[,]" or seven years before plaintiffs began to use the Rena mark in June 2006. (Id.; see also Defendants Sis-Joyce International Co. Ltd. and Alice Lin's Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiffs' First Amended Complaint ("Amended Answer & Counterclaims," Dkt. No. 126) at ¶ 11). Defendants' counterclaims include statutory and common law trademark infringement, trademark cancellation, and trademark libel. (See Amended Answer & Counterclaims at ¶¶ 31-42, 50-56 & 61-66).

On May 31, 2013, plaintiffs filed a Motion for Terminating and Other Sanctions Against Defendants. ("Prior Motion," Dkt. No. 131). Approximately three weeks before plaintiffs filed the Prior Motion, Leon E. Jew ("Jew"), counsel for defendants sought to withdraw as counsel. (See Motion to Withdraw as Counsel for Defendants Sis-Joyce International Co. Ltd., and Alice Lin ("Motion to Withdraw," Dkt. No. 127) at 6 & 7). Jew's request to withdraw was in part based on his belief that his "continued employment will result in violation of the Rules of Professional Conduct," and defendants' "continued defiance of the[ir] counsel's legal advice by refusing to follow it." (Declaration of Leon E. Jew in Support of Ex-Parte Application to Withdraw as Counsel for Defendants Sis-Joyce International Co. Ltd. and Alice Lin ("Jew Motion to Withdraw Decl.," Dkt. No. 115) at ¶¶ 8-9). The court granted Jew's motion to withdraw and denied plaintiffs' Prior Motion without prejudice, so that plaintiffs could confer with Sis-Joyce's new counsel if it were to retain such counsel. (See Court's Order of July 29, 2013, Dkt. No. 155, at 4).

Several months later, after a meet and confer with defendants' new counsel – Ali Kamarei, a partner at InHouse Co. Law Firm ("InHouse") – plaintiffs filed the instant Motion.  Thereafter, defendants filed their opposition, (see Defendants Sis-Joyce International Co., Ltd. and Alice Lin's Opposition to Plaintiffs' Renewed Motion for Full Terminating and Other Sanctions ("Opp'n," Dkt. No. 209), and plaintiffs filed their reply.  (See Reply in Support of Motion for Full Terminating and Other Sanctions ("Reply," Dkt. No. 217)).

Plaintiffs' Motion seeks terminating sanctions against Sis-Joyce and Alice Lin based on their alleged "obstruction of justice, deliberate submission of and reliance upon fabricated evidence to this Court, the United States District Court for the Northern District of California, and the Ninth Circuit Court of Appeals in support of falsified claims and defenses, and the other grounds set forth in" their Motion.  (Notice of Motion, Dkt. No. 195, at 3).  Specifically, plaintiffs request "terminating sanctions and/or default against Sis-Joyce and [Alice] Lin, including by striking their pleadings, terminating their defenses and counterclaims, and . . . granting default judgment against them on plaintiffs' claims."  (Id. at 2).  In the alternative, plaintiffs request that the court "grant[] issue, evidentiary, and instructional sanctions" against defendants.  (Id.).

Plaintiffs' Motion also requested leave to file an application for an award of attorney's fees and costs pursuant to the court's inherent power as well as under 28 U.S.C. § 1927.  (See Motion at 24-25).  During the hearing on the Motion, the court noted that "the issue[s] on plaintiffs' Motion are thoroughly briefed[,]" and the parties' "papers are substantial."  (Transcript of Proceedings, December 12, 2013, Dkt. No. 250, at 3 & 6).  The court explained at the hearing that plaintiffs' request for fees was, in essence, "part of the same Motion[,]" and therefore, rather than grant plaintiffs leave to file a separate motion or application, the court would treat the fees and costs request as part of same motion and rule on "all the requested sanctions together" after receiving supplemental briefing on those issues.  (Id. at 5).  Accordingly, the court issued an order directing the parties to submit supplemental briefing addressing:  "(1) the authority(ies) under which the fees and costs are sought;  (2) the amount of fees and costs sought by plaintiffs and the reasonableness of the requested amounts;  and (3) whether the fees and costs should be assessed against defendants and/or counsel."  (Court's Order of December 13, 2013, Dkt. No.

242).

As part of their supplemental briefing regarding attorney's fees and costs, (see Plaintiffs' Supplemental Memorandum of Points and Authorities in Further Support of Costs and Fees Requested in Renewed Motion for Full Terminating and Other Sanctions ("Suppl. Fees Motion," Dkt. No. 243)), plaintiffs requested that a portion of the fees and costs be assessed, jointly and severally, against defendants as well as InHouse and Ali Kamarei.[3]  (See id. at 1-2).  Defendants filed an opposition to the supplemental briefing, (see Defendants Sis-Joyce and Alice Lin's Supplemental Memorandum Re: Motion for Terminating Sanctions ("Def'ts First Fees Suppl. Opp'n," Dkt. No. 255)), as well as a "corrected" opposition.  (See Corrected Supplemental Memorandum Re: Motion for Terminating Sanctions ("Def'ts Second Fees Suppl. Opp'n," Dkt. No. 263)).

With leave of court, InHouse filed its own brief to address plaintiffs' contentions that the attorney's fees sanctions should also be imposed against InHouse and Ali Kamarei, (see Responding Attorneys' Opposition to Plaintiffs' Brief in Further Support of Costs & Fees Requested in Renewed Motion for Full Terminating and Other Sanctions ("InHouse's Fees Opp'n," Dkt. No. 256)), to which plaintiffs filed a reply.  (See Plaintiffs' Reply in Further Support of Request for Fees in Renewed Motion for Full Terminating and Other Sanctions ("Fees Reply," Dkt. No 261)).

Finally, the parties filed supplemental briefs with respect to defendants' compliance with the preliminary injunction.  (See Plaintiffs' Supplemental Brief in Further Support of Renewed Motion for Full Terminating and Other Sanctions ("Suppl. Motion," Dkt. No. 236); Defendants' Opposition to Plaintiffs' Supplemental Brief in Further Support of Renewed Motion for Full Terminating and Other Sanctions ("Suppl. Opp'n," Dkt. No. 237); Notice of Additional Violations of Preliminary Injunction by Defendants Sis-Joyce International Co., Ltd. and Alice "Annie" Lin ("Notice re Prelim. Inj.," Dkt. No. 274-2); Defendants' Response to Plaintiff's Ex Parte Application ("Prelim. Inj. Opp'n," Dkt. No. 282); Plaintiffs' Reply in Support of Notice of Additional Violations

---

[3]  Plaintiffs did not request sanctions against Jew, defendants' former counsel.

of Injunction Order ("Prelim. Inj. Reply," Dkt. No. 283)).

## **FACTUAL ALLEGATIONS**

Wanzhu "Kathryn" Li ("Li") is the owner and founder of American Rena International Corp. ("Rena") and Robert Milliken ("Milliken") is its chief executive officer (collectively, "plaintiffs"). (See FAC at ¶ 17). Rena makes and sells skin care products, such as Activation Energy Serum, Activation Mist, and Activation Energy Elixir. (See id. at ¶ 18). Plaintiffs allege that since June 2006, Rena "has sold its products using its RENA and RENA BIOTECHNOLOGY trademarks." (Id. at ¶ 17). "It obtained registration of its RENA BIOTECHNOLOGY word mark, No. 3,332,867, in 2007 with a first-use-in-commerce date of February 1, 2007." (Id. at ¶ 19). "The stylized RENA BIOTECHNOLOGY mark, used on all Rena products since June 2006[,]" is as follows:



(Id.). Rena's products, images, graphics, and scientific references are found on its website, www.AmericanRena.com. (See FAC at ¶¶ 28 & 36).

Rena is organized as a "multi-tiered sales organization," which enlists "independent sales agents worldwide" to sell its products. (FAC at ¶ 96). Low ranking sales agents report to a smaller number of higher ranking members, who "have control of more sales personnel than persons in lower tiers enjoy." (Id.).

Plaintiffs allege that defendants Alice Lin, Simone, and Ko are former distributors of Rena products. (See FAC at ¶ 22). Defendant Lin is the owner of defendant Sis-Joyce, which also sells skin care products variously referred to as "ARëna." (See id. at ¶¶ 3 & 11). In 2010, Alice Lin registered the "Sis-Joyce" mark and "NEW! ARëna Activation Energy Serum" mark as shown below:



1    (Id. at ¶¶ 41-42).

2       Plaintiffs allege that around October or November of 2010, they discovered that Alice Lin

3 was "selling adulterated RENA products by applying counterfeited labels that used Rena's

4 protected trademarks to generic spray bottles, which were then filled with diluted RENA products

5 and sold as genuine." (FAC at ¶ 22). Starting in early 2011, Alice Lin allegedly began working

6 with defendants Simone and Ko "to manufacture and sell so-called 'ARëna' products," including

7 distributing materials to promote infringing products. (Id. at ¶ 26). According to plaintiffs, Alice Lin

8 and the other individual defendants "engaged in a coordinated effort to both directly counterfeit

9 genuine Rena products and also pass their [own] products off as 'new Rena' products." (Id. at ¶

10 42). "The infringing products were packaged with the Sis-Joyce logo and labeled 'NEW! ARëna

11 Activation Energy Serum.'" (Id. at ¶ 31). "Further, the packaging used to ship the infringing

12 products bore a stylized Rena mark and included promotional brochures containing variations of

13 plaintiffs' protected RENA and RENA BIOTECHNOLOGY marks." (Id.). Defendants also allegedly

14 sold knock-off "'ARëna Activation Energy Serum' product[s] in a bottle that is identical in size and

15 shape to the distinctive bottle used by [plaintiff] Rena; with a similar color; and with the infringing

16 'ARëna' name and the same 'Activation Energy Serum' description that appears on the genuine

17 RENA product." (Id. at ¶ 40).

18       Plaintiffs allege that defendants "aggressively marketed and sold purported 'ARëna

19 Activation Energy Serum' products . . . designed to cause confusion with genuine Rena products."

20 (FAC at ¶ 42). Defendants' efforts at selling counterfeit "ARëna" products allegedly included the

21 creation and operation of fraudulent and infringing websites. (See id. at ¶ 27). Specifically, with

22 Alice Lin's knowledge or constructive knowledge, defendant "Simone registered the

23 www.RenaSkin.com website through an intermediary or using an assumed name, 'Damon Rith,'

24 in an effort to hide his involvement in the site." (Id.). "On August 14, 2012, defendant Simone

25 purchased private, anonymous domain registration services for www.RenaSkin.com, using the

26 e-mail address renausa1@gmail.com." (Id.). Plaintiffs allege that the website was "carefully

27 crafted to cause maximum confusion with plaintiff Rena's genuine products and [its]

28 AmericanRena.com website." (Id. at ¶ 28). "Virtually every page of [the www.RenaSkin.com] site

ha[d] the following header:  'Genuine American Rena Anti-Aging Activation Serum[,]'" (id.), and "[t]he site display[ed] a photograph of Rena's founder, [] Li, and . . . . [of] . . . Milliken[.]" (Id.).  The www.RenaSkin.com site copied substantially all the designs, graphics, photographs and text of the AmericanRena.com website, including a letter authored by Milliken.  (See id. at ¶¶ 29 & 30).

Simone, with Alice Lin's knowledge or constructive knowledge, registered two other websites – www.ArenaSkin.com and www.American-Rena.com.  (See FAC at ¶¶ 32 & 35).  These two sites contained many of the same infringing representations, such as "copied graphics and text from [plaintiff] Rena's website."  (Id. at ¶ 33; see also id. at ¶¶ 34-36).  Also, Alice Lin allegedly "t[ook] measures to directly trade on the goodwill and popularity of Rena's products in advertisements for their own infringing products."  (Id. at ¶ 37).  "Simone, with the knowledge or constructive knowledge of [Alice Lin], posted YouTube videos that appear to promote genuine RENA products – and display those products, and even Rena's place of business in Los Angeles – but then direct consumers to the bogus RenaSkin.com website that sells defendants' infringing goods."  (Id.) (emphasis in original).

Sis-Joyce and Alice Lin allegedly misappropriated the confidential and trade secret identities of Rena's global sales force, purported to be Rena, and poached a substantial portion of Rena's sales force to work with Sis-Joyce to manufacture and sell so-called "ARёna" products.  (See FAC at ¶¶ 26 & 99).

Plaintiffs allege that "Rena's sales numbers dramatically reveal the effect of Defendants' unfair competition and fraudulent activities."  (FAC at ¶ 43).  In 2009, Rena's sales totaled just under $17 million, and in 2010, its sales were approximately $30 million, with revenues exceeding $1 million each month.  (See id.).  By August 2011, Rena's sales had decreased to approximately $2.2 million, and since then, "its monthly sales have steadily declined, dropping to . . . $271,000 in June of 2012."  (Id.).

## LEGAL STANDARD

"It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."  Chambers v. NASCO, Inc., 501

1   U.S. 32, 43, 111 S.Ct. 2123, 2132 (1991) (internal quotation and alteration marks omitted).  The

2   "courts have inherent power to [enter sanctions] . . . when a party has willfully deceived the court

3   and engaged in conduct utterly inconsistent with the orderly administration of justice." Fjelstad v.

4   Am. Honda Motor Co., Inc., 762 F.2d 1334, 1338 (9th Cir. 1985); see Unigard Sec. Ins. Co. v.

5   Lakewood Eng'g & Mfg. Corp., 982 F.2d 363, 368 (9th Cir.1992) (The "[c]ourts are invested with

6   inherent powers that are 'governed not by rule or statute but by the control necessarily vested in

7   courts to manage their own affairs so as to achieve the orderly and expeditious disposition of

8   cases.'") (quoting Chambers, 501 U.S. at 43, 111 S.Ct. at 2132).  "This inherent power is not

9   limited by overlapping statutes or rules.  The Supreme Court explained 'that the inherent power

10  of a court can be invoked even if procedural rules exist which sanction the same conduct.'" Haeger

11  v. Goodyear Tire & Rubber Co., 793 F.3d 1122, 1131-32 (9th Cir. 2015) (quoting Chambers, 501

12  U.S. at 49, 111 S.Ct. at 2135).

13      In the exercise of its inherent power, a court "may impose sanctions including, where

14  appropriate, default or dismissal." Thompson v. Hous. Auth. of Los Angeles, 782 F.2d 829, 831

15  (9th Cir.), cert. denied 479 U.S. 829 (1986); TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 916

16  (9th Cir. 1987) ("Courts have inherent equitable powers to dismiss actions or enter default

17  judgments[.]").  In deciding whether to impose the "harsh" sanction of either default judgment or

18  dismissal, see Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 482 F.3d 1091, 1096 (9th

19  Cir. 2007) ("A terminating sanction, whether default judgment against a defendant or dismissal of

20  a plaintiff's action, is very severe."), the court considers the following factors:  "(1) the public's

21  interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the

22  risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases

23  on their merits; and (5) the availability of less drastic sanctions." Leon v. IDX Sys. Corp., 464 F.3d

24  951, 958 (9th Cir. 2006) (citing Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337,

25  348 (9th Cir. 1995)).[4]  While the district court need not make explicit findings regarding each of the

26  ─────────────────

27      [4]  There is some question as to whether the five-factor test in Anheuser-Busch applies to

28  sanctions granted under the court's inherent powers.  "Although this five-factor test is usually used to review the propriety of Rule 37 sanctions, this same test was applied in Anheuser-Busch to

9

five factors,[5] a finding of "willfulness, fault, or bad faith" is required for dismissal or default judgment to be proper.  See Leon, 464 F.3d at 958; Anheuser-Busch, 69 F.3d at 348.

## DISCUSSION

I.    EVIDENTIARY OBJECTIONS.

The court will first resolve plaintiffs' evidentiary objections to the Declaration of Annie Lin ("Annie Lin Opp'n Decl.," Dkt. No. 209-3) and the Declaration of Alice Lin ("Alice Lin Opp'n Decl.," Dkt. Nos. 209-4 to 209-12) submitted by defendants in support of their opposition.

A.    Annie Lin Declaration.

The court overrules the objections to the Annie Lin declaration as to paragraphs 5, 8, 10, 20-21, 30, and 31, and sustains the objections as to paragraphs 7, 11, 12, 15-16, 18-19, 22-23, 25-27, 29, and 32 for the reasons stated in the objections, including the objections based on hearsay and relevance.  (See Plaintiffs' Evidentiary Objections to the Declaration of Annie Lin in Support of Defendants' Opposition to Plaintiffs' Motion for Terminating and Other Sanctions ("Evid. Objs. to Annie Lin Opp'n Decl.," Dkt. No. 217-3); Defendants' Opposition to Plaintiffs' Evidentiary Objections to the Declaration of Annie Lin Submitted in Opposition to Plaintiffs' Motion for Terminating Sanctions, Dkt. No. 230).  Also, for the reasons stated in plaintiffs' evidentiary objections, including lack of authentication, the court sustains the objections to exhibits one, two

_____

review sanctions granted under a court's 'inherent power.'"  Leon, 464 F.3d at 958 n. 4.  However, in Haeger, the court did not apply the five-factor test and instead evaluated whether the party's behavior constituted "bad faith" and whether the district court fashioned appropriate sanctions, i.e., whether the district court abused its discretion in imposing the challenged sanctions.  See 793 F.3d at 1132-41.  It may be that the reason the Haeger court did not apply the five-factor test is because the sanctionable conduct (e.g., failure to disclose evidence during discovery) was discovered after the case closed and thus many of the five factors were irrelevant.  Nevertheless, the court will, out of an abundance of caution, apply the five-factor test set forth in Anheuser-Busch.

[5]    Although the five-factor test is frequently referred to as the "'Malone factors,' probably because [the Ninth Circuit's] opinion in [Malone v. U.S. Postal Serv., 833 F.2d 128, 130-34 (9th Cir. 1987), cert. denied 488 U.S. 819 (1988)] provides a comprehensive discussion of them," In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 460 F.3d 1217, 1234 n. 11 (9th Cir. 2006), the court will refer to them as the Anheuser-Busch factors since it was that court that applied the Malone factors to review sanctions granted under a court's inherent powers.  See 69 F.3d at 348.

1  and three, attached to the Annie Lin declaration, (see Evid. Objs. to Annie Lin Opp'n Decl. at 10-

2  12), and accordingly strikes them from the record.

3      B.     Alice Lin Declaration.

4      The court overrules the objections as to paragraphs 2-8, 14, and 18-20, to the Alice Lin

5  declaration.  However, the objections as to paragraphs 9-12, 15, 28, and 29, are sustained for the

6  reasons stated in the objections, including the objections based on hearsay and relevance.  (See

7  Plaintiffs' Evidentiary Objections to the Declaration of Alice Lin in Support of Defendants'

8  Opposition to Plaintiffs' Motion for Terminating and Other Sanctions ("Evid. Objs. to Alice Lin

9  Opp'n Decl.," Dkt. No. 217-2); Defendants' Opposition to Plaintiffs' Evidentiary Objections to the

10  Declaration of Alice Lin Submitted in Opposition to Plaintiffs' Motion for Terminating Sanctions

11  ("Resp. to Evid. Objs. to Alice Lin Opp'n Decl.," Dkt. No. 229)).

12      In addition, paragraph 29 is stricken based on the principles of the sham affidavit rule.  "The

13  general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit

14  contradicting his prior deposition testimony."  See Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir.

15  2012), cert. denied 133 S.Ct. 2026 (2013).  Here, Alice Lin submitted a declaration that directly

16  contradicts information she gave in previous deposition testimony.  (Compare Alice Lin Opp'n

17  Decl. at ¶ 29) ("I did not draft the declarations themselves, do not know how the signatures were

18  obtained, and did not know whether they were falsified.") with (Declaration of Ryan Q. Keech in

19  Support Thereof Plaintiffs' Reply in Support of Renewed Motion for Full Terminating and Other

20  Sanctions ("Keech Reply Decl.," Dkt. No. 217-1), Exh. B ("Alice Lin Oct. 2013, Dep.," Dkt. No. 223-

21  2)) at 280-81 & 286 (explaining how she obtained the declarations and stating that she "called

22  [her] sister up on the phone [and] told her how to write it.")).  Thus, paragraph 29 is stricken, as

23  the court finds that paragraph 29 is a sham produced merely to attempt to create a disputed issue

24  of fact.  See Yeager, 693 F.3d at 1080 ("In order to trigger the sham affidavit rule, the district court

25  must make a factual determination that the contradiction is a sham, and the inconsistency between

26  a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify

27  striking the affidavit.") (internal quotation marks omitted).  Also, based on the reasons stated in

28  plaintiffs' evidentiary objections, including lack of authentication, the court sustains the objections

1  to exhibits one through six, attached to the Alice Lin declaration, (see Evid. Objs. to Alice Lin

2  Opp'n Decl. at 9-13), and strikes them from the record.

3  II.    MOTION FOR TERMINATING SANCTIONS.

4          The primary causes of action underlying plaintiffs' suit against defendants are based on

5  trademark infringement.  (See FAC at ¶¶ 44-80).  It is undisputed that plaintiffs registered the

6  RENA BIOTECHNOLOGY mark with a first-use-in-commerce date of February 1, 2007, (see id.

7  at ¶ 19; Amended Answer & Counterclaims at ¶ 19), before Lin registered the "NEW! ARëna

8  Activation Energy Serum" mark in 2010.  (Court's Order of October 15, 2012, at 4).  Because

9  "ownership of a mark is determined by priority of use[,]" (id. at 10), defendants' purported priority-

10  of-use defense is critical to this case.

11          The crux of plaintiffs' Motion is that "Sis-Joyce's claim of seniority, and the evidence that

12  it has proffered to support it, have been fabricated[,]" (Motion at 2), thus warranting terminating

13  sanctions. Specifically, plaintiffs assert that defendants: (1) fabricated and filed three declarations

14  in an attempt to show defendants' first use of the trademarks at issue, (see id. at 6-9 & 11-15); and

15  (2) obstructed justice when defendants fabricated documents in an attempt to prevent one of

16  defendants' witnesses from attending a deposition noticed by plaintiffs – even after a judge from

17  the Northern District of California issued an order holding the witness in contempt. (See id. at 9-

18  15).

19          A.    Litigation Misconduct.

20              1.    **False and Fabricated Declarations**.

21          Plaintiffs assert that defendants falsified declarations bearing the signatures of Jess Chen

22  ("Chen"), Amy Luong ("Luong"), and Alice Win ("Win"), (see Motion at 7-9 & 11-12), and that

23  defendants committed fraud on the court when they filed those declarations in this court and the

24  Ninth Circuit Court of Appeals, in support of their appeal of the court's preliminary injunction. (See

25  id. at 6-7).  Plaintiffs assert that their investigation shows that defendants falsified and/or

26  fraudulently procured the declarations and then filed them with the courts. (See id. at 7-9 & 11-

27  12).

28

1   All three declarations[6] are typewritten on non-legal pleading paper, and have only seven

2   to eight lines each, generally consisting of:  the name of the declarant, the year in which they

3   allegedly purchased ARёna products, an "under penalty of perjury" declaration, and the date and

4   location of execution, followed by a signature.  (See Declaration of Ryan Q. Keech in Support of

5   Plaintiffs' Motion for Terminating Sanctions ("Keech Prior Motion Decl.," Dkt. No. 131-1), at Exh.

6   E ("Alice Win Decl."); Exh. F ("Jess Chen Decl.") & Exh. G ("Amy Luong Decl.")).

7   Defendants first filed the three declarations on February 20, 2013, as part of their

8   supplemental excerpts of record in the Ninth Circuit Court of Appeals in support of their appeal of

9   the preliminary injunction.  See Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co. Ltd., Case No. 12-57169

10   (9th Cir. 2012) ("Appeal") (Dkt. No. 22) (filing paper copies of the supplemental excerpts of

11   record).  Having not raised a first-use defense in opposing plaintiffs' motion for preliminary

12   injunction, (see, generally, Opp'n to Prelim. Inj.), defendants argued on appeal for the first time

13   that "Lin began to use ARёna as her trademark long before Rena was incepted."  Appeal

14   (Appellants' Opening Brief, Dkt. No. 7, at 12).  Defendants affirmatively represented to the Ninth

15   Circuit that the Chen, Luong, and Win declarations are "from ARёna users and salon owners in

16   California who state that they used ARёna as far back as 2000, 2002, and 2003."  Id. (Appellants'

17   Reply Br., Dkt. No. 21, at 9).

18   Plaintiffs assert, and defendants do not deny, that defendants agreed to withdraw the

19   declarations from the Ninth Circuit only after plaintiffs "threatened motion practice" regarding the

20   improperly filed declarations in defendants' supplemental excerpts of record ("ASER").  (See

21   Keech Prior Motion Decl. at ¶ 7 & Exh. I; Motion at 6 n. 2; see, generally, Opp'n.).  On February

22   22, 2013, defendants filed a motion to file a substitute or corrected reply brief and supplemental

23

24   _____

   [6]   Because defendants nowhere argue or provide evidence challenging the authenticity of
25   plaintiffs' evidence, particularly the falsified evidence at issue (i.e., the Chen, Luong, and Win
   declarations, and the Luong letters), (see, generally, Opp'n.), the court finds that an evidentiary
26   hearing is not necessary.  See Prof'l Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council,
   Inc., 727 F.2d 1470, 1472-73 (9th Cir. 1984) (no abuse of discretion in ordering sanctions without
27   an evidentiary hearing where district court ruled such a hearing was unnecessary; party did not
   contest the authenticity of falsified evidence, and district court made findings of fact on the record
28   when ordering sanctions).

excerpts of record, in which they stated that defendants' "counsel inadvertently included . . . new evidence to the [ASER], and now request that the new evidence be removed from the ASER." Appeal (Motion to File Substitute or Corrected Reply Brief and Supplemental Excerpts of Record, Dkt. No. 24-1, at ¶ 5). Specifically, defendants sought, and were granted leave to remove evidence of and references to "Jess Chen's Declaration (02/17/13)[;] Amy Luong's Declaration (02/15/13)[; . . . and] Alice Win's Declaration (11/19/12)." (Id. at ¶ 6).

Defendants also filed the three declarations in multiple filings in this court. For example, in their opposition to plaintiffs' motion to dismiss defendants' counterclaims, defendants relied on the three declarations to support their argument that "Lin had been using the common law mark ARёna before Rena's inception." (Defendants' Memorandum in Opposition to Motion to Dismiss Counterclaims ("Opp'n to Motion to Dismiss Counterclaims," Dkt. No. 97) at 9; see Declaration of Steven Tran in Support of Defendants' Opposition to Plaintiffs' Motion to Dismiss Counterclaims, Dkt. No. 97-1 at Exh. 1 (Amy Luong Decl., Dkt. No. 97-2), Exh. 2 (Jess Chen Decl., Dkt. No. 97-3) & Exh. 3 at 14 (Alice Win Decl., Dkt. No. 98-1)).

Defendants also relied on the Luong, Chen, and Win declarations to assert an affirmative defense of justification and privilege. (See Amended Answer & Counterclaims at p. 36). Defendants asserted that they "were justified and privileged. . . when they established prior use dating back to the years 1999 and 2000." (Id.) (citing Amy Luong Decl. and Jess Chen Decl.).

Defendants also opposed plaintiffs' ex parte application to depose Amy Luong by contending that "Ms. Luong has stated in her declaration (Exhibit D) and in her letters to the Court that she simply purchased my product and had nothing further to add." (Defendant Alice Lin's Opposition to Plaintiffs' Ex Parte Application for Leave to Take the Deposition of Amy Huynh Luong After the Discovery Cut-Off ("Opp'n to Taking Luong's Deposition," Dkt. No. 168), at 4 & Exh. D). Defendant Lin, in support of defendants' argument that the court should not permit plaintiffs to depose Luong after the discovery deadline, attached and repeated the false allegations contained in the Luong declaration and two letters that defendants had Luong sign that claimed that plaintiffs' counsel threatened and harassed Luong. (See id. at ¶¶ 2-4 & Exhs. B, C & D); see infra at §§ II.A.1.c & II.A.2.

1    Although defendants claim that they have no intention to rely on the declarations any further

2    in this court, (see Opp'n at 18), they have never formally withdrawn the declarations as they did

3    before the Ninth Circuit.

4                          a.    *Declaration of Alice Win.*

5            The declaration of Alice Win states the following: (1) "I am a resident of Union City,

6    California;" (2) "I am the owner of City Salon in Union City, California.  I have owned City Salon

7    since it opened in the year 2000;" and (3) "I purchased ARëna products from Sis-Joyce in . . .

8    2000." (Alice Win Decl.).  The declaration indicates that it was executed on November 19, 2012,

9    in San Jose, California, and bears a signature over the typed signature line.  (See id.).

10           Plaintiffs retained the services of a private investigator, whose investigation determined that

11   "there is no person named 'Alice Win' who lives in or around Union City, California, and no person

12   who has recently lived in or around Union City, California, who goes by that name."  (Declaration

13   of Chris Reynolds in Support of Plaintiffs' Motion for Terminating Sanctions ("Reynolds Decl.," Dkt.

14   No. 131-2) at ¶ 9).  The investigator also determined that "there is no 'Alice Win' who has been

15   associated in any way with 'City Salon' in Union City, California."  (Id. at ¶ 10).  According to the

16   investigator, county records indicate that the only "City Salon" in Alameda County, where Union

17   City is located, is owned by a man named Phong Le, and was previously owned by Quan Van

18   Hoang and Thuong Thi Hoang.  (See id. at ¶ 11).  Moreover, "[n]o person named 'Alice Win' is

19   licensed by the California State Board of Barbering and Cosmetology, which one would require

20   to operate a business" like City Salon.  (Id. at ¶ 10).

21           After producing the Alice Win declaration, defendants took great efforts to prevent plaintiffs

22   from contacting, locating or otherwise conducting discovery as to Alice Win.  For example,

23   defendant Lin asserted in her declaration:  "I will not [find Alice Win] for Quinn.  We are not

24   required to construct their case.  I will not provide Alice Win's privileged third party private and

25   confidential information."  (Declaration of Alice Lin in Support of Defendants' Opposition to

26   Plaintiffs' Notice of Motion and Motion for Terminating and Other Sanctions ("Alice Lin Prior Opp'n

27   Decl.," Dkt. No. 140-2) at ¶ 6).  At a telephonic meet and confer, defendants' former counsel

28   echoed his clients' statements that defendants "refuse[] to release the detailed contact

1   information" for Alice Win and "do[] not want to release the contact information for Alice Win."[7]

2   (Keech Prior Motion Decl., Exh. B at 7 & 8) (transcript of May 13, 2013, telephonic meet and

3   confer). Further, although the Win declaration is dated November 19, 2012, defendant Lin testified

4   approximately two months later that she could not identify "anyone who could verify" defendants'

5   prior use defense. (Keech Reply Decl., Exh. A ("Alice Lin Jan. 2013 Dep.") at 115) (Q. "Can you

6   give me the name of anyone who could verify that the beauty liquid was sold under the ARёna

7   brand either at the store or at swap meets before 2010?"  A. "I cannot think of any name at this

8   point.  But do not worry, because I will provide such information to the Court at a later date.").

9         In their Opposition, defendants make several arguments in an attempt to explain the Alice

10  Win declaration.  First, defendants claim that on October 14, 2013, Alice Lin received a call from

11  Alice Win, who was in Beijing and could be contacted at the phone number 011 86 13521325272.

12  (See Opp'n at 8; Def'ts Second Fees Suppl. Opp'n at 7).  Counsel for defendants go so far as to

13  claim that they "employed an independent English Chinese Translator Interpreter," dialed the

14  phone number and spoke with Alice Win for 22 minutes, who confirmed that "she signed the

15  declaration," "had been a resident of Union City and the owner of City Salon," and "did use ARёna

16  products and did provide them to other people in the year 2000." (See Def'ts Second Fees Suppl.

17  Opp'n at 8).

18        Defendants' claim strains credulity.  Defendants first provided the phone number to plaintiffs

19  and this court in their Opposition, giving plaintiffs no opportunity to verify whether the phone

20  number belongs to the same Alice Win that purportedly submitted the Alice Win declaration.

21  Defendants never explain why they did not provide plaintiffs with Alice Win's phone number prior

22  to the filing of the instant Opposition or why they made no attempt to contact Alice Win when they

23  filed their opposition to the Prior Motion.  (See, generally, Opp'n).  Also, given the content of "Alice

24  _____

25        [7] Of course, defendant Lin misunderstands her obligations under the Federal Rules of Civil
    Procedure.  Defendant Lin was obligated to provide the contact information for Alice Win.  See
26  Fed. R. Civ. P. 26(a)(1) ("a party must, without awaiting a discovery request, provide to the other
    parties:  (i) the name and, if known, the address and telephone number of each individual likely
27  to have discoverable information – along with the subjects of that information – that the disclosing
    party may use to support its claims or defenses, unless the use would be solely for
28  impeachment").

Win's" 22-minute conversation – namely, her affirmation of the veracity of the contents of the Win declaration – and the fact that defendants believed it was necessary to retain an interpreter for the phone call, defendants never explain why they did not submit another declaration from Alice Win. (See, generally, Opp'n & Alice Win Decl.).   In any event, defendants' willingness to submit an inadmissable hearsay declaration from their interpreter, see infra at § III. (striking statements by Howard Huang), rather than submit another (potentially fraudulent) declaration from Alice Win suggests that this may be yet another attempt by defendants to save their first-use affirmative defense.

If, based on defendants' phone call with Alice Win, the Alice Win declaration at issue was valid and accurate, then defendants would not need to distance themselves from the declaration – essentially conceding that the Win declaration is fraudulent – by contending that they never "authorized or instructed anyone acting under their authority or on their behalf to fabricate information or to obtain false signatures on declarations." (Opp'n at 2 & 24; see Alice Lin Opp'n Decl. at ¶ 5).  If defendants never authorized or instructed anyone to obtain false signatures or declarations, then why did defendants file declarations with the court they never authorized? Surely, even a "simple person [such as Alice Lin] who has a very limited ability to speak and understand English," (Opp'n at 1), knows that submitting false evidence to a court is wrong.

Finally, somewhat contradictorily, defendants attempt to shift responsibility for obtaining the Alice Win declaration onto Annie Lin, who is claimed to be defendant Alice Lin's sister[8] and a Sis-

---

[8] Defendants contend that plaintiffs have fraudulently asserted that Alice Lin and Annie Lin are one and the same.  (Def'ts Second Fees Suppl. Opp'n at 10 n. 2 (claiming plaintiffs "cannot ethically perpetuate a fraud upon the Court by pretending that a person, a witness, does not exist.").  Defendants' contention is utterly meritless.  The original Complaint named Alice "Annie" Lin as a defendant.  (See Complaint, Dkt. No. 1).  In the court's preliminary injunction order, the court noted that Alice Lin "denie[d] that she has ever used the name 'Annie,'" despite the fact that Annie and Alice Lin "share the same phone number," and "the same addresses." (Court's Order of October 15, 2012, at 5).  Alice Lin did not clarify in her opposition to the motion for preliminary injunction that Annie Lin was her sister and/or a Sis-Joyce employee. (See, generally, Opp'n to Prelim. Inj.).  Also, at her January 11, 2013 deposition, when asked about a Fremont, California address that Alice and Annie may have shared, Alice Lin testified that she owned a residential rental property in Fremont that had "at least seven" renters, but was not sure if any of the renters were named "Annie Lin." (See Alice Lin Jan. 2013 Dep. at 18-19).  Again, Alice Lin did not clarify

1  Joyce employee.  (See Alice Lin Oct. 2013, Dep. at 187-89 (Alice Lin testifying Annie Lin is her

2  sister) & 237-38 (Lin testifying that Annie Lin works for Sis-Joyce as a part-time employee).

3  Specifically, defendants assert that "[they] did not draft the declarations themselves[,]" and that

4  "Annie prepared and obtained the declarations . . . and provided them to Alice and Sis-Joyce."

5  (Opp'n at 22).  Defendants' assertions are plainly meritless and contradict their prior statements.

6      Much of Annie Lin's declaration was stricken, especially as it relates to any statements

7  made to her by the alleged Alice Win.  See supra at § I.  Further, even assuming the court

8  considered the stricken portions of Annie Lin's declaration, the result would not change.[9]  Alice Lin

9  admits that Annie Lin is an agent of Sis-Joyce, (see Alice Lin Oct. 2013, Dep. at 237-38), and has

10  not been terminated or reprimanded for any conduct as a Sis-Joyce employee.  (See id. at 238)

11  (Q. "Have you ever fired or terminated the employment of your sister with Sis-Joyce?"  A. "No."

12  Q. "Have you ever reprimanded your sister for anything that she's done while working for

13  Sis-Joyce?"  A. "No.").  Thus, even assuming that Annie Lin was solely responsible for the alleged

14  misconduct – which she is not – the evidence is clear that she committed the acts that are the

15  subject of the Motion as an agent of defendants.  See Holley v. Crank, 400 F.3d 667, 673 (9th Cir.

16  _____

17  that Annie was her sister or a Sis-Joyce employee.

18      It was only at her October 30, 2013, deposition that Alice Lin testified that she had a sister
19  named Annie Lin, whose Taiwanese name is Ah Yu and Chinese name is Szuyu.  (See Alice Lin
   Oct. 2013 Dep. at 187-188).  Although Alice Lin claims that she refers to Annie by her Taiwanese
20  name, Alice Lin also admitted that she has known that her sister had used the English name
   "Annie" for more than ten years.  (See id. at 189) (Q. "Was it more than ten years ago that your
21  sister went by the name Annie?"  A. "Yes.").  In short, defendants knew there was confusion on
   the part of plaintiffs as to whether Alice Lin and Annie Lin were the same person and did nothing
22  to clarify the matter.

23      [9]  The portion of Annie Lin's declaration that is admissible adds little, if anything, to the
   discussion.  For example, Annie Lin attests that she met Alice Win in 1999 at an adult language
24  school, (see Annie Lin Opp'n Decl. at ¶ 20), and "[i]n 2002 . . . [they] attended Fremont Beauty
   College" together.  (Id. at ¶ 4).  According to Annie Lin, "[i]n or around November 2012, [she]
25  called Ms. Win and asked her whether she remembered ever using or purchasing [her] sister's
   ARёna products."  (Id. at ¶ 21).  Annie Lin states that she "prepared Ms. Win's declaration in
26  Chinese and translated the declaration into English with a computer program."  (Id. at ¶ 24).
   However, conspicuously missing is any indication of when and how the signature on the Win
27  declaration was obtained.  (See, generally, Opp'n; Annie Lin Opp'n Decl.; Alice Lin Opp'n Decl.).

28

1   2004) ("Principals are liable for the torts of their agents committed within the scope of their

2   agency.").

3        In any event, the uncontradicted evidence indicates that defendant Lin is responsible for

4   creating the fabricated Win declaration.   When asked about all three declarations at her

5   deposition, including the Win declaration, Alice Lin testified:  "I wrote them down in Chinese.  And

6   then essentially my sister translated them through Google or some sort of Hong Kong translation

7   software.  And then after they were translated, then my sister [Annie] typed them up." (Alice Lin

8   Oct. 2013 Dep. at 281).  When asked by plaintiffs' counsel, "Ms. Lin, is it true that in conjunction

9   with your sister, you wrote these three declarations that are marked as Exhibits 68 [Win

10  declaration], 69 [Chen declaration], and 70 [Luong declaration]?" (see id. at 284), Alice Lin

11  responded in the affirmative.  She testified, "Yes.  My sister typed these documents up and went

12  to get their signatures." (Id.) (emphasis added).  When Alice Lin was asked whether it was true

13  that "[she] originally wrote these [declarations] in Chinese[,]" Alice Lin responded:  "I called my

14  sister up on the phone, [and] I told her how to write it.  So my sister wrote it in Chinese, then later

15  on it was translated into English." (Id. at 286) (emphasis added).  Thus, Alice Lin's own testimony

16  proves that she instructed her employee, Annie Lin, how to draft the Win declaration, and Alice

17  Lin and/or Annie Lin wrote it in Chinese, before Annie Lin translated it into English.

18        In short, the court finds that the evidence is clear and convincing that the fraudulent Win

19  declaration was created personally and/or at the direction of, defendant Lin and that the

20  declaration was filed both in this court and the Ninth Circuit with the intent that the courts rely on

21  the false declaration.  Further, defendants' refusal to provide plaintiffs with any contact information

22  for Win, their own witness, constitutes a violation of their discovery obligations and also supports

23  the conclusion that defendants attempted to conceal the fraudulent nature of the Win declaration.

24                b.    Declaration of Jess Chen.

25        The declaration of Jess Chen states the following: (1) "I am a resident of Fremont,

26  California;" (2) "I am the owner of Little Scissors Salon in Fremont, California.  I have owned Little

27  Scissors Salon since it opened in 2003;" and (3) "I purchased ARëna products from Sis-Joyce in

28  the year 2003." (Chen Decl.).  The declaration indicates that it was executed on February 17,

2013, in Fremont, California, and bears a signature over the typed signature line.  (See id.).

After serving a subpoena for "Ping Xu, AKA Jess Chen[,]" plaintiffs took the deposition of Ping Xu ("Xu") on May 1, 2013.  (See Keech Prior Motion Decl. at Exh. J ("Xu Dep.")).  Xu testified that her full name is Ping Xu, and she sometimes uses the name Jessie.  (See id. at 5).  Xu also clarified that her husband's last name is Chen.  (See id. at 27) (Q. "[Y]our familiar name with clients and whatnot is Jessie. Right?"  A. "Jessie, yeah."  Q. "And you don't go by the last name Chen.  Correct?"  A. "No."  Q. "But your husband does go by the last name Chen?"  A. "Yeah.").  Xu testified that although she and her husband co-own Little Scissors Salon, (see id. at 11), she does not go by "Jessie Chen," or "Jess Chen," but rather "Jessie Xu."  (See id. at 12) (Q. "And so you go by Jessie?"  A. "Yeah, Jessie.  If I sign, I will sign Jessie Xu.  I never sign Jessie Chen.");  (see also id. at 25) (Q. "But you also go by Jessie.  Right?"  A. "Jessie, but Jessie – never Jessie Chen.").  Xu further testified that, while she is the owner of Little Scissors Salon, it is a children's hair salon and has been a children's hair salon since it opened in 2003, (see id. at 10), and as such, Xu and Little Scissors Salon do not sell any skin care products such as those sold by the parties.  (See id. at 23) ("I don't have this product.  This product is for facial something?  I have no idea what kind of product, because I don't do the facial anything in the shop.").

After being presented with the Chen declaration, Xu responded that she had never before seen the declaration and that she did not sign it.  (See Xu Dep. at 16-19) (Q. "You never signed this document, did you?"  A. "No, I never saw that."  Q. "And you've never seen this document before you received the subpoena in this case.  Correct?"  A. "Yeah, I never see this before."  Q. "Is that your signature?"  A. "No.  It's totally no, not my signature").  As to the assertion in the Chen declaration stating that Chen "purchased ARëna products from Sis-Joyce in the year 2003[,]" (Chen Decl.), Xu testified that she "never purchased anything from Sis-Joyce[,]" (Xu Dep. at 20), and had never purchased or even seen any product called ARëna or Rena.  (See Xu Dep. at 21-23 & 26).  During her deposition, Xu repeatedly denied ever signing the Chen declaration.  (See id. at 21-22).  She further testified that she has never met a person named Alice Lin, (see id. at 22-23), and that the Chen declaration is "totally fake."  (See id. at 24) (Q. "And so this document, Exhibit 43, which purports to be a document that you have signed 2 months ago under penalty of

1  perjury, is a fake document?"  A. "Yes, fake.  It's totally fake.  I – not my signature.  Okay?").

2       Defendants do not deny the Chen declaration is false or otherwise present any admissible

3  evidence that it is not.  (See, generally, Opp'n.).  Instead, they assert that "[n]either Alice nor Annie

4  have ever met Ms. Chen[,]" (Opp'n at 8; see Alice Lin Opp'n Decl. at ¶ 16; Annie Lin Opp'n Decl.

5  at ¶ 28), and that the non-existent "Alice Win" was responsible for obtaining the Chen declaration.

6  (See Opp'n at 8; Annie Lin Opp'n Decl. at ¶ 31 ("I gave Ms. Win the document to be signed by Ms.

7  Chen, and received a signed version back shortly thereafter.")).  Again, defendants assert that

8  they did not authorize or instruct anyone acting under their authority or on their behalf to fabricate

9  information or to obtain false signatures on the declarations.  (See Opp'n at 8).  Defendants further

10  state that they were not present when Xu's signature was obtained.  (See id.).

11       Defendants' assertions beg the question as to why they would submit declarations that they

12  allegedly neither authorized nor witnessed.  Further, their belated and incredulous assertions are

13  belied by the evidence that defendant Lin along with Annie Lin personally helped draft and/or

14  prepare the Chen declaration.  See supra at § II.A.1.b.  Indeed, defendants' own evidence

15  indicates that "per Alice's instructions," "[Annie Lin] prepared Ms. Chen's declaration in Chinese

16  and translated it into English with a computer program." (Annie Lin Opp'n Decl. at ¶ 30) (emphasis

17  added).  Finally, even assuming "Alice Win" does exist – which she does not – and that she was

18  responsible for obtaining the declaration, she would have been acting on behalf of defendants, just

19  as Annie Lin did, in procuring evidence to aid in their defense.  See, e.g., Am. Soc'y of Mechanical

20  Eng'rs. Inc. v. Hydrolevel Corp., 456 U.S. 556, 565-66, 102 S.Ct. 1935, 1942 (1982) ("[U]nder

21  general rules of agency law, principals are liable when their agents act with apparent authority and

22  commit torts").

23       In short, the court finds that the evidence is clear and convincing that the fraudulent Chen

24  declaration was created personally and/or at the direction of, defendant Lin and that the

25  declaration was filed both in this court and the Ninth Circuit with the intent that the courts rely on

26  the false declaration.

27

28

c.    *Declaration of Amy Luong.*

The declaration of Amy Luong states the following: (1) "I am a resident of San Jose, California;" (2) "I purchased ARëna products from Sis-Joyce in the year 2002 for personal use[;]" and (3) "I was completely satisfied with the product." (Luong Decl.).  The declaration indicates that it was executed on February 15, 2013, in San Jose, California, and bears a signature over the typed signature line.  (See id.).

After being held in contempt by a judge from the Northern District of California for refusing to appear for her deposition for five months, see infra at § II.A.2, Luong finally appeared for her deposition on September 5, 2013.  Luong appeared with her own counsel, and provided testimony in Cantonese, her primary language, through an interpreter.  (See Declaration of Ryan Q. Keech ("Keech Motion Decl.," Dkt. No. 195-1) at Exh. B ("Luong Dep.")).

Luong testified that she met Annie Lin in 2002 in cosmetology school.  (See Luong Dep. at 11).  After plaintiffs' counsel showed Luong her declaration of February 15, 2013, she affirmed that she personally signed the declaration after Annie Lin provided it to her.  (See id. at 12).  According to Luong, Annie Lin requested that they meet at the parking lot of an Asian grocery store in San Jose, California.  (See id. at 13-14).  When they met, Annie Lin presented the declaration to her, (see id.), which they discussed in Mandarin, although Luong's primary dialect is Cantonese.  (See id. at 7 (Q. "And what is your native language?"  A. "Cantonese.") & 16 (Q. "When you were speaking to Annie Lin, in what language were you speaking?"  A. "A little bit Mandarin.  Basically my Mandarin is not that good."  Q. "Does Amy [sic] Lin, to your knowledge, speak Cantonese?"  A. "She does not speak Cantonese.")).  Luong testified: "We were standing in the parking lot of Lion's market, and I asked her why did I have to sign this document.  She told me not to worry about anything.  This was just something related to advertising online, and I could just sign it."  (Id. at 15; see also id. at 21 (same)).

Although Luong could not read or understand the declaration because it was in English, she signed the document because "[she] was only thinking of helping out a friend."  (Luong Dep. at 15) (Q. "And when you were handed the document you were unable to read it and understand it because you don't read English.  Is that right?"  A. "That's right.  And I was only thinking of helping

1   out a friend.").  Luong did not know what the declaration said when she signed it, (see id. at 16),

2   does not know anything about Sis-Joyce, (see id. at 17), and had never before heard of Sis-Joyce

3   or a product called ARëna prior to her involvement with the lawsuit.  (See id. at 18).  Luong

4   testified that, contrary to the assertions in her declaration, she never purchased ARëna products.

5   (See id. at 21) (Q. "And, ma'am, what is not true is the statement 'I purchased ARëna products

6   from Sis-Joyce in the year 2002 for personal use.'  Correct?"  A. "Correct.").

7          As an initial matter, defendants do not dispute or otherwise provide any admissible

8   evidence to counter Luong's own account of how she was tricked into signing the false declaration.

9   (See, generally, Opp'n).  Indeed, Annie Lin's declaration confirms Luong's account of events.

10  Annie Lin states that "[i]n or around February 2013, [she] called Ms. Luong and asked her whether

11  or not she remembered having used or purchased [her] sister's products," (Annie Lin Opp'n Decl.

12  at ¶ 10), but admits that she did not discuss her sister's products as bearing an ARëna or Rena

13  mark.  (See id. at ¶ 15).  Annie Lin declares that she "prepared Ms. Luong's declaration in Chinese

14  and translated the declaration into English using a computer program."  (Id. at ¶ 13).  She

15  "thereafter . . . met with Ms. Luong to give her the document."  (Id. at ¶ 14).  Annie Lin admits that

16  she did not tell Luong that the document would be submitted to the court or the name of the

17  disputed products when she requested that Luong sign the declaration.  (See id. at ¶ 15) ("I did

18  not realize that I should tell Ms. Luong that the document would be submitted to the court, or that

19  I should remind her of the name of the products.").  Annie Lin's declaration does not dispute that

20  she misrepresented the document as being needed for online advertising purposes and that she

21  failed to mention that it was going to be used as part of a lawsuit.  (See, generally, id.).

22         In an effort to justify their conduct with respect to the Luong declaration, defendants rely

23  on the purported "language barrier" between Luong and Annie Lin.  (See Annie Lin Opp'n Decl.

24  at ¶ 17) ("My native language is the Chinese dialect known as Mandarin.").  Defendants also claim

25  that Annie Lin lacked "knowledge and was never informed of the proper procedural method or

26

27

28

1    requisite due diligence required when obtaining a declaration for a court proceeding."[10]   (Id. at ¶

2    16).  Defendants' assertions are utterly meritless.

3           Annie Lin's assertion that she did not understand how to prepare a declaration is belied by

4    the assertion that per defendants' "attorneys' instructions, Annie drafted a document stating each

5    person's name, that the individual used the product, the time when the individual used the product,

6    and to include [a] line that the declaration was made under penalty of perjury."  (Opp'n at 3; see

7    Annie Lin Opp'n Decl. at ¶ 8).  And even if Annie Lin did not receive sufficient instructions as to

8    how to prepare a declaration, it strains credulity for defendants to claim that Annie Lin needed a

9    reminder that any declaration that she prepared had to be accurate, true, and not fraudulently

10   procured.

11          Further, the language barrier between Luong and Annie Lin was not nearly as formidable

12   as defendants make it out to appear.  Although a Cantonese translator attended Luong's

13   deposition, defendants admit that Luong has more than sufficient oral command of the English

14   language. (See Def't's Second Fees Suppl. Opp'n at 4) ("In fact, Luong's command of English was

15   such that . . . Luong's lawyer had to admonish her to wait for questions posed in English to be

16   translated into Cantonese before she answered them.").  Although Annie Lin has declared that

17   Mandarin is her "native language," that is not to say that Mandarin is her only language or that she

18   does not have oral command of the English language. (See Annie Lin Opp'n Decl. at ¶ 17) ("My

19   native language is the Chinese dialect known as Mandarin.").

20          Finally, defendants' efforts to somehow question the conduct of the deposition because

21   there were requests to go off the record by plaintiffs' counsel are plainly meritless because Luong

22

23

24   _____

25   [10]  More recently, as part of defendants' pattern of providing shifting explanations for their conduct, defendants maintain that the evidence confirms that Luong "signed not only the

26   declaration but all of the disputed letters bearing her name," and as such, were not forged. (See Def't's Second Fees Suppl. Opp'n at 4) (emphasis in original).  This argument misses the point

27   entirely, for the issue is not whether Luong signed the declaration or letters, but rather, whether defendants drafted the false declaration and letters and encouraged and/or convinced Luong to

28   sign them.

1 – a third-party witness – was represented by her own counsel at the deposition.[11]  The fact that

2 defendants chose not to send counsel to appear on their own behalf is not a reason to call into

3 question Luong's deposition.[12]  In any event, as discussed below, see infra at § II.A.2., it was

4 defendants who attempted to prevent the taking of Luong's deposition and, given Luong's

5 deposition testimony, it is easy to understand why defendants wanted to prevent the deposition

6 from going forward.

7       In short, the court finds that the evidence is clear and convincing that defendants knowingly

8 and fraudulently obtained and filed a false declaration by deceiving Luong into signing a fabricated

9 declaration.  The court further finds that the evidence is clear and convincing that the fraudulent

10 Luong declaration was created personally and/or at the direction of defendant Lin and that the

11 declaration was filed both in this court and the Ninth Circuit with the intent that the courts rely on

12 the false declaration.

13

14

---

15    [11] For example, defendants reference a sequence, (see Opp'n at 4), in Luong's deposition

16 where she appears to testify that she did use ARëna products from Sis-Joyce in 2002.  (See
Luong Dep. at 19 (Q. "Is it true that you purchased ARëna products from Sis-Joyce in the year

17 2002 for personal use?"  A. "Yes.")).  But immediately after Luong testified in the affirmative to the

18 question, the subsequent testimony ensued:

19      Q.   Let me ask the question again.  You just told me you have never heard of
         ARëna a minute ago; correct?

20      A.   Except that when I purchased the products I had no knowledge of the name
         of the products.

21

22 (Id.).  Counsel for plaintiffs confirmed, "[y]ou just told me you have never heard of ARëna a minute
ago," because that was Luong's testimony a minute prior to her statement that she used ARëna

23 products in 2002.  (See id. at 18 (Q. "When you were at the parking lot in February of 2013 with
Annie Lin, did you discuss a product called ARëna?  That's A-R-e-n-a."  A. "No."  Q. "Before your

24 involvement in this lawsuit had you ever heard of a product called ARëna?"  A. "No, I have no
recollection whatsoever.")).

25

26    Luong then testified two more times that it was not true, as her declaration states, that she

27 "purchased ARëna products from Sis-Joyce in the year 2002 for personal use[.]"  (See id. at 20-
21) (citing Luong Decl.).

28    [12] Further, there was nothing preventing defendant Lin from attending Luong's deposition.

2. **Written Complaints by Amy Luong**.

Not only was Luong's declaration false and fraudulently procured, defendants subsequently tried to conceal their wrongdoing by inducing Luong to make and submit false complaints to the District Court for the Northern District of California.  Plaintiffs assert that defendants "instructed Luong not to appear for deposition or to cooperate with plaintiffs, and then convinced Luong to sign and file still more false documents with the Northern District of California, where plaintiffs initiated an action seeking to compel Luong's deposition."  (Motion at 4).

On April 10, 2013, plaintiffs served a deposition subpoena on Luong.  (See Declaration of Ryan Q. Keech ("Keech Motion to Compel Decl.," Dkt. No. 151-1) at ¶ 7; id., Exh. E at 78).  Luong refused to appear, requiring plaintiffs to file an action in the Northern District of California to compel her appearance.  (See Declaration of Ryan Q. Keech ("Keech Motion for Leave Decl.," Dkt. No. 165-1), at ¶ 6 & Exh. C).  The Northern District imposed contempt sanctions against Luong.  (See id. at ¶ 10); Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co., Ltd., Case No. 13-80142 (EMC) (N.D. Cal.) ("N.D. Cal. Action") (Order Finding Respondent Amy Huynh Luong in Contempt, and Ordering Sanctions ("Contempt Order", Dkt. No. 17)).  It was only after the contempt sanctions were imposed that Luong finally agreed to appear for her deposition on September 5, 2013, nearly five months after being served with the subpoena.

At her deposition, Luong testified that when she was served with the deposition subpoena on April 10, 2013, she called Annie Lin and asked what the notice of deposition was about.  (See Luong Dep. at 22-24).  Annie Lin told Luong "to give her the letter, and she would take care of it."  (Id. at 24).  Luong gave Annie Lin the deposition notice at the supermarket parking lot where they had previously met.  (See id. at 25).  At that meeting, Annie Lin told Luong that the document asked Luong to go to court, (see id. at 24), but that "there was no need for [her] to go, [and] that [Annie's] sister would take care of it."  (Id. at 25-26).

Luong testified that Annie Lin did not want her to attend her deposition.  (See Luong Dep. at 30 (Q. "[D]id Annie Lin in April of 2013 tell you that she didn't want you to go to your deposition?"  A. "Yes.").  Annie Lin suggested that Luong avoid her deposition by saying that she had to take care of her husband's sister, who was ill.  (See id.) (Q. "And did she suggest to you

that you can avoid your deposition by saying you had to take care of your husband's sister?"  A. "Yes.").  According to Luong, Annie Lin prepared a letter for her to submit to the court, (see id. at 26) (A. "[Annie Lin] told me that this notice related to asking me to go to court to testify.  So she would prepare a letter for me so that I would not have to go to court."), which she gave to her at that time and stated as follows:  "I, Amy Luong, will not be available for deposition, I have to take care of my terminal cancer patient.  I will not be available until August 2013."  (Id. at 27).  Plaintiffs' counsel received this letter on April 25, 2013, bearing Luong's signature.  (See Keech Motion to Compel Decl. at ¶ 9; id. at Exh. G).

After plaintiffs initiated the subpoena enforcement action against Luong, the Northern District Court of California received a letter on July 24, 2013, (dated July 18, 2013) purportedly from Luong, making various accusations against plaintiffs' counsel.  (See Motion at 14; Keech Motion Decl. at ¶ 6); N.D. Cal. Action (July 18, 2013, Huong letter, Dkt. No. 7).  The letter states that plaintiffs' counsel allegedly threatened Luong over the telephone with "tak[ing her] house, destroy[ing her] credit rating, and tak[ing] a lot of money from [her]" if she did not attend the deposition.  See N.D. Cal. Action (July 18, 2013, Letter).  The letter also stated that Luong "contacted the United States Attorney's Office in San Jose, California to file a complaint about [plaintiffs' counsel] and their agents."  (Id.).

When Luong was presented with the July 18, 2013, letter at her deposition, she testified that Annie Lin had provided her with the letter at yet another meeting at the supermarket parking lot.  (See Luong Dep. at 33-34).  Along with the letter, Annie Lin gave Luong written step-by-step instructions.  (See id. at 37 & 42); (Keech Motion Decl. at Exh. F).  The instruction sheet directed Luong to sign and send the July 18, 2013, letter to the Clerk of the Court for the Northern District of California.  (See Keech Motion Decl. at Exh. F).  Specifically, the instructions told Luong to "print attached document" (the July 18, 2013, letter); "Make three photo copies;" sign those copies; "make 1 signed copy for Sis-Joyce;" "send 1 signed copy by certified mail" to the Clerk of the Northern District; send another copy to plaintiffs' counsel; "use Amy's name and address as the sender;" and, "[h]ave Amy call the U.S. Attorney's Office in San Jose (408) 535-5061 to file a complaint that she was threatened by the Quinn lawyer.  Only call.  If she cannot get through or

they say they can do nothing, it's ok."  (Id.).

Luong testified that the accusations contained in the letter against plaintiffs' counsel were false.  (Luong Dep. at 34-35) (Q. "And did Mr. Keech threaten to take your home in that conversation?"  A. "No."  Q. "And did Mr. Keech threaten to destroy your credit rating during that conversation?"  A. "No."  Q. "Did Mr. Keech threaten to take a lot of money from you during that conversation?"  A. "No.").  Luong also testified that the statements regarding the lodging of a complaint with the U.S. Attorney's Office were false.  (See id. at 43) (Q. "And did you ever call the U.S. Attorney's Office to complain about Ryan Keech?"  A. "No.").

On August 5, 2013, the Northern District of California granted plaintiffs' motion to compel Luong to appear for her deposition.  See N.D. Cal. Action (Notice of Referral and Order re Motion to Compel and for Order to Show Cause, Dkt. No. 9).  The Northern District of California received another letter from Luong, dated August 9, 2013.  See id. (August 9, 2013, Huong letter, Dkt. No. 13).  The letter, addressed to plaintiffs' counsel, stated "I hereby object again to your request to depose me. . . .  I object for the same reasons as I did in my letter of July 18, 2013 – you have harassed and threatened me with the loss of my home, the destruction of my credit rating, and loss of a lot of money[.]"  (Id.).

Again, Luong testified that she did not write the August 9, 2013, letter; rather, Annie Lin provided the letter to her at another meeting at the supermarket parking lot.  (See Luong Dep. at 45).  The August 9, 2013, letter was accompanied by another set of written instructions, identical to the ones provided in July 2013, which again included an instruction to call the U.S. Attorney's Office and make false accusations against plaintiffs' counsel.  (See Keech Motion Decl. at Exh. G; Luong Dep. at 46 & 49-50).

Luong's persistent refusal to attend her deposition eventually resulted in her being held in contempt by the Northern District of California on August 23, 2013.  N.D. Cal. Action (Contempt Order).  However, that apparently made no difference to defendants, who continued to instruct Luong not to appear for her deposition.  (See Luong Dep. at 32) (Q. "And so when you met with Annie about two weeks ago did she tell you again not to show up for your deposition?"  A. "She did.").  As noted above, Luong finally appeared for her deposition only after she was held in

1    contempt and retained counsel.  (See id.) (Q.  "But you thought it was getting more serious now,
2    and so you hired a lawyer and have taken care of it?"  A. "Yes, because I previously did not
3    understand the ramifications.  After my nephew explained it to us, I realized that it could be
4    serious."  Q. "And even when it became serious, Annie Lin asked you to not show up for your
5    deposition still; right?"  A. "Correct.").

6            Defendants do not deny that defendant Lin drafted the instructions and letters that Luong
7    filed with the Northern District of California.  (See, generally, Opp'n).  Nor do they deny that they,
8    directly or indirectly, devised the scheme to prevent Luong from appearing for her deposition.
9    (See, generally, id.).[13]  Nor could they because defendant Lin admitted at her deposition that she
10   either wrote or was otherwise responsible for all the false letters which were provided to Luong.
11   (Alice Lin Oct. 2013, Dep. at 320-21) (Q. "Turning back to Exhibit 73, Exhibit B, next page, please,
12   did you prepare this letter to the Northern District of California?"  A. "I don't remember for sure.
13   But I believe so, because they were all prepared by me.") (July 18, 2013, letter); id. at 322-23 (Q.
14   "Did you write that letter?"  A.  "I wrote it in Chinese, yes."  Q. "And your sister helped you translate
15   it?"  A. "Yes."  Q. "And that letter was supposed to be sent to the United States District Court,
16   correct?"  A. "I don't know for sure, but I know for a fact that it was sent to the lawyer at Quinn, as
17   well as to the Court.") (August 9, 2013, letter).  Defendant Lin also admitted that she personally
18   prepared the instruction sheets that were provided to Luong, which gave detailed instructions as
19   to how to file the letters with the courts and the false reports about plaintiffs' counsel with the U.S.
20   Attorney's Office.  (Alice Lin Oct. 2013, Dep. at 323-24) (referring to the written step-by-step
21   instructions translated by Alice Lin:  Q. "Does that refresh your recollection that you wrote that
22   document, ma'am?"  A.  "I'm not sure about Item 9. But the rest, I did prepare them.").

23           Plaintiffs assert that defendants continued to rely on the false Luong documents even after

---

25   [13]  Defendants' failure to deny these serious allegations is tantamount to a concession on those
26   issues.  See GN Resound A/S v. Callpod, Inc., 2013 WL 1190651, *5 (N.D. Cal. 2013) (when
     plaintiff failed to oppose a motion as to a particular issue, "the Court construes as a concession
27   that this claim element [is] not satisfied;" Hall v. Mortg. Investors Grp., 2011 WL 4374995, *5 (E.D.
     Cal. 2011) ("Plaintiff does not oppose Defendants' arguments regarding the statute of limitations
28   in his Opposition.  Plaintiff's failure to oppose . . . on this basis serves as a concession[.]").

1  plaintiffs filed the Prior Motion on May 31, 2013.  (See Motion at 14-15).  For example, on

2  September 4, 2013, after defendants' prior counsel withdrew from the case, defendant Lin,

3  proceeding pro se, filed an opposition to plaintiffs' ex parte application to take Luong's deposition.

4  (See Opp'n to Taking Luong's Deposition).  Defendant Lin attached Luong's declaration and the

5  July 18 and August 9, 2013, letters to support her argument that the court should not permit

6  plaintiffs to depose Luong after the discovery deadline.  (See id. at ¶¶ 2-4 & Exhs. B, C & D).  In

7  the opposition, defendant Lin cited to and repeated the false allegations contained in the Luong

8  declaration and the July 18 and August 9, 2013, letters.[14]  (See id. at ¶ 2) ("[Luong] also stated that

9  she had been threatened and harassed by the plaintiffs' attorney and his service agent every day

10  on the telephone") (emphasis in original).  Defendant Lin goes even further, in affirmatively

11  declaring, under penalty of perjury, that "Plaintiff's agents have also called, oppressed and

12  harassed Ms. Luong's son . . . [and s]uch unconsented contact (harassment) against a member

13  of her family serves no legitimate purpose and reasonably causes Ms. Luong to suffer emotional

14  distress[,]" (id. at ¶ 4), and "[Luong] has stated in her declaration [ ] and in her letters to the Court

15  that she simply purchased my product and had nothing further to add."  (Id.).

16       Again, defendants do not deny plaintiffs' allegations that Alice Lin – even after being put

17  on notice that the Luong declaration and July 18 and August 9, 2013, letters were false – filed the

18  fabricated Luong declaration and draft letters with this court.  (See, generally, Opp'n).  In short,

19  the court finds that the evidence is clear and convincing that defendants knowingly and

20  intentionally interfered with the judicial process when they fabricated, coordinated and directed the

21  filing of false documents with the Northern District of California, actively misled Luong to prevent

22  her from appearing for her deposition, and filed false documents with this court to prevent the

23  court from arriving at the truth of the matters at issue in ruling on plaintiffs' ex parte application

24  _____

25  [14]  While the letters filed with the Northern District of California bear Luong's signatures, the
   exhibits filed by Alice Lin do not.  (Compare Opp'n to Taking Luong's Deposition at Exhs. B & C

26  with N.D. Cal. Action (Dkt. Nos. 7 & 13).  Defendant Lin fails to explain why and how she has in
   her possession draft, unsigned versions of the letters that were purportedly written by Luong.

27  (See, generally, Opp'n).  Defendant Lin's failure to explain this discrepancy provides further
   support to plaintiffs' assertion that defendant Lin drafted the letters containing the fabricated

28  allegations.

1  seeking leave to depose Luong.  The court also finds that defendant Lin lied when she filed her

2  declaration of September 4, 2013, knowingly repeating the fraudulent allegations from the false

3  Luong documents, and attaching the documents as exhibits.

4              3.      **Violation of the Court's Preliminary Injunction**.

5          Plaintiffs also assert that defendants have violated the court's preliminary injunction and

6  "have done so repeatedly[.]" (Suppl. Motion at 1).  According to plaintiffs, "[t]hese violations further

7  show that full terminating sanctions are needed to vindicate the sanctity of the judicial process."

8  (Id.).

9          The court's preliminary injunction explicitly requires, among other things, that defendants

10  "turn over and deposit with Plaintiffs' counsel all existing products in their possession, custody or

11  control that bear the RENA or RENA BIOTECHNOLOGY marks or any of the Arena [ARëna]

12  marks." (Court's Order of October 15, 2012, at 19).

13          On November 1, 2012, defendants filed a notice of their compliance with the court's

14  preliminary injunction, in which defendant Lin declared that "[t]here were no such products existing

15  and/or under the control of Sis-Joyce or myself to be turned over and deposited with Plaintiffs'

16  counsel bearing the RENA or RENA BIOTECHNOLOGY marks or any of the Arena marks as of

17  October 25, 2012." (Declaration of Alice Lin in Support of Notice of Compliance with Court Order

18  ("Alice Lin's Decl. of Compliance," Dkt. No. 52-1) at ¶ 7).  On January 11, 2013, more than two

19  months after defendants certified to the court that they did not possess any Rena- or ARëna-

20  branded products, Alice Lin produced an unopened ARëna product at her deposition. (See Suppl.

21  Motion at 2; Alice Lin Jan. 2013, Dep. at 73-74).  She also pulled from her purse an empty bottle

22  bearing the RENA mark, (see Suppl. Motion at 3; Alice Lin Jan. 2013, Dep. at 136-137), and

23  defendants' former counsel, Jew, agreed to take custody of it. (See Suppl. Motion at 3; Alice Lin

24  Jan. 2013, Dep. at 149-50).

25          On July 5, 2013, Jew, in a declaration regarding his motion to withdraw as counsel,

26  described defendants' alleged misconduct in violating the court's preliminary injunction. (See

27  Reply Declaration of Leon E. Jew in Support of His Motion to Withdraw as Counsel for Defendants

28  Sis-Joyce International Co. Ltd. and Alice Lin ("Jew Reply Decl," Dkt. No. 150-1)).  Jew declared

1  that at Alice Lin's January 11, 2013, deposition, she produced "an empty 45 ml bottle with a
2  'RENA' mark, as a piece of physical evidence." (Id. at ¶ 3).  Plaintiffs' counsel "pointed out that
3  the empty bottle was within the scope of the preliminary injunction order" and "suggested that
4  either he or [Jew] maintain custody of the empty bottle." (Id. at ¶ 4).  Jew "agreed to maintain
5  custody of the empty bottle." (Id. at ¶ 5).  On January 19, 2013, defendant Lin visited Jew at his
6  office to borrow the bottle. (See id. at ¶ 8).  Jew "told her that she must return it to [him] as early
7  as she can and she promised to return it to [Jew] soon." (Id.)  Jew "requested Alice Lin many
8  times to return the empty bottle," but as of July 3, 2013, Lin "ha[d] not yet returned it to" him. (Id.
9  at ¶ 9).

10       Further, more than one year after the court issued the preliminary injunction, defendant Lin
11  produced products bearing the ARëna mark at her second deposition on October 30, 2013. (See
12  Alice Lin Oct. 2013, Dep. at 219; Suppl. Motion at 3).  Defendant Lin testified that she found these
13  bottles "in a drawer[,]" (see Alice Lin Oct. 2013, Dep. at 219), and admitted knowing that the court
14  had ordered defendants to turn over all such products to plaintiffs "long ago." (Id. at 219-20).

15       Plaintiffs assert that defendants continue to violate the court's preliminary injunction
16  because, "[t]o date, the RENA product [produced in January 2013] has never been turned over,
17  and Defendants maintain possession of it in plain violation of the Injunction Order." (Suppl. Motion
18  at 3).  Plaintiffs point to Jew's declaration stating that "while he in fact did take possession of the
19  RENA bottle after the deposition[,]" (id.) (citing Jew Reply Decl. at ¶ 5), "Lin subsequently
20  reclaimed the bottle and refused to return it, despite repeated inquiries about compliance with the
21  Injunction Order." (Id.) (citing Jew Reply Decl. at ¶¶ 8-11).  Plaintiffs further assert that defendant
22  Lin's declaration of compliance was false when she stated that no RENA or ARëna products
23  existed or were under defendants' control. (See Suppl. Motion at 1; Alice Lin's Decl. of
24  Compliance at ¶ 7).  According to plaintiffs, defendant Lin's production of the enjoined items in
25  January and October 2013, prove that her testimony to the court was false. (See Suppl. Motion
26  at 4-5).

27       Defendants do not deny that they first violated the preliminary injunction order by failing to
28  turn over enjoined Rena and ARëna items in their custody until January 11, 2013. (See, generally,

Suppl. Opp'n). Instead, defendants assert their violations were "minor" and that they "immediately complied with the vast majority of this Court's preliminary injunction, and turned over various small items that they later located once they were found[.]" (Id. at 2). As to the ARëna items produced by Alice Lin at her October 30, 2013, deposition, defendants claim that defendant Lin "produced everything she could find" after she "performed another search for any remaining" products. (Id. at 2). Defendants assert that "[i]t is important to note that Ms. Lin's business operates from her home and garage[,]" (id. at 4), but they do not explain why that alleged fact is important or how it supports their position. (See, generally, id.). Rather, the only inference to be made from that fact is that the enjoined items were in Alice Lin's possession and accessible to defendants, and they nevertheless failed to perform a timely search of Alice Lin's home. And while defendants contend that they turned over the ARëna products after conducting "another search," they nowhere state when they first performed a search of Alice Lin's home and garage. (See, generally, id.).

As to defendants' continuing violation of the court's preliminary injunction based on their repossession of the Rena bottle initially produced in January 2013, defendants provide a somewhat different account than that alleged by their former attorney. While Jew stated that Alice Lin took the bottle from him on January 19, 2013, and refused to return it despite his multiple requests that she do so, (see Jew Reply Decl. at ¶¶ 8-9), defendants contend that it was Annie Lin who took the Rena bottle from Jew's office in June 2013, and that Jew never asked Annie Lin for its return. (See Suppl. Opp'n at  2 & 6; Declaration of Annie Lin ("Annie Lin Suppl. Opp'n Decl.," Dkt. No. 237-3) at ¶¶ 2 & 3; Declaration of Alice Lin ("Alice Lin Suppl. Opp'n Decl.," Dkt. No. 237-2) at ¶ 13). Defendants assert that Jew's declaration "is suspect, primarily due to the fact that he was absolutely desperate to get out of the case[.]" (Suppl. Opp'n at 4).

Based on defendant Lin's fabrication and filing of false declarations and her scheme to prevent Luong from testifying, see supra at § II.A., she has little if any credibility, and it is therefore likely that the court's resolution of the disputed facts concerning the chain of custody of the Rena

bottle would not fare well for defendants.[15] The court, however, need not resolve the relatively insignificant difference between Jew's, defendant Lin's, and Annie Lin's declarations, since defendant Lin's own version of the facts proves that defendants violated the court's preliminary injunction. In support of defendants' supplemental opposition, Alice Lin declared that she personally instructed Annie Lin, her sister and Sis-Joyce's employee, to collect the Rena bottle from Jew in June 2013. (See Alice Lin Suppl. Opp'n Decl. at ¶ 13). Defendant Lin directly arranged for the Rena bottle to fall back into the custody and control of Sis-Joyce, in spite of her knowledge that the court prohibited defendants from maintaining any Rena bottle "in their possession, custody or control." (Court's Order of October 15, 2013, at 19). The enjoined bottle thereafter remained in possession of defendants' employee, Annie Lin, for about six months, until Annie Lin "gave it to Alice Lin," during the week of December 2, 2013. (See Annie Lin Suppl. Opp'n Decl. at ¶ 3).

Defendants remain in violation of the preliminary injunction to this day. Defendants state that the Rena bottle "is now in the custody of Defendants' current counsel[,]" (Suppl. Opp'n at 4; see Declaration of Ali Kamarei, Dkt. No. 237-1, at ¶ 2), ostensibly to show that defendants have cured any violation. However, the preliminary injunction explicitly requires defendants to "turn over and deposit with Plaintiffs' counsel" all Rena or ARёna products in their "possession, custody or control." (Court's Order of October 15, 2013, at 19). Defense counsel provides no explanation why they have not turned over the subject bottle to plaintiffs' counsel.

Nor do defendants provide any explanation for the glaring contradiction between defendant Lin's declaration in which she represented to the court that "[t]here were no such products existing and/or under the control of Sis-Joyce or myself to be turned over and deposited with Plaintiffs' counsel bearing the RENA or RENA BIOTECHNOLOGY marks or any of the Arena marks as of October 25, 2012," (Alice Lin's Decl. of Compliance at ¶ 7), and the subsequent productions of the enjoined items. (See, generally, Suppl. Opp'n). Defendants make no attempt to explain the

---

[15] Nor does the court give any credence to defendants' most recent argument that Alice Lin somehow felt she had no choice but to violate the preliminary injunction because she distrusted Jew. (See Def'ts Second Fees Suppl. Opp'n at 12).

1  irreconcilable discrepancies between the representations made to the court in Alice Lin's notice
2  of compliance with the preliminary injunction and her later conduct.  (See, generally, id.).
3  Defendants' silence in the face of plaintiffs' contention that Alice Lin's testimony was false amounts
4  to their admission.  See GN Resound A/S, 2013 WL 1190651, at *5; Hall, 2011 WL 4374995, at
5  *5.

6       In short, the evidence is clear and convincing that despite defendants' ongoing obligations
7  to turn over all products bearing the ARëna mark to plaintiffs, defendants failed to comply with the
8  preliminary injunction order by failing to turn over to plaintiffs' counsel all products bearing the
9  RENA or RENA BIOTECHNOLOGY marks or ARëna marks.  Further, the court finds that
10 defendant Lin made false representations to the court in her November 1, 2012, declaration, when
11 she stated that no  products existed and/or were under the control of Sis-Joyce or Alice Lin
12 bearing the RENA or RENA BIOTECHNOLOGY marks or any of the ARëna marks as of October
13 25, 2012.

14      The court's preliminary injunction also prohibits "referencing, mentioning and/or using in any
15 way the purported Arena marks . . . in connection with the sale of products;" "selling, advertising,
16 or making any other use of a bottle and/or label that is confusingly similar to Rena's bottles and
17 labels, including the 0.51 ounce bottle currently used by Defendants to sell 'ARëna,' 'aRena,'
18 'aRENA,' and 'NEW! ARËNA ACTIVATION ENERGY SERUM products;'" "advertising, marketing,
19 or describing 'ARëna,' 'aRena,' 'aRENA,' and 'NEW! ARËNA ACTIVATION ENERGY SERUM'
20 products in any manner likely to mislead consumers as to the source of such products and/or their
21 affiliation with Rena;" and "posting, maintaining, displaying or performing promotional videos or
22 advertisements for genuine RENA products or Defendants' 'ARëna,' 'aRena,' 'aRENA,' and 'NEW!
23 ARËNA ACTIVATION ENERGY SERUM products.'"  (Court's Order of October 15, 2012, at
24 19-20).

25      Plaintiffs assert that in February 2015, they discovered a website, "www.iarenausa.net" that
26 uses the prohibited "ARëna" mark (along with the name of defendant Sis-Joyce) throughout the
27 website and represents another attempt to advertise and sell ARëna products in direct violation
28 of the court's preliminary injunction.  (See Notice re Prelim. Inj. at 3).  Specifically, plaintiffs assert

the following violations of the preliminary injunction:

• The home page of the website displays enjoined "NEW! ARËNA ACTIVATION ENERGY SERUM" products, in the enjoined bottles, using the slogan "Your skin's favorite WATER," next to an image of a woman and below the "Sis-Joyce Co." name. (Supplemental Declaration of Ryan Q. Keech ("Keech Prelim. Inj. Decl.," Dkt. No. 274-3), Exh. A at 1).

• The "About us" section of the website claims that "ARëna is a NEW material" and advertises "NEW Upgraded ARëna." (Id., Exh. A at 7; id., Exh. B at 7).

• The "Reading" section of the website contains references to ARëna, including a large image of "Sis-Joyce Activation Energy Serum" next to an image of enjoined "NEW! ARËNA ACTIVATION ENERGY SERUM" products, in the prohibited bottles. (Id., Exh. A at 17; id., Exh. B at 18).

• The "Contact Us" section of the website uses the prohibited "ARëna" mark next to an invitation for users to contact Sis-Joyce, below a "Members Login" button at the top of the page, which links back to defendants' www.sisjoyce.com website. (Id., Exh. A at 37; id., Exh. B at 35-39).

(Notice re Prelim. Inj. at 3). WhoIs records show that www.iarenausa.net is registered to "Perfect Privacy LLC," a company that apparently specializes in concealing the names of domain registrants. (See id. at 5; Keech Prelim. Inj. Decl. at ¶ 5 & Exh. C). WhoIs records also show that the virtually identical domain name – www.iarenausa.com – is registered to defendant Sis-Joyce International, Ltd.[16] (Notice re Prelim. Inj. at 5; Keech Prelim. Inj. Decl. at ¶ 5 & Exh. C).

On February 23, 2015, plaintiffs notified defendants of the infringing website and the alleged

_____

[16] Defendants assert that WhoIs records showing ownership of domains are "not to be relied on." (Prelim. Inj. Opp'n at 5). But defendants also assert that the WhoIs records showing their control over the www.iarenausa.com domain are accurate. (Defendants' Objection to American Rena International Corporation, et al.'s Reply in Support of Plaintiffs' Ex Parte Application for Leave to File Additional Notice, Dkt. No. 278, at 1 ("Sis-Joyce readily admits to that fact" that www.iarenausa.com is registered to Sis-Joyce). In any event, such records properly may be considered. See Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1064 & n. 22 (9th Cir. 2009) (recognizing that WHOIS is "a publically available online database through which users can access information regarding domains, including the registrant's name, address, phone number, and e-mail address"); Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 395 (2d Cir. 2004) (similar).

1   violations of the preliminary injunction.  (See Notice re Prelim. Inj. at 4; Declaration of B. Dylan

2   Proctor ("Proctor Decl.," Dkt. No. 274-1) at Exh. A).  Defendants responded the next day that they

3   could not evaluate any of plaintiffs' claims because "the www.iarenausa.net website [plaintiffs]

4   described does not appear to exist." (Proctor Decl. at Exh. B).  Prior to advising defendants of the

5   infringing website, plaintiffs had downloaded a complete copy of the website.  (Prelim. Inj. Reply

6   at 3-4).

7          Defendants assert that there are no facts showing "that Defendants had anything to do with

8   the putting up or the taking down of the iarenausa.net website of which Plaintiffs complain."

9   (Prelim. Inj. Opp'n at 1).  Defendants further assert that, "on the record before the Court, the

10  offending website could have been put up by anyone with an interest in using Plaintiffs' lawsuit to

11  be rid of Sis-Joyce as a competitor." (Id. at 4).  Defendants' assertions are unpersuasive.

12         As an initial matter, defendants do not and cannot dispute that the www.iarenausa.net

13  website is infringing and violates the preliminary injunction.  (See, generally, Prelim. Inj. Opp'n).

14  Further, defendants' efforts to distance themselves from the site by denying that they operate or

15  control it are unpersuasive.  For example, as plaintiffs note, the "only toll-free telephone number

16  listed on the www.iarenausa.net website is Defendants' toll-free telephone number, also listed on

17  the Defendants' www.sisjoyce.com website." (Prelim. Inj. Reply at 2; compare Keech Prelim. Inj.

18  Decl., Exh. A, at 8-38 (www.iarenausa.net website asking the public to contact the operator of the

19  site at 1-855-690-8889) with Declaration of Alice Lin in Response to Plaintiffs' Additional Violations

20  of Preliminary Injunction ("Alice Lin Prelim. Inj. Decl.," Dkt. Nos. 282-3 to 282-7) Exh. A at 3, 12-14

21  (www.sisjoyce.com website asking the public to contact Sis-Joyce at 1-855-690-8889).  Also, the

22  only email address listed on the infringing website is defendants' email address that was in use

23  on the www.sisjoyce.com website as of 2012, when the preliminary injunction was issued.[17]

24  (Prelim. Inj. Reply at 2;  Alice Lin's Decl. of Compliance, Exh. A at 25, 29, 30-36, 38 & 40-91).

25  Under the circumstances, defendants' assertion that the infringing website could have been

27

28      [17]  Plaintiffs give other examples of the infringing website's content that points to defendants
    use and control of the website.  (See Prelim. Inj. Reply at 2-3).

operated by "anyone," such as a competitor, (see Prelim. Inj. Opp'n at 4), strains credulity.

Further, the circumstances regarding the taking down of the infringing website are, to say the least, suspicious. While the website was live on February 23, 2015, it was, inexplicably, taken down within hours after plaintiffs notified defendants of the website. (See Prelim. Inj. Reply at 3). Also, defendant Lin states that during a telephone conference with Sis-Joyce "members" after receiving the February 23, 2015, notice from plaintiffs' counsel, she "mentioned the iarenausa.net website and it was causing a problem." (Alice Lin Prelim. Inj. Decl. at ¶ 14.I).  Although there is no indication as to the date and time of the conference call – other than it occurred after receiving notice from plaintiffs' counsel of the infringing website – defendant Lin's declaration suggests that she and/or one of her agents, i.e. members, were likely aware of, if not responsible for, the infringing website.

The court's preliminary injunction applies not only to defendants but also to all others acting in concert or participation with them. See Fed. R. Civ. P. 65(d)(2)(B) & (C) (injunction orders apply to defendants' "officers, agents, servants, employees and attorneys [and] other persons who are in active concert or participation with [them]"); Golden State Bottling Co., Inc. v. N.L.R.B., 414 U.S. 168, 179, 94 S.Ct. 414, 422-23 (1973) ("A decree or injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control.").  Thus, any "member" who supposedly set up or took down the site was clearly within defendants' actual control and subject to defendants' contractual agreement. See, e.g., Netlist Inc. v. Diablo Techs. Inc., 2015 WL 163434, *1-2 (N.D. Cal. 2015) (Because the objectives of an injunction may be "thwarted by the conduct of parties not specifically named," "contracting partners of the defendant [can]not sell the infringing products any more than the defendant who was expressly barred from doing so by the original order.").

Finally, it should be noted that defendant Lin's declaration indicates that defendants continue to violate the preliminary injunction in other ways.  Although the preliminary injunction prohibits all sales or promotions of ARëna products, (see Court's Order of October 15, 2012, at 19-20) (ordering defendants to cease "referencing, mentioning and/or using in any way the purported Arena marks … in connection with the sale of products"), defendants continue to use

1   a member agreement on their www.sisjoyce.com website that sets forth the terms and conditions

2   by which a user can become an "Arëna Sales Distributor."  (Alice Lin Prelim. Inj. Decl., Exh. D at

3   § 8:3).  Defendant Lin claims "the [products] most frequently sold by our member independent

4   sales distributors are ARëna products."  (Id. at ¶ 13.c; see id. (while members can sell any number

5   of products, "ARëna products … are" the "product most often sold" pursuant to Sis-Joyce's

6   member agreement).  Defendants specify the terms and conditions governing these sales in their

7   member agreement, (see Alice Lin Prelim. Inj. Decl. at Exh. D), including the requirement that

8   members "must have the mark 'ARëna Sales Distributor'" on "business cards using the company's

9   name."[18]  (Id. at § 8:3).  Sis-Joyce's member agreement also uses the enjoined "ARëna" mark

10   repeatedly.  (See, e.g., id. at § 8) (Section regarding "ARëna trade mark, logo, copyright and

11   business card," which requires that members "[m]ust not use Sis-Joyce or ARëna trade mark, logo

12   to do other business").

13       In short, while the evidence that defendants violated the preliminary injunction by supporting

14   or controlling the infringing website is not clear and convincing, the evidence that defendants

15   violated the preliminary injunction by continuing to use the ARëna marks in its member

16   agreements on its own website is clear and convincing.  Pursuant to the preliminary injunction,

17   defendants have no right to utilize member agreements that promote sales of enjoined ARëna

18   products.  Defendants' use of the member agreements on the Sis-Joyce website make it clear that

19   defendants continue to violate the terms of the preliminary injunction to this day.

20       B.   Bad Faith and Willfulness.

21       "Before awarding sanctions pursuant to its inherent power, the court must make an express

22   finding that the sanctioned party's behavior constituted or was tantamount to bad faith."  Haeger,

23   793 F.3d at 1132 (internal quotation marks omitted); see Leon, 464 F.3d at 958; Anheuser-Busch,

24

25     [18]  Defendant Lin asserts that plaintiffs' attorneys were aware of the member agreement and did not ask for any changes to the agreement.  (See Alice Lin Prelim. Inj. Decl. at ¶ 12).  However,

26   plaintiffs contend that they did not know about the member agreement, as it was not included in defendants' notice of compliance.  (See Prelim. Inj. Reply at 6 & n. 3).  Further, given how

27   aggressively plaintiffs have pursued potential violations of the preliminary injunction, the court has no reason to doubt that had plaintiffs' counsel been aware of the member agreement, they would

28   have immediately brought that matter to the court's attention.

1  69 F.3d at 348.  "Actions constituting a fraud upon the court or actions that cause the very temple

2  of justice [to be] defiled are . . . sufficient to support a bad faith finding."  Haeger, 793 F.3d at 1133

3  (internal quotation marks omitted).   Under the circumstances, the court has little difficulty

4  concluding that defendants acted in bad faith in this litigation.

5                    1.    **False Declaratory Evidence and Obstruction of Justice**.

6          Courts have found bad faith stemming from "a full range of litigation abuses," Chambers,

7  501 U.S. at 46, 111 S.Ct. at 2134, many of which are present in this case.  For example, it is well-

8  settled that fabricating and submitting knowingly false evidence amounts to willful and bad faith

9  conduct.[19]  See, e.g., Newman v. Brandon, 2012 WL 4933478, *4 (E.D. Cal.  2012), report and

10  recommendation adopted, Civ. Case No. 10-0687AWI (JLT) (2013) (submission of perjured

11  testimony going to material issues in the case "was an act of bad faith which undermines the

12  confidence placed in our system of justice"); Uribe v. McKesson, 2011 WL 3925077, *4 (E.D. Cal.

13  2011) (bad faith found where declarant "never saw or read the declaration prior to Plaintiff forging

14  his name to the document" and plaintiff "attempted to 'teach' him what to say to help Plaintiff win

15  his lawsuit"); Sunrider Corp. v. Bountiful Biotech Corp., 2010 WL 4590766, *22 (C.D. Cal.), report

16  and recommendation adopted, 2010 WL 4589156 (2010) (bad faith found when party "knowingly

17  ma[de] false statements under oath or penalty of perjury," and "repeatedly and willfully disregarded

18  his discovery obligations and disobeyed court orders to provide or permit discovery"); Combs v.

19  Rockwell Int'l Corp., 927 F.2d 486, 488 (9th Cir. 1991) (affirming bad faith finding where plaintiff

20  "attempted to deceive the district court" by changing deposition evidence going to material "issues

21  of central importance in the upcoming summary judgment hearing"); Da-Silva v. Smith's Food &

22  _____

23        [19]   Also, submitting false and perjured evidence such as the declarations at issue may
     constitute a crime under state and federal law.  See, e.g., Cal. Penal Code § 132 ("Every person
24   who upon any trial, proceeding, inquiry, or investigation whatever, authorized or permitted by law,
     offers in evidence, as genuine or true, any book, paper, document, record, or other instrument in
25   writing, knowing the same to have been forged or fraudulently altered . . . is guilty of a felony.");
     18 U.S.C. § 1621 ("Whoever . . . in any declaration, . . . or statement under penalty of perjury . .
26   . willfully subscribes as true any material matter which he does not believe to be true[] is guilty of
     perjury[.]"); see also People v. Bhasin, 175 Cal.App.4th 461, 468 (2009) ("There simply is no
27   requirement that a document must be moved into evidence in order to constitute a violation of
     section 132.").
28

Drug Ctrs., Inc., 2013 WL 2558302, *4 (D. Nev.), report and recommendation adopted, Civ. Case No. 12-0595 GMN (VCF) (2013) (bad faith found when plaintiff wilfully provided false deposition testimony); Garcia v. Berkshire Life Ins. Co. of Am., 569 F.3d 1174, 1177-78 & 1180 (10th Cir. 2009) ("especially egregious" case of bad faith where plaintiff forged four documents including from disgruntled ex-employee accusing former employer of unfair business practices); Englebrick v. Worthington Indus., Inc., 944 F.Supp.2d 899, 909 (C.D. Cal. 2013) aff'd in part and rev'd in part on other grounds, 2015 WL 4071553 (9th Cir. 2015) ("Providing false or incomplete information during a deposition or in a response to a discovery request constitutes the sort of willfulness, bad faith, or fault required for dismissal.").  Such willful and bad faith conduct provides grounds for the imposition of the sanction of default judgment and dismissal.  See Combs, 927 F.2d at 488.

In Newman, a case similar to the instant case, the court had "no hesitation in finding that Plaintiff's actions were willful and made in bad faith" where a plaintiff prisoner submitted false declarations of purported witnesses and "knowingly filed these documents despite his knowledge of their falsity."  2012 WL 4933478, at *2 & *4.  The court found "the statements of the witnesses in these falsified declarations go to material issues in this case; whether Defendant [] used excessive and unnecessary force against Plaintiff."  Id. at *4.  The court further found that "[i]t is clear that Plaintiff intended the Court to rely upon this perjured testimony when evaluating Defendants' motion for summary judgment."  Id.

As in Newman, defendants here "prepared . . . declarations and included the false information[,]" and as for Luong, defendants "presented the declaration to [her] but . . . did not allow [Luong] to read it."  2012 WL 4933478 at *3; see id. at *4 ("Because Plaintiff himself drafted these false declarations and obtained signatures on them using trickery, the Court finds that Plaintiff knew the documents were falsified.").  The Win, Chen, and Luong declarations were fabricated for the purpose of establishing and supporting defendants' prior use defense. Defendants clearly intended the Ninth Circuit and this court to rely on the fraudulent evidence in evaluating the merits of the parties' trademark claims, even though they knew the evidence was manufactured.

Defendants attempt to distinguish this case from Newman by arguing that they "did not draft

1  the declarations themselves and did not know whether . . . they were falsified[,]" (Opp'n at 22), and

2  did not act in bad faith because they never "instructed anyone acting under their authority or on

3  their behalf to fabricate information or to obtain false signatures on declarations." (Id. at 2; Alice

4  Lin Opp'n Decl. at ¶ 5).  However, as discussed above, that argument is contradicted by the

5  evidence, which shows that defendant Lin drafted and/or directed Sis-Joyce's employee, Annie

6  Lin, to draft and obtain the false declarations.  See supra at §§ II.A.1.a.-c.

7       Defendants also argue that their procurement and submission of the false declarations was

8  due to defendant Lin's "lack of exposure or understanding of the American legal system" and her

9  prior attorney's failure to explain "the proper procedural method or requisite due diligence needed

10  prior to obtaining and submitting declarations." (Opp'n at 1).  Even if the court were to construe

11  this argument as a contention that defendants could not have acted in bad faith or should not be

12  penalized for their misconduct because the conduct was outside their control, see, e.g., Stars'

13  Desert Inn Hotel & Country Club, Inc. v. Hwang, 105 F.3d 521, 525 (9th Cir. 1997) ("conduct not

14  shown to be outside the control of the litigant is sufficient to demonstrate willfulness, bad faith or

15  fault warranting default"), the argument is utterly meritless.  First, whatever misunderstanding

16  defendants had concerning their counsel's instructions or explanations, it does not qualify as

17  conduct outside of their control such as to excuse their misconduct.  See Nat'l Corporate Tax

18  Credit Funds III, IV, VI, VII v. Potashnik, 2010 WL 457626, *4 (C.D. Cal. 2010) (a party's

19  "misunderstanding [of her] own counsel are not matters outside of a party's control"); see also Link

20  v. Wabash R.R. Co., 370 U.S. 626, 634, 82 S.Ct. 1386, 1390 (1962) (a client "is deemed bound

21  by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can

22  be charged upon the attorney'").  Second, as the court noted earlier, even a "simple person [such

23  as defendant Lin] who has a very limited ability to speak and understand English," (Opp'n at 1),

24  knows (or should know) that submitting false evidence to a court is wrong.  "Only an inundation

25  of naivete and credulity would lead to an acceptance of" these arguments.  United States v.

26  Thompson, 109 F.3d 639, 642 (9th Cir. 1997).

27       Indeed, contrary to defendants' assertion that defendant Lin is a "simple person," (Opp'n

28  at 1), the evidence in the record indicates otherwise.  Defendants previously represented to the

court that Alice Lin is a person of "entrepreneurial spirit" who began a grass roots business selling personal care products, which she expanded to the extent that "[s]he incorporated as Sis-Joyce Corporation in 2004, and later re-incorporated as Sis-Joyce International Co., Ltd. in 2010." (Opp'n to Motion to Dismiss Counterclaims at 1).  Alice Lin testified that in 2004 and 2005, Sis-Joyce's sales yielded about $8 million in each of those years.  (See Alice Lin Oct. 2013, Dep. at 239-241).  But perhaps more importantly, the evidence that Alice Lin drafted the declarations and devised the scheme to keep plaintiffs from deposing Luong, see supra at §§ II.A.1-2, demonstrates that Alice Lin is indeed sophisticated, disingenuous, and in control of the direction of defendants' litigation.

In Hyde & Drath v. Baker, 24 F.3d 1162 (9th Cir. 1994), the court considered plaintiff's purported excuses for misconduct when the plaintiff corporations failed to appear for depositions.  The Ninth Circuit explained that "[a]lthough the evidence is not conclusive, there is enough in the record for the district court to have properly decided that [the individual plaintiff] influenced, if not controlled, the [plaintiff] corporations' wrongful behavior during discovery."  Id. at 1168.  The plaintiff argued that he could not control and was therefore not responsible for the misconduct, even though he had personally answered and verified interrogatory responses propounded on the corporations.  See id. at 1169.  The plaintiff explained that "he had not read through the answers and was ignorant of the information before swearing that the responses were accurate."  Id.  The Ninth Circuit rejected the plaintiff's contentions and held that "the district court had sufficient evidence of [his] control of the lawsuit to have inferred that [he] also influenced the corporations' failure to appear at depositions."  Id.

As in Hyde & Drath, there is sufficient evidence of Alice Lin's control of defendants' overall conduct in this case.  As discussed, Alice Lin devised the plan with respect to the three declarations, having both drafted them and provided instructions to Sis-Joyce's employee, Annie Lin, on how to draft and finalize the declarations.  See supra at § II.A.1.  She also devised the scheme to prevent Luong from appearing for her deposition, and again instructed Annie Lin on carrying out that scheme.  See id. at § II.A.2. When defendants' prior counsel withdrew from the case, Alice Lin filed documents opposing plaintiffs' ex parte application seeking leave to take the

deposition of Luong.  (See, e.g., Opp'n to Taking Luong's Deposition).  In support of her pro se opposition, Lin filed the fraudulent Luong declaration and the July 18 and August 9, 2013 letters, knowing that the documents were false.

Finally, the court has already found that defendant Lin controlled the direction and strategy of this litigation.  Specifically, in granting Jew's motion to withdraw, the court took into consideration Jew's statement that his "continued employment will result in violation of the Rules of Professional Conduct," (Court's Order of July 29, 2013, at 2), and gave credence to his contention that "Defendants insist[ed] upon presenting defenses that, pursuant to . . . counsel's belief, are not warranted under existing law and cannot be supported by good faith argument for a modification or reversal of existing law."  (Id.).  In short, the evidence belies Alice Lin's contentions that the misconduct here was beyond her control.

The court has undertaken a careful examination of the evidence in the record and concludes that the evidence is clear and convincing that defendant Lin fabricated and submitted to this court and the Ninth Circuit the Win, Chen, and Luong declarations.  See supra §§ II.A.1.a-c. The court also examined the arguments and evidence concerning plaintiffs' assertions that defendants obstructed discovery, and thus the administration of justice, when they made multiple efforts to prevent plaintiffs from deposing Luong.  See supra at § II.A.2.  Specifically, the court finds that defendants knowingly carried out a scheme, directly and indirectly through their employee Annie Lin, to prevent Luong from appearing for her deposition.  See id.  The scheme included:  instructing Luong not to appear for her deposition; writing letters that contained false allegations against plaintiffs' counsel, with instructions that Luong file them with the Northern District of California in plaintiffs' separate action to enforce the Luong subpoena; and filing the fabricated Luong declaration in this court and repeating the false allegations in the Luong letters in their effort to persuade this court to deny plaintiffs leave to depose Luong.  See id.

"[O]bstructionist tactics employed solely to frustrate [a party's] ability to defend itself in [an] action and . . . its pursuit of asserted [c]laims[]" wrongfully interferes with the administration of justice.  Vargas v. Peltz, 901 F.Supp.1572, 1578 (S.D. Fla. 1995) (finding obstruction of justice where motion for sanctions exposed "a litany of lies told by Plaintiff . . . during discovery in th[e]

case," and "introduction of fabricated evidence").  Here, the court finds that the evidence is clear and convincing that defendants acted willfully, intentionally, and in bad faith when they obtained and filed fraudulent declarations in the Ninth Circuit and this court, and obstructed discovery and caused false documents to be submitted to the Northern District of California in an attempt to prevent Luong from being deposed.

2.  **Violation of Preliminary Injunction**.

The conduct referenced above, see supra at § II.A.1-2., is more than sufficient – on its own – to justify the imposition of terminating sanctions.  See, e.g., Newman, 2012 WL 4933478, at *4 ("[P]erjury on any material fact strikes at the core of the judicial function and warrants a dismissal of one's right to participate at all in the truth seeking process."); Uribe, 2011 WL 3925077, at *5 ("dismissal is the only sanction that adequately redresses the severity of Plaintiff's misrepresentations to this Court" by filing a false and fraudulently procured declaration).  However, defendants' lack of compliance with the preliminary injunction reflects a continuation of defendants' pattern of litigation misconduct and will be considered in assessing the type and scope of the sanctions to be imposed.

"A person fails to act as ordered by a court when he fails to take all the reasonable steps within his power to insure compliance with the court's order."  Gifford v. Heckler, 741 F.2d 263, 265 (9th Cir. 1984) (internal quotation and alteration marks and citation omitted).  "[A party's] failure to respond to the court's order establishes willfulness [when he] has not shown his disobedience to be outside his control."  Evans v. Insulation Maint. & Contracting, 2013 WL 1315414, *1 (D. Nev. 2013) (internal quotation and alteration marks omitted).  Having already found that defendants violated, and continue to violate, the court's preliminary injunction, see supra at § II.A.3., the court now examines whether defendants took all reasonable steps within their power to comply with the preliminary injunction, or whether their disobedience was outside their control, such that it would be unjust to hold them responsible.

As noted above, defendants violated the injunction by failing to turn over products bearing the disputed marks to plaintiffs' counsel.  See supra at § II.A.3.  Defendants do not deny that they withheld and failed to turn over products covered by the preliminary injunction.  (See, e.g., Suppl.

45

Opp'n at 4) (at least one enjoined item remains in the custody of defense counsel to this day). Instead, they assert that their "inadvertent violation should not be grounds for terminating sanctions." (Id. at 6).  Defendants assert that Alice Lin's lack of compliance with the preliminary injunction was due in part to her asserted illness that lasted from November 2012 – coincidentally the month after the injunction was issued – to September 18 or 19, 2013, when she had heart surgery.  (See id. at 3).  Defendants also assert that they should be excused from violating the preliminary injunction because defendant "Lin never fully understood the preliminary injunction order to apply to Rena products as well as ARëna products[.]"  (Suppl. Opp'n at 4; see Alice Lin Suppl. Opp'n Decl. at ¶ 11).  Defendants' assertions are unpersuasive.

Alice Lin's November 1, 2012, statement of compliance with the preliminary injunction is very clear with respect to the scope of defendant Lin's compliance.  Alice Lin, declares, under penalty of perjury, that "[t]here were no . . . products existing and/or under the control of Sis-Joyce or myself to be turned over and deposited with Plaintiffs' counsel bearing the RENA or RENA BIOTECHNOLOGY marks or any of the Arena marks as of October 25, 2012."  (Alice Lin's Decl. of Compliance at ¶ 7).  Thus, defendants' assertion that defendant Lin did not fully understand the scope of the preliminary injunction is belied by Lin's November 1, 2012, declaration.  Further, whether defendant Lin may have misunderstood the scope of the court's order based on her counsel's representations is insufficient to establish that compliance with the preliminary injunction was outside her control.  See Nat'l Corporate Tax Credit Funds, 2010 WL 457626, at *4 (a party's "misunderstanding [of her] own counsel are not matters outside of a party's control").  Finally, defendant Lin's current declaration provides no information as to when or how many searches she conducted since the preliminary injunction issued – on October 15, 2012 – to locate Rena or ARëna products that were required to be turned over pursuant to the preliminary injunction.  (See, generally, Alice Lin Suppl. Opp'n Decl.).  The only reference to any search is the one that was apparently conducted after defendants' third set of attorneys asked defendant Lin to search for any remaining products that could be violating the preliminary injunction.  (See id. at ¶ 9).

Alice Lin's assertion that throughout the relevant time period, she was suffering from "severe medical problems [that] have interfered with both her daily life and her ability to defend

and prosecute this action," (Suppl. Opp'n at 3; Alice Lin Suppl. Opp'n Decl. at ¶ 4), is belied by the record.  For example, on September 4, 2013 – just days before her heart surgery on September 18, 2013 – defendant Lin, proceeding pro se, filed an opposition to plaintiffs' ex parte application to take Luong's deposition.  (See Opp'n to Taking Luong's Deposition).  While Lin's medical condition apparently kept her from complying with the court's preliminary injunction, it did not keep her from continuing to file false documents with the court.

Also, defendants' failure to turn over to plaintiffs' counsel the products identified in the preliminary injunction, one of which  apparently is "in the custody of Defendants' current counsel," (Suppl. Opp'n at 4), continues to be a violation of the preliminary injunction.[20]  See supra at § II.A.3.  Moreover, as noted earlier, by continuing to use the ARëna marks in its member agreements, defendant Sis-Joyce is in violation of the preliminary injunction.  See id.

In short, there is no basis for the court to conclude that defendants took all reasonable steps to comply with the court's preliminary injunction.  There is nothing before the court suggesting that defendants' transgressions were outside of their control.[21]  Rather, the only reasonable conclusion based on the evidence is that defendants willfully disobeyed the court's preliminary injunction order.  See United States v. United Mine Workers of Am., 330 U.S. 258, 333-34, 67 S.Ct. 677, 715 (1947) ("It is plain that the defendants acted willfully for they knew that they were disobeying the court's order.").

C.    The Five-Factor Terminating Sanctions Balancing Test.

Having concluded that defendants engaged in various acts of litigation misconduct  willfully and in bad faith, see supra at § II.B., the court now turns to the Ninth Circuit's five-prong test to

---

[20] Defendants have not submitted evidence showing that the parties entered into an agreement allowing, or that plaintiffs otherwise consented to, defendants' counsel maintaining possession of the enjoined products.  (See, generally, Opp'n; Suppl. Opp'n).

[21] Indeed, defendants' assertion that their business is operated out of Alice Lin's home undermines any claim that defendants could not have taken reasonable steps to comply with the court's preliminary injunction.  See Fair Hous. of Marin v. Combs, 285 F.3d 899, 905-06 (9th Cir.), cert. denied 537 U.S. 1018 (2002) (holding that defendant's failure to produce documents that allegedly did not exist was not outside defendant's control because they were later found hidden in his apartment).

determine whether to impose terminating sanctions against defendants.  See Leon, 464 F.3d at 958; Hous. Auth. of Los Angeles, 782 F.2d at 831.

    1.    **Factors 1 and 2: Public's Interest in Expeditious Resolution of Litigation and the Court's Need to Manage Its Docket**.

As an initial matter, defendants do not address the first two factors in their Opposition. (See, generally, Opp'n at 12-22).  In any event, these factors, the public's interest in expeditious resolution of this action and the court's need to manage its docket, see PPA Prods. Liab. Litig., 460 F.3d at 1227 (explaining that the first two factors are usually reviewed together), weigh in favor of terminating sanctions.  "The public and this Court have an interest in securing the just, speedy and inexpensive determination of all actions[.]"  Bump Babies Inc. v. Baby The Bump, Inc., 2011 WL 5037070, *6 (C.D. Cal.), report and recommendation adopted, 2011 WL 5036919 (2011) (internal quotation marks and citation omitted).  "Orderly and expeditious resolution of disputes is of great importance to the rule of law.  By the same token, delay in reaching the merits . . . is costly in money, memory, manageability, and confidence in the process."  PPA Prods. Liab. Litig., 460 F.3d at 1227; see id. at 1234 ("Sound management of the court's docket also counsels in favor of sanctions as a deterrent to others[.]").

Here, defendants' litigation misconduct, see supra at § II.A., has "greatly impeded the resolution of the case by obscuring the factual predicate of the case and consuming months of sanction-related litigation."  Leon, 464 F.3d at 959 n. 5 (internal quotation mark and citation omitted); see Malone, 833 F.2d at 131 (first two factors supported terminating sanction because, among other things, district court was prevented from adhering to its trial schedule).  Plaintiffs expended a substantial amount of time and resources obtaining discovery relating to the three fraudulent declarations and the complaints submitted to the Northern District of California.  As to Luong alone, plaintiffs spent at least five months attempting to depose her, and were required to file an enforcement action in the Northern District of California.[22]  See supra at §§ II.A.1.c & II.A.2.

---

[22]  Even after full briefing on plaintiffs' initial motion for terminating sanctions, defendants continued to falsify and submit the false evidence to both this court and the Northern District of California.  See supra at §§ II.A.1. & II.A.2.

1  Moreover, defendants' past and current violations of the court's preliminary injunction undermine

2  the court's management of the action, as well as its overall judicial function of resolving the claims

3  and issuing orders accordingly.[23]  In short, there is "ample evidence of the time and resources

4  spent in investigating and resolving the" litigation misconduct issues set forth above.  See Leon,

5  464 F.3d at 958 n. 5.  "As such, Defendant[s'] obstructive conduct poses a genuine threat to the

6  expeditious resolution of this litigation and the Court's need to manage its docket."  Bump Babies,

7  2011 WL 5037070, at *6; see PPA Prods. Liab. Litig., 460 F.3d at 1234 (explaining that court's

8  findings regarding parties' unnecessary delay in production supported terminating sanctions).

9          2.   **Factor 3: Risk of Prejudice to the Party Seeking Sanctions**.

10        Plaintiffs suffer prejudice if defendants' "actions impair [plaintiffs'] ability to go to trial or

11  threaten to interfere with the rightful decision of the case."  Anheuser-Busch, 69 F.3d at 354

12  (internal quotation marks and citation omitted); Kopitar v. Nationwide Mut. Ins. Co., 266 F.R.D.

13  493, 499 (E.D. Cal. 2010) (same).  In examining this factor, courts consider whether the party's

14  misconduct "'make it impossible for a court to be confident that the parties will ever have access

15  to the true facts.'"  Bump Babies, 2011 WL 5037070, at *6 (quoting Conn. Gen. Life Ins. Co., 482

16  F.3d at 1097); Bradford v. Davis, 2014 WL 37325, *2 (E.D. Cal. 2014) (same); Davidson v.

17  Barnhardt, 2013 WL 6388354, *6 (C.D. Cal. 2013) (same).

18        Plaintiffs contend that they have been prejudiced as a result of defendants' bad faith

19  conduct and stand to suffer further prejudice should the court impose anything but terminating

20  sanctions.  (See Motion at 20-21).

21        Defendants respond that their conduct has "not caused any prejudice to plaintiffs" because

22  the fraudulent declarations were not actually relied on by the courts and are therefore

23  "inconsequential[.]"  (Opp'n at 12 & 19; see id. at 3 & 4).  According to defendants, even though

24  _____

25      [23]  The court notes that defendants also violated the Court's Order of July 19, 2013, which ordered Sis-Joyce to produce August Klerks, its CEO (and Alice Lin's husband), by July 29, 2013.

26  Defendants failed to do so, requiring plaintiffs to file a motion to enforce the court's order and for sanctions.  (See Plaintiffs' Motion and Joint Stipulation re Plaintiffs' Motion to Enforce the Court's

27  July 19, 2013 Order and for Sanctions, Dkt. No. 177).   On October 22, 2013, the court granted plaintiffs' motion and ordered defendants to pay $5,000 in sanctions.  (See Court's Order of

28  October 22, 2013, Dkt. No. 201, at 1).

they filed the fraudulent Chen, Win, and Luong declarations with the Ninth Circuit, they were "new evidence" that is "rarely, if ever, considered on appeal." (Id. at 3). Defendants add that they later "withdrew the declarations from the Ninth Circuit's docket[.]" (Id. at 3 & 4). Similarly, they assert that the fraudulent declarations filed in this court in support of their oppositions to plaintiffs' motion to strike their affirmative defenses and motion to dismiss counterclaims were harmless because the declarations were "extrinsic evidence [that] cannot be considered when ruling on either type of motion."[24] (Id. at 4). Defendants therefore submit that the declarations "have thus far been entirely inconsequential" because "the courts to which these declarations were submitted would not have considered them in ruling." (Id. at 12). Finally, defendants assert that plaintiffs will not be prejudiced going forward because defendants "have no intention of using these declarations and will not be relying on them in any way as this case approaches to trial." (Id. at 18).

Defendants' "no harm, no foul" argument is disingenuous and not well-taken. Clearly, in filing the fraudulent evidence with this court and the Ninth Circuit, defendants intended the courts to rely on such evidence in adjudicating the issues before them. But defendants' argument essentially posits that their fabrication and filing of material evidence cannot be found to have interfered with the rightful decision of the case or otherwise prejudiced plaintiffs, because their filings were in violation of procedural and evidentiary rules that prevented the courts from relying on the evidence. (See Opp'n at 3, 4 & 12). Defendants' position further exhibits their continued disrespect for the legal process.

The court in Sun World, Inc. v. Lizarazu Olivarria, 144 F.R.D. 384 (E.D. Cal. 1992) was presented with similar arguments in response to similar misconduct. There, the defendant

_____

[24] Contrary to defendants' assertion, a court may consider matters – such as the subject declarations – outside the pleadings on a motion to dismiss. A court may consider documents attached or referenced in the pleadings – as defendants did in their amended counterclaims – if the documents' authenticity is not contested and the pleading "necessarily relies" on the documents, without converting a motion to dismiss into one for summary judgment. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). Also, the court could have relied on the false documents by converting plaintiffs' motion to dismiss and motion to strike into a motion for summary judgment. See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . ., matters outside a pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment.").

submitted a fabricated document that went to material issues regarding the parties' disputed contractual agreement.  See id. at 386-89.  The defendant argued that the "the fraudulent document d[id] not go to the heart of th[e] case" and therefore did not warrant terminating sanctions. Id. at 391.  The court flatly rejected the defendant's attempt to minimize the prejudicial effect of the defendant's fraud, stating that had the document been "genuine, [it] would have directed the outcome of this litigation.  In the furtherance of this fraud [defendant] perjured himself on at least two occasions." Id. at 390.  The court characterized such behavior as "reprehensible," which "mocked the authority of this court and scorned its rules." Id.  The court went on to explain that

> [defendant's] mendacity has needlessly delayed this case for the purpose of furthering his strategic objectives.  He has toyed with this court, interfering with its ability to promote the efficient administration of justice and causing the needless expenditure of precious and finite judicial resources.  There is no sign of repentance or any indication that this pattern of behavior would cease if this case were allowed to proceed.

Id.

As in Sun World, had the subject declarations been considered – which they would have been if plaintiffs' counsel had not investigated the authenticity of the declarations – the court could have found that they established or raised a genuine issue of material fact as to defendants' defenses and counterclaims.  Defendants appear to be completely indifferent to the prejudice suffered by plaintiffs, (see, generally, Opp'n), in having to expend time and resources investigating the whereabouts of a phantom declarant (Alice Win), deposing a purported declarant who testified she had never seen a declaration bearing her purported name (Jess Chen / Jessie Xu), and undertaking laborious and cost-intensive efforts to enforce the subpoena of defendants' third purported declarant (Amy Luong).  See Englebrick, 944 F.Supp.2d at 912 (ruling that "[p]laintiffs' deception has already prejudiced [defendant], and it will continue to prejudice [defendant] if the Court proceeds with the trial [because it] spent enormous amounts of time and money, including retaining three experts and taking more than 30 depositions, to respond to Plaintiffs' denials").

1    Finally, defendants' offer to give up their right to "rely[] on the[ declarations] in any way as

2    this case approaches trial[,]" (Opp'n at 18), makes a mockery of the judicial process.  As an initial

3    matter, defendants fail to address the fact that on September 4, 2013 – only one month before

4    making this supposed concession – Alice Lin affirmatively relied on and again filed one of the

5    fraudulent declarations and perjured herself in furtherance of that evidence.  (See Opp'n to Taking

6    Luong's Deposition at ¶ 4 & Exh. D).

7    Further, a party has no right to simply abandon false evidence and promise to be honest

8    going forward.  In Aptix Corp. v. Quickturn Design Sys., Inc., 2000 WL 852813 (N.D. Cal. 2000),

9    aff'd in part, vacated in part, 269 F.3d 1369 (Fed. Cir. 2001), a "patent holder fraudulently [sought]

10   to strengthen a patent-in-suit through the manufacture of counterfeit evidence[,]" which was

11   discovered during the litigation. Id. at *30.  The court rejected plaintiffs' plea that they were "willing

12   to press forward with the [patent] application date as the date of invention – that is, without the

13   benefit of [the] fabrications." Id.  The court explained that "[n]ot all frauds are detected[,] and [t]hey

14   are not easy to detect[,]" and the "wrongdoer has no right to simply abandon the false evidence

15   and to promise to be honest going forward." Id.; see also Henry v. Gill Indus., Inc., 983 F.2d 943,

16   947 (9th Cir. 1993) (rejecting party's argument that any discovery violation was "purged by his

17   [eventually] submitting to deposition" and noting that belated compliance does not preclude

18   sanctions) (alterations omitted).  As one court stated in granting terminating sanctions based on

19   the submission of one false declaration, "to continue this action would not deter repetition of such

20   conduct or comparable conduct.  Such a course would simply place [the offending party] back in

21   the same position he was in, without the false declaration." Uribe, 2011 WL 3925077, at *5.

22   In short, the court finds that plaintiffs have been severely prejudiced by defendants'

23   misconduct and that they would be further prejudiced by the significant costs that would be

24   required to litigate against parties who exhibit little, if any, regard for the integrity of the judicial

25   process.[25]  "There is no doubt that [plaintiffs have] been prejudiced by [defendants'] actions.

26   _____

27       [25]  Defendants argue that plaintiffs have unclean hands in that they have engaged in
     questionable business and litigation practices.  (See Opp'n at 9-11).  Defendants do not provide
28   any authority, however, showing how such allegations affect the court's examination of the merits

1  [They] ha[ve] been forced to litigate against an opponent who . . . intentionally committed a fraud
2  on this court, who ha[ve] perjured [themselves] on at least two occasions, who ha[ve] exercised
3  delay tactics, [and] who ha[ve] shown complete disregard for the jurisdiction of this court[.]" <u>Sun</u>
4  <u>World</u>, 144 F.R.D. at 391.

5            3.    **Factor 4: Public Policy Favoring Disposition of Cases on Their Merits**.

6        The fourth factor, the "public policy favoring the disposition of cases on their merits[,]"
7  "always weighs against dismissal." <u>Dreith v. Nu Image, Inc.</u>, 648 F.3d 779, 788 (9th Cir. 2011).
8  By itself, however, this factor is not dispositive, as the five factors are "not a series of conditions
9  precedent" that must all be found before the imposition of terminating sanctions is warranted, but
10 rather are "a way for a district judge to think about what to do[.]" <u>Conn. Gen. Life Ins.</u>, 482 F.3d
11 at 1096.  Here, the public policy favoring resolution of cases on their merits does not outweigh the
12 other factors favoring terminating sanctions.

13           4.    **Factor 5: Availability of Less Drastic Sanctions**.

14       Generally, a court must consider "the impact of the sanction and the adequacy of less
15 drastic sanctions[,]" <u>United States v. Nat'l Med. Enters., Inc.</u>, 792 F.2d 906, 912 (9th Cir. 1986),
16 before ordering terminating sanctions.  In conducting the lesser sanctions inquiry, the court
17 examines the following factors: (1) the feasibility of less drastic sanctions and why alternative
18 sanctions would be inadequate; (2) whether alternative methods of sanctioning or curing the
19 malfeasance were implemented before ordering dismissal; and (3) whether the party has been
20 warned of the possibility of dismissal before actually ordering dismissal.  <u>See</u> <u>Malone</u>, 833 F.2d
21 at 132; <u>Anheuser-Busch</u>, 69 F.3d at 352; <u>Leon</u>, 464 F.3d at 960.

22       In egregious circumstances, "it is unnecessary (although still helpful) for a district court to
23 discuss why alternatives to dismissal are infeasible."  <u>Malone</u>, 833 F.2d at 132; <u>Dreith v. Nu</u>
24 <u>Image, Inc.</u>, 648 F.3d 779, 788-89 (9th Cir. 2011) (same); <u>see</u> <u>In re Fitzsimmons</u>, 920 F.2d 1468,
25 1474 (9th Cir. 1990) ("[U]nless there are egregious circumstances, the district court must, as the
26 general rule requires, explicitly consider relative fault and alternative sanctions.").  "[B]ecause bad

27  _____

28  of plaintiffs' Motion.  (<u>See</u>, <u>generally</u>, <u>id.</u>).

faith behavior poses such a serious threat to the authority of a district court, the existence of bad faith constitutes egregious circumstances which can warrant dismissal even without the explicit consideration of alternative sanctions and relative fault[.]"  In re Fitzsimmons, 920 F.2d at 1474; see In re Napster, Inc. Copyright Litig., 462 F.Supp.2d 1060, 1071 (N.D. Cal. 2006) ("[E]xtraordinary circumstances exist where there is a pattern of disregard for Court orders and deceptive litigation tactics that threaten to interfere with the rightful decision of a case.") (internal quotation marks and citation omitted); Englebrick, 944 F.Supp.2d at 909 (same) (collecting cases); Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989) (Litigation misconduct constitutes fraud on the court when it "harms the integrity of the judicial process.") (internal quotation marks omitted); Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc., 682 F.2d 802, 805 (9th Cir. 1982) ("A 'fraud on the court' is 'an unconscionable plan or scheme which is designed to improperly influence the court in its decision'") (citation omitted).  Otherwise, "the message to one bent on delay [and other bad faith conduct] would be: 'No matter how gross the abuse of the judicial process, your case will not be dismissed until after you have failed to comply with some alternative sanction.'"  In re Fitzsimmons, 920 F.2d at 1474.

Here, the court has considered lesser sanctions, such as allowing adverse inferences against defendants and instructing the jury that the court found that defendants have falsified evidence.[26]  The court finds that less drastic sanctions would not be useful here because defendants have "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."  Anheuser-Busch, 69 F.3d at 348 (terminating sanctions are available when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings").  Defendants' premeditated scheme to strengthen its trademark claims and defenses based on false evidence and other litigation misconduct undermines the

---

[26]  Defendants ask the court to consider prohibiting defendants from "introducing or relying upon the three declarations in this proceeding going forward" instead of imposing terminating sanctions.  (See Opp'n at 23).  Defendants, however, have already stated that they would not use the three declarations.  (See id. at 18) ("Defendants have no intention of using these declarations and will not be relying on them in any way as this case approaches to trial.").  Thus, imposing as a sanction something defendants have already agreed to do is tantamount to imposing no sanction at all.

integrity of the court.  Thus, defendants' contention that, "[i]n lieu of imposing such drastic [terminating] sanctions . . . this Court should instead allow this case to be properly decided on its merits[,]" (Opp'n at 12), is untenable.  Defendants' misconduct was intentional, calculated, and in bad faith.  What's more, even after being put on notice of the false declarations and other related misconduct through the filing of plaintiffs' first motion for terminating sanctions, defendants persisted in continuing their ongoing misconduct.  See supra at § II.A.2.

In addition, defendants filed the false declarations with the Ninth Circuit and submitted the false complaints to the Northern District of California before this court had any opportunity to order "lesser sanctions."  See Leon, 464 F.3d at 960 ("The second [Anheuser-Busch] criterion is inapplicable here because [the party] erased the files and ran the wiping program before the district court had an opportunity to compel discovery or otherwise order 'lesser sanctions.'").  Defendants' obstructive misconduct has severely damaged the integrity of this litigation, and the court seriously doubts whether alternative sanctions will deter defendants from further misconduct.  See Conn. Gen. Life Ins. Co., 482 F.3d at 1097 ("It is appropriate to reject lesser sanctions where the court anticipates continued deceptive conduct.").  A party may not grossly abuse the judicial process and then expect to be allowed to litigate the merits of their case until they have exhausted graduated sanctions.  See In re Fitzsimmons, 920 F.2d at 1474 (declining to impose lesser sanctions because it would convey the message, "[n]o matter how gross the abuse of the judicial process, your case will not be dismissed until after you have failed to comply with some alternative sanction").  Defendants' egregious and persistent misconduct stripped them of the privilege of litigating the merits of their counterclaims and defenses.  See Arnold v. Cnty. of El Dorado, 2012 WL 3276979, *4  (E.D. Cal. 2012) ("[P]erjury on any material fact strikes at the core of the judicial function and warrants a dismissal of one's right to participate at all in the truth seeking process."); Nat'l Corporate Tax Credit Funds, 2010 WL 457626, at *10 ("Defendants have engaged in dilatory tactics intended to frustrate the resolution of this case[,]" such that "alternative sanctions do not weigh against terminating sanctions in this case.").

With respect to the third Anheuser-Busch factor, defendants contend that terminating sanctions are inappropriate because they have not "been warned that these declarations or any

failure to comply with discovery could lead [to] the sanction of dismissal and default." (Opp'n at 13). As with the second criterion, this criterion is inapplicable because defendants filed and submitted the false declarations and false complaints to the Ninth Circuit and Northern District of California before this court had an opportunity to warn defendants. See Leon, 464 F.3d at 960 ("Likewise, the third criterion, which examines whether the district court warned the party, is inapplicable here because the destruction of the evidence occurred before the court had any opportunity to warn [the party].").

In any event, the nature of defendants' misconduct is so egregious and antithetical to the integrity of the judicial system that no warning of lesser sanctions is required. See Nat'l Corporate Tax Credit Funds, 2010 WL 457626, at *10 ("While a failure to warn has been a contributing factor in Ninth Circuit decisions to reverse grants of terminating sanctions, warnings are not required in egregious circumstances.") (internal quotation marks and citation omitted). A court should not have to warn a party to refrain from inventing phantom witnesses (Alice Win), forging declarations (Jess Chen / Jessie Xu), falsifying and fraudulently procuring declarations (Amy Huong), filing false declarations with various federal courts, obstructing the discovery process by filing fraudulently procured complaints, and lying under oath. As the court in Sun World, Inc. explained, the courts "need not order [a party] to refrain from submitting false documents or perjuring himself in order for those acts to be punishable by dismissal and the entry of default judgment. The legal obligation to refrain from committing such acts is imposed upon every party to a lawsuit." 144 F.R.D. at 389-90; see also Garcia, 569 F.3d at 1180 (explaining that although party did not receive an "explicit warning that dismissal would be a likely sanction for fabricating evidence," and submitting false responses to discovery, such a warning was not a "prerequisite[,]" since "additional warnings [would have been] superfluous at best") (internal quotation marks and citation omitted).

Finally, it should be noted that defendants did receive notice of the possibility of terminating sanctions in the form of plaintiffs' first motion for terminating sanctions, which was filed on May 31, 2013. See Nat'l Corporate Tax Credit Funds, 2010 WL 457626, at *10 (Plaintiffs "warned defense counsel during a meet and confer that Plaintiffs planned on filing a motion for terminating

sanctions if Defendants did not appear for depositions and otherwise comply with the court-ordered discovery[,] . . . and earlier [filed a] Motion for Leave to File Motion for Terminating Sanctions . . . , which surely placed Defendants on notice of the possibility of terminating sanctions."). Defendants failed to heed that warning, and instead continued to pursue their scheme to prevent Luong from appearing at her deposition, see supra at § II.A.1.c., and thereafter, on September 4, 2013, filed the fraudulently procured Luong declaration and the fraudulent Luong July 18, and August 9, 2013, complaints with this court. (See Opp'n to Taking Luong Deposition). In short, the court finds it was unnecessary to warn defendants of the possibility of terminating sanctions given the egregiousness of the misconduct, some of which occurred before the court even had a chance to warn defendants, and because defendants' conduct after plaintiffs filed the Prior Motion suggest that defendants would have failed to heed such a warning. See Leon, 464 F.3d at 960 (party's misconduct occurred before the court had any opportunity to warn); CFTC v. Noble Metals Int'l, Inc., 67 F.3d 766, 771 (9th Cir. 1995), cert. denied 519 U.S. 815 (1996) (affirming dispositive sanctions despite lack of prior warning because parties "could not have been surprised by the severity of the sanction").

Under the circumstances, the court is persuaded that alternative, lesser sanctions are futile. The court has no confidence that it can accept defendants' account of either the law or the facts in this matter. See Newman, 2012 WL 4933478, at *4 (submission of perjured testimony going to material issues in the case "was an act of bad faith which undermines the confidence placed in our system of justice"); Da-Silva, 2013 WL 2558302, at *4 (less severe sanction is not appropriate when party "callously deceived the court, the defendant, her doctors, and her own attorney," and it would be "unlikely" that a trier of fact would believe party's testimony). There is nothing before the court indicating that defendants would now rectify their litigation conduct even if the court were to impose something less than terminating sanctions. See Conn. Gen. Life Ins. Co., 482 F.3d at 1097 ("It is appropriate to reject lesser sanctions where the court anticipates continued deceptive conduct."). Further, the court is persuaded that lesser sanctions would not deter defendants' repetition of misconduct; lesser sanctions would simply place defendants back in the same position they were in prior to submitting the false declarations and false complaints.

1    See Uribe, 2011 WL 3925077, at *5 ("[T]o continue this action would not deter repetition of such

2    conduct or comparable conduct.  Such a course would simply place [party] back in the same

3    position he was in, without the false declaration.").

4              5.    **Summary of the Five-Factor Test**.

5         Four of the five Anheuser-Busch factors support the imposition of terminating sanctions.

6    The prejudice to plaintiffs and the futility of lesser sanctions weigh heavily in favor of terminating

7    sanctions.  Likewise, the need to manage the court's docket, as well as the public interest in the

8    expeditious resolution of litigation, weigh in favor of terminating sanctions.  See Leon, 464 F.3d

9    at 960.  "The only factor weighing against dismissal is the public policy favoring disposition of

10   cases on their merits, which standing alone, is not sufficient to outweigh the other four factors."

11   Id. at 960-61 (internal quotation marks omitted).  Additionally, the court's bad faith determination,

12   see supra at § II.B., supports the imposition of terminating sanctions.  In short, the court's

13   examination of the record and analysis of the five-prong test conclusively establish that

14   defendants' conduct poses too great a risk that they will continue to undermine the judicial process

15   and interfere with the appropriate merits-based decision in this case.  See Anheuser–Busch, 69

16   F.3d at 352 (Terminating sanction is appropriate where a "pattern of deception and discovery

17   abuse ma[kes] it impossible" for a district court to conduct a trial "with any reasonable assurance

18   that the truth would be available."); see also Conn. Gen. Life Ins. Co., 482 F.3d at 1097 ("In

19   deciding whether to impose case-dispositive sanctions, the most critical factor is not merely delay

20   or docket management concerns, but truth.")

21        Defendants assert a due process argument premised on the notion that "the wrongdoing

22   in the instant case was both peripheral and confined to one finite issue." (Opp'n at 16).  According

23   to defendants, the "declarations at issue are entirely irrelevant to the vast majority of the case[,]"

24   since plaintiffs assert other causes of actions in addition to trademark infringement.  (Id. at 15).

25   Defendants' assertions are plainly without merit.

26        The crux of plaintiffs' suit concerns trademark infringement.  (See, generally, FAC).

27   Defendants' main defense in this case is the claimed priority of the ARëna mark, and their

28   affirmative counterclaims rest on this same claim.  (See Amended Answer & Counterclaims at ¶

11 (alleging that Lin started using the mark ARëna in 1999, or seven years before plaintiffs began to use the disputed marks in June 2006); see also id. at ¶¶ 31-42, 50-56 & 61-66 (alleging counterclaims of statutory and common law trademark infringement, trademark cancellation, and trademark libel)).   There is an undeniably close nexus between the subject-matter of the false declarations (i.e., prior use of the ARëna marks) and the core trademark claims and defenses in this action (i.e., priority of RENA versus ARëna), which strongly supports the imposition of terminating sanctions.   Indeed, in arguing against the evidentiary sanctions plaintiffs seek – i.e., an order "conclusively establish[ing]" that plaintiffs' trademarks have priority or a preclusion order preventing defendants from introducing any evidence of Arena marks prior to plaintiffs' marks, (see Motion at 23) – defendants assert that such sanctions would result in a "complete foreclosure of Defendants' case."[27]   (Opp'n at 23).   In short, there are no due process concerns with the imposition of terminating sanctions because there is a "close nexus" between the sanctioned conduct and the merits of the case.   See Anheuser-Busch, 69 F.3d at 348 (Due process requires "that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case.") (internal quotation marks omitted).

Defendants also argue that they should be permitted to litigate the merits of this action because they have other evidence that proves their claims and defenses as to the alleged trademark violations.   (See Opp'n at 11-12).   This is simply an iteration of their "no harm, no foul" argument, in which defendants ask the court to ignore their egregious bad faith conduct because they have legitimate grounds upon which to proceed.   But as the Ninth Circuit has explained, "[w]here a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of" terminating sanctions under the

---

[27]   Defendants give shifting and conflicting explanations with respect to the significance of the false declarations. On the one hand, defendants claim that the wrongdoing in this case – i.e., the filing of the false declarations – was "peripheral" and "confined to one finite issue." (Opp'n at 16). On the other hand, defendants assert that the evidentiary sanctions plaintiffs seek based on the false declarations – i.e., supporting defendants' first use defense – would result in a "complete foreclosure of Defendants' case." (Id. at 23). More recently, defendants claim that the three declarations "are of no use to them." (Def'ts Second Fees Suppl. Opp'n at 17).

court's inherent power.  B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1108 (9th Cir. 2002).  "To permit the fabrication of spurious corroborating evidence without the imposition of a harsh responsive sanction would constitute an open invitation to abuse of the judicial system of the most egregious kind."  Asia Pac. Agr. & Forestry Co. v. Sester Farms, 2013 WL 4742934, *11 (D. Or. 2013); see also Arnold, 2012 WL 3276979, at *4 ("[P]erjury on any material fact strikes at the core of the judicial function and warrants a dismissal of one's right to participate at all in the truth seeking process."); id. ("Perjury is much more than simply a 'gotcha,' harmful in effect only for the reason that one got caught. . . . If one can be punished for perjury with up to five years imprisonment, 18 U.S.C. § 1621, it should not seem out of place that a civil action might be dismissed for the same conduct.").

In short, the court concludes that the evidence is clear and convincing that defendants fabricated evidence, obstructed the discovery process and administration of justice, submitted false evidence to this court and the Ninth Circuit, and violated the court's preliminary injunction.  See supra at § II.  Defendants' bad faith conduct "covers the 'full range of litigation abuses.'"  Vargas v. Peltz, 901 F.Supp.1572, 1581-82 (S.D. Fla. 1995).  The court has no confidence that defendants would move forward in this litigation in good faith, and it will not allow plaintiffs' and the court's extremely limited resources to be further wasted when defendants have consistently engaged in such egregious misconduct.  The court therefore concludes that defendants' misconduct warrants no less than terminating sanctions, and will grant plaintiffs' default judgment, dismiss defendants' counterclaims, and strike their answers and defenses.

III.    MONETARY SANCTIONS.

Having found that defendants' conduct was in bad faith and that the imposition of terminating sanctions is appropriate, see supra at § II.B.-C., the court now turns to plaintiffs' request for attorney's fees and costs.  See Haeger, 793 F.3d at 1135 ("Once a district court makes a finding of bad faith, it has the discretion to award sanctions in the form of attorneys' fees against a party or counsel.") (internal quotation marks omitted).  However, before addressing the merits of plaintiffs' request for attorney's fees and costs, the court notes that defendants' briefing failed to comply with the Court's Order of December 13, 2013.  At the December 12, 2013, hearing, the

court explained that "the issue[s] on plaintiffs' Motion are thoroughly briefed[,]" and the parties' "papers are substantial." (Transcript of Proceedings, December 12, 2013, at 3 & 6). The court ordered additional briefing, however, only as to the narrow issue of attorney's fees and costs as a sanction. (See id. at 5 & 7). The court did this because plaintiffs, in their Motion, requested leave to file an application for an award of attorney's fees and costs pursuant to the court's inherent power and 28 U.S.C. § 1927. (See Motion at 24-25). The court explained at the hearing that plaintiffs' request for fees was, in essence, "part of the same Motion[,]" and therefore, rather than grant plaintiffs leave to file a separate motion or application, the court would treat that request as part of same motion and rule on "all the requested sanctions together" after receiving supplemental briefs on those issues. (Transcript of Proceedings, December 12, 2013, at 5). Accordingly, on December 13, 2013, the court issued an order directing plaintiffs to submit a supplemental memorandum addressing "(1) the authority(ies) under which the fees and costs are sought; (2) the amount of fees and costs sought by plaintiffs and the reasonableness of the requested amounts; and (3) whether the fees and costs should be assessed against defendants and/or counsel." (Court's Order of December 13, 2013).

Rather than address the merits of plaintiffs' request for attorney's fees and costs, defendants – who by this time again had new counsel – took it as an opportunity to present new arguments and evidence relating to whether sanctions should be imposed in the first place.[28] (See, e.g., Def'ts First Fees Suppl. Opp'n at 8-9 (relying on new declaration of Howard Huang to support claim that the Alice Win declaration is not false because defendants recently spoke to Alice Win by telephone in Beijing); Def'ts Second Fees Suppl. Opp'n at 7-9 (similar)). The court is not obligated to give parties and their counsel several opportunities to raise facts and legal arguments that could have been asserted earlier. The papers filed with this court are not first drafts, subject to revision and resubmission at the litigant's pleasure. In short, the court will

---

[28] Defendants could have raised all the arguments and evidence they wished in their oppositions to the Prior Motion and Motion. In contrast, InHouse was not retained when the Prior Motion was briefed. In its brief opposing plaintiffs' attorney's fees and costs, InHouse necessarily had to address some of the merits of InHouse's own conduct.

1    disregard any arguments and evidence in defendants' supplemental papers relating to attorney's

2    fees that are merely a rehash or attempt to re-frame arguments that were either presented or

3    could or should have been presented in defendants' earlier submissions.[29]

4         Even though the purpose of the supplemental briefing was to address plaintiffs' request for

5    fees and costs, defendants' new counsel provided a disservice to their clients by, inexplicably,

6    making no attempt to challenge the reasonableness of plaintiffs' fees or hourly rates.[30]   For

7    example, defendants' new counsel did not specifically identify any particular time entries they

8    believed should not be compensated.[31]   (See, generally, Def'ts Second Fees Suppl. Opp'n).

9    Defendants' new counsel's failure to provide any specific basis or challenge to plaintiffs' counsel's

10   hours means that no reduction to plaintiffs' fees or costs may be appropriate.   See Gates v.

11

12   [29] Defendants submitted new evidence in the form of the declarations of Stephen Johnson and

13   Howard Huang.  (See Declaration of Howard Huang, Dkt. No. 255-3; Declaration of Stephen Johnson, Dkt. No. 255-1).   The court has considered plaintiffs' evidentiary objections and

14   defendants' responses to the objections to these declarations.  (See Evidentiary Objections to Evidence Proffered by Defendants and InHouse in Opposition to Request for Fees and Costs in

15   Renewed Motion for Full Terminating and Other Sanctions ("Plffs' Fees Evid. Objs.," Dkt. No. 261-2); Reply to Plaintiffs' Objections to the Declaration of Stephen C. Johnson and Howard Huang

16   ("Def'ts Fees Reply to Evid. Objs.," Dkt. No. 264)).   The court sustains all of plaintiffs' objections and strikes paragraphs 4 to 18 of the declaration of Stephen Johnson on the grounds that the

17   statements constitute inadmissible hearsay, lack foundation, and are irrelevant.   The court also strikes paragraphs 2 and 4-14 of the declaration of Howard Huang on the grounds that the

18   statements constitute inadmissible hearsay, lack foundation and are irrelevant.

19

20   [30] Although defendants' opposition to attorney's fees and costs includes a section heading entitled, "The Amount Requested by Quinn Emanuel is Absurd; it finds no support in the facts or

21   the law," (Def't Second Fees Suppl. Opp'n at 13), that section, which is only four paragraphs long, makes no effort to address the reasonableness of the requested fees, costs or hourly rates.

22   (See, generally, id. at 13-14).

23   [31] Although defendants do not challenge the reasonableness of plaintiffs' proposed fees, InHouse does, and includes the declaration of an attorney's fees expert, Edward O. Lear.  (See

24   InHouse's Fees Opp'n at 24-25; Declaration of Edward O. Lear ("Lear Decl.," Dkt. No. 256-4)). Given the court's conclusion below that sanctions are not warranted against InHouse or Kamarei,

25   see infra at § III.A., it is unclear whether the court can or should consider InHouse's fee expert's declaration in assessing the reasonableness of fees requested by plaintiffs solely against

26   defendants.   In any event, the court will review the Lear declaration in assessing the reasonableness of plaintiffs' request for monetary sanctions against defendants, even though

27   defendants did not assert any specific challenges (or even incorporate by reference Lear's

28   declaration).

Rowland, 39 F.3d 1439, 1449 (9th Cir. 1994) (fee opponents failed to meet their burden rebutting with specificity any charges that were excessive or duplicative); Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc., 106 F.3d 284, 296-97 (9th Cir. 1997), rev'd on other grounds, 523 U.S. 340 (1998) (rejecting argument that certain hours should have been excluded, because no specific objection was raised in district court); see also Smith v. Rogers Galvanizing, 148 F.3d 1196, 1199 (10th Cir. 1998) (district court did not abuse discretion in refusing to reduce hours as to which fee opponent made no specific objection); Sheets v. Salt Lake City, 45 F.3d 1383, 1391 (10th Cir. 1995) (fee opponent who argued merely that fee request was exorbitant and duplicative failed to carry burden of opposing fee, and waived issue for purposes of appeal).

Plaintiffs request $1,363,728.88 in attorney's fees and costs.  (See Suppl. Fees Motion at 17; Declaration of Bruce Van Dalsem ("Van Dalsem Decl.," Dkt. Nos. 243-1 to 243-11) at ¶ 7). This amount reflects 75% of plaintiffs' total fees and costs that are attributable to defendants' misconduct.  (See id.; Suppl. Fees Motion at 17 & 22).  Plaintiffs also ask the court to impose, pursuant to the court's inherent power and 28 U.S.C. § 1927,[32] $396,994.14 of the above-referenced amount jointly and severally against InHouse and Ali Kamarei, a partner at InHouse. (See Suppl. Fees Motion at 1 & 13-16).

A.    Ali Kamarei and InHouse Co. Law Firm.

Under its inherent powers, a court may award sanctions in the form of attorney's fees against an attorney who acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 648 (9th Cir. 1997).  In order to invoke its inherent power, the court must make an explicit finding of bad faith.  See Mendez v. Cnty. of San Bernardino, 540 F.3d 1109, 1131 (9th Cir. 2008), overruled on other grounds Ariz. v. ASARCO, LLC, 773 F.3d 1050 (9th Cir. 2014); Fink v. Gomez, 239 F.3d 989, 992 (9th Cir. 2001) ("In reviewing sanctions under the court's inherent power, our cases have consistently focused on bad faith.").  Bad faith is found where an attorney "knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent."  Primus Auto. Fin.

_____

[32]  Further references to 28 U.S.C. § 1927 will be to "§ 1927."

1  Servs., 115 F.3d at 649; Walsh v. Frederick J. Hanna & Assocs., P.C., 2011 WL 537854, *1 (E.D.

2  Cal. 2011) (same); see also Fink, 239 F.3d at 992 (bad faith includes a broad range of improper

3  conduct, including actions that are not frivolous, yet are "substantially motivated by vindictiveness,

4  obduracy, or mala fides").

5      Pursuant to § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case

6  unreasonably and vexatiously may be required by the court to satisfy personally the excess costs,

7  expenses, and attorneys' fees reasonably incurred because of such conduct."[33] See Pac. Harbor

8  Capital, Inc. v. Carnival Air Lines, Inc., 210 F.3d 1112, 1117 (9th Cir. 2000) ("Section 1927

9  authorizes the imposition of sanctions against any lawyer who wrongfully proliferates litigation

10 proceedings once a case has commenced."). Section 1927 is "concerned only with limiting the

11 abuse of court processes" and is "indifferent to the equities of a dispute and to the values

12 advanced by the substantive law." Roadway Express, Inc. v. Piper, 447 U.S. 752, 762, 100 S.Ct.

13 2455, 2462 (1980); accord T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626,

14 638 (9th Cir. 1987). Sanctions under § 1927 may be imposed when: (1) the attorney

15 unreasonably multiplied the proceedings; (2) the attorney's conduct was unreasonable and

16 vexatious; and (3) the conduct caused an increase in the cost of the proceedings. 28 U.S.C.

17 § 1927; B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1107 (9th Cir. 2002), as amended Feb. 20,

18 2002). While a finding of bad faith is required for the imposition of sanctions pursuant to the

19 court's inherent power, "recklessness suffices for § 1927." Fink, 239 F.3d at 993; accord B.K.B.,

20 276 F.3d at 1107.

21     The court has already made a finding that defendants' misconduct was willful and in bad

22 and subject to terminating sanctions.   See supra at § II.B.-C.   Before addressing the

23 reasonableness of plaintiffs' monetary sanctions request, the court must determine whether

24 InHouse and/or Kamarei's conduct was in bad faith and/or reckless (for Kamarei only as to 28

25

26     [33] Title "28 U.S.C. § 1927 does not permit the award of sanctions against a law firm." Kaass

27 Law v. Wells Fargo Bank, 799 F.3d 1290, 1291 (9th Cir. 2015). Therefore, plaintiffs' request for
   sanctions against the InHouse law firm under § 1927 is denied. However, the court must still

28 determine whether sanctions are warranted against InHouse under the court's inherent power.

U.S.C. § 1927), in order to hold them jointly and severally liable for a portion of the monetary sanctions.

Plaintiffs allege that InHouse and Kamarei acted in bad faith by: (1) recklessly or knowingly misstating facts and law with an improper purpose, (see Fees Reply at 9); (2) recklessly or knowingly putting forth frivolous arguments, (see id.); (3) violating counsel's duty of candor, (see id. at 10); and (4) obstructing discovery. (See id.).

                1.    **Misstating Facts and Law with an Improper Purpose**.

Plaintiffs assert that InHouse and Kamarei knowingly relied on evidence that they knew was false, namely the Chen, Win, and Luong declarations. (See Suppl. Fees Motion at 5). Plaintiffs contend that InHouse and Kamarei prepared or failed to amend two documents, which relied on the three declarations. First, during the time InHouse and Kamarei were retained by Sis-Joyce, Sis-Joyce submitted supplemental responses to interrogatories in October 2013, which identified Jess Chen, Amy Luong, and Alice Win as individuals who had knowledge that defendants "first used the ARëna marks in the United States prior to Rena's use of the Rena marks." (Keech Reply Decl., Exh. G at 22). Second, plaintiffs point out that defendants' operative answer, to this day, alleges an affirmative defense that specifically references the three declarations. (See Amended Answer and Counterclaims at p. 36).

In response, InHouse and Kamarei assert that they began representing defendants in September 2013, and "made an attempt to quickly and efficiently get the case back on track" when preparing the supplemental discovery responses. (Declaration of Ali Kamarei ("Kamarei Decl.," Dkt. Nos. 256-1 & 256-2) at ¶ 2). According to InHouse and Kamarei, "[t]he residual reference to the three declarations in the affirmative defense of justification and privilege was inadvertent." (Id. at ¶ 8).

Given that plaintiffs filed their Prior Motion in May 2013, InHouse and Kamarei should have been aware that the Chen, Win, and Luong declarations may have been false. On the other hand, the efforts required to get up to speed on the instant action midstream may have been considerable. InHouse and Kamarei were retained in September 2013, only a month after defendants served the supplemental responses, and the amended answer and counterclaims

1   were prepared and filed by prior counsel.  Although it is a close call, the court is persuaded that

2   while the "evidence in the record . . . certainly shows ignorance or negligence on the part of

3   [InHouse and Kamarei], [it] does not compel a finding that [they were] reckless or acted in bad

4   faith."  Barber v. Miller, 146 F.3d 707, 711 (9th Cir. 1998); see In re Girardi, 611 F.3d 1027, 1038

5   n. 4 (9th Cir. 2010) ("'Recklessness' of course, may have different meanings in different contexts.

6   . . . In the instant context, recklessness might be defined as a departure from ordinary standards

7   of care that disregards a known or obvious risk of material misrepresentation.").

8        Finally, even if the court had found that Kamarei's conduct rose to the level of recklessness,

9   see 28 U.S.C. § 1927, plaintiffs have not established how the supplemental responses multiplied

10   the proceedings.  (See, generally, Suppl. Fees Motion; Fees Reply); see In re Keegan Mgmt. Co.,

11   Sec. Litig., 78 F.3d 431, 435 (9th Cir. 1996) ("[S]ection [1927] authorizes sanctions only for the

12   multiplication of proceedings, [and] applies only to unnecessary filings and tactics once a lawsuit

13   has begun.")  (emphasis added) (internal citations and alterations omitted).

14          2.    **Putting Forth Frivolous Arguments and Violating Counsel's Duty of**

15                  **Candor**.

16        Plaintiffs claim that InHouse's and Kamarei's argument regarding Alice Lin's role preparing

17   the Luong declaration was disingenuous and violated their duty of candor.  (See Suppl. Fees

18   Motion at 3-5).  InHouse's and Kamarei's argument distinguishing Alice Win's "drafting," i.e.,

19   forming the substance of the Win, Chen, and Luong declarations from "writing" them, i.e.,

20   physically transcribing the documents, (see InHouse's Fees Opp'n at 8-10), is weak and

21   unpersuasive.  Although this is an even closer call than the issue discussed in the previous

22   section, it does not appear to rise to the level of bad faith or recklessness.  See, e.g., In re Girardi,

23   611 F.3d at 1062 ("[I]n the contexts of § 1927, frivolousness should be understood as referring to

24   legal or factual contentions so weak as to constitute objective evidence of improper purpose.").

25   While InHouse's and Kamarei's argument relating to the "drafting" of declarations clearly strains

26   credulity, the court cannot say that the argument was reckless or in bad faith.

27          3.    **Obstructing Discovery**.

28        Plaintiffs also contend that the conduct of Kamarei at Alice Lin's October 2013, deposition

1  constituted an obstruction of the discovery process.  (See Suppl. Fees Motion at 8-9; Fees Reply

2  at 15-16).  For example, shortly after the commencement of Alice Lin's deposition, Kamarei tried

3  to limit the deposition to 59 minutes.  (See Alice Lin Oct. 2013, Dep. at 173).  Kamarei made

4  repeated and lengthy speaking objections, (see Fees Reply at 8) (citing examples), which Kamarei

5  insisted the interpreter translate into Mandarin for his client's benefit.  (See Alice Lin Oct. 2013,

6  Dep. at 179 (Proctor: "So you're insisting that your client have translated for her your speaking

7  objections?"  Kamarei: "She has to translate all my objections, including every discussion that

8  occurs.")).

9      Again, this is a close call.  While Kamarei's deposition conduct is arguably sanctionable

10  under Rule 37 of the Federal Rules of Civil Procedure, plaintiffs did not raise that as basis for the

11  imposition of sanctions.  The court is persuaded that Kamarei's deposition conduct – though

12  unprofessional and likely sanctionable under Rule 37 – did not  "rise to the level of bad faith,

13  harassment, or obduracy sufficient to impose sanctions under either § 1927 or the court's inherent

14  authority."  Cardroom Int'l LLC v. Scheinberg, 2012 WL 2263330, *9 (C.D. Cal. 2012).

15      Finally, plaintiffs assert that InHouse and Kamarei violated the court's orders and local

16  rules.  (See Suppl. Fees Motion at 9-11).  Having reviewed plaintiffs' contentions with respect to

17  InHouse's and Kamarei's multiple failures to comply with the court's orders and local rules, (see

18  id.), the court is persuaded that InHouse's and Kamarei's conduct – while possibly sanctionable

19  on other grounds – again does not "rise to the level of bad faith, harassment, or obduracy

20  sufficient to impose sanctions under either § 1927 or the court's inherent authority."  Cardroom Int'l

21  LLC, 2012 WL 2263330, at *9.

22      In short, while defendants' egregious misconduct discussed above was willful and made

23  in bad faith, the court cannot clearly conclude that InHouse's or Kamarei's conduct was reckless

24  or in bad faith.  In other words, the court is not persuaded that sanctions are warranted against

25  InHouse or Kamarei under either the court's inherent power or, as applied to Kamarei.  28 U.S.C.

26  § 1927.  Accordingly, monetary sanctions will be imposed only against defendants and not their

27  counsel.  See, e.g., Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., 2009 WL 2898824, *2 (C.D.

28  Cal. 2009) ("Based on all the evidence before it, the Court is persuaded Plaintiff acted at least in

1  part out of obduracy . . . [n]evertheless, its counsel's motivations were such that the Court cannot

2  conclude he was 'substantially motivated' by obduracy, vindictiveness, or <u>mala fides</u>.").

3       B.       Computation of Monetary Sanctions.

4       Having concluded that terminating sanctions are warranted and that defendants acted in

5  bad faith, <u>see supra</u> at § II.; <u>Leon</u>, 464 F.3d at 961, the court now turns to the amount of monetary

6  sanctions that will be imposed against defendants. (<u>See</u> Suppl. Fees Motion at 24).

7       Before addressing the specifics of plaintiffs' request for fees and costs, the court believes

8  it is necessary to address a few threshold matters.  First, as noted earlier, defendants' new

9  counsel did not assert any specific challenge or objection to the hourly rate or number of hours

10  requested by plaintiffs. <u>See supra</u> at § III.  The court, however, will consider the declaration of

11  InHouse's fee expert, Edward Lear, submitted in conjunction with InHouse's opposition to plaintiffs'

12  motion for attorney's fees.  The court will consider the Lear Declaration – subject to plaintiffs'

13  evidentiary objections[34] – in conducting its own independent review of the attorney's fees and

14  costs at issue.  <u>See</u> Gates v. Deukmejian, 987 F.2d 1392, 1401 (9th Cir. 1992) (court has duty "to

15  independently review plaintiffs' fee request even absent defense objections").  In referring or

16  addressing objections to plaintiffs' fee request raised by InHouse, the court will refer – throughout

17  the remainder of this order – to InHouse and defendants interchangeably.

18       Second, defendants assert that "any sanctions awarded should directly reflect fees incurred

19  with respect to specific misconduct." (InHouse's Fees Opp'n at 24).  Defendants' assertion is

20  unpersuasive.

21       In <u>Haeger</u>, after the parties settled a case concerning allegedly defective tires, plaintiffs

22  discovered that defendant Goodyear Tire & Rubber Company ("Goodyear") withheld documents

23  relating to the testing of the tires.  <u>See</u> 793 F.3d at 1129-31.  "[R]elying upon its inherent power,

24  _____

25  [34]  The court has reviewed plaintiffs objections and InHouse's response, (<u>see</u> Plffs' Fees Evid.
   Objs.; Responding Attorneys' Response to Plaintiffs' Evidentiary Objections to the Declarations

26  of Ali Kamarei and Edward Lear ("Def'ts Fees Evid. Objs.," Dkt. No. 266), and hereby overrules
   plaintiffs' objections to paragraphs 2-3 in their entirety and sustains plaintiffs' objections to

27  paragraphs 4-11 and exhibits 2-3 in their entirety on the grounds that they contain improper legal
   opinion.  The court further sustains plaintiffs' objections to paragraphs 12-17 and exhibits 4-5 to

28  the extent they contain improper legal opinion.

the district court determined that the most appropriate sanction for 'remedying a years-long course

of misconduct' would be 'to award Plaintiffs <u>all</u> of the attorneys' fees and costs they incurred after

Goodyear served its supplemental responses to Plaintiffs' First Request.'" <u>Id.</u> at 1130 (emphasis

in original).  On appeal, Goodyear challenged the sanctions amount, claiming that it must be

directly linked to its bad faith conduct.  <u>See</u> <u>id.</u> at 1136.

The Ninth Circuit "consider[ed] how close a link is required between the harm caused and

the compensatory sanctions awarded when a court invokes its inherent power." <u>Haeger</u>, 793 F.3d

at 1137.  The Ninth Circuit stated that the linkage question "is squarely answered by <u>Chambers</u>

<u>v. NASCO, Inc.</u>" <u>Id.</u>  In particular, the Ninth Circuit stated that the Supreme Court's <u>Chambers</u>

decision "expressly rejected the linkage argument made by [Goodyear] here when it upheld the

award for full attorney's fees 'due to the frequency and severity of Chambers's abuses of the

judicial system and the resulting need to ensure that such abuses were not repeated.'" <u>Id.</u> at 1138

(quoting <u>Chambers</u>, 501 U.S. at 56, 111 S.Ct. at 2139).  According to the <u>Haeger</u> court, the

<u>Chambers</u> decision "made clear" that a district judge's "determinations in arriving at the proper

measure of compensatory damages [is reviewed] for abuse of discretion." <u>Id.</u>  The Ninth Circuit

upheld the district judge's decision to award plaintiffs $2,741,201.16 for their attorney's fees and

costs against Goodyear and their counsel.  <u>See</u> <u>id.</u> at 1125-26 & 1141.

The <u>Haeger</u> court quoted extensively from the <u>Chambers</u> decision, see <u>Haeger</u>, 793 F.3d

at 1137-38, and noted why and under what circumstances, full attorney's fees were warranted:

> The Supreme Court further explained [in <u>Chambers</u>] that it was within the
> district court's discretion to "compensate NASCO by requiring Chambers to
> pay for all attorney's fees."  The Supreme Court reasoned that the district
> court "imposed sanctions for the fraud [Chambers] perpetrated on the court
> and the bad faith he displayed toward both his adversary and the court
> throughout the course of litigation."  And, such sanctions both "vindicat[e]
> judicial authority without resort to the more drastic sanctions available for
> contempt of court and mak[e] the prevailing party whole for expenses caused
> by his opponent's obstinacy."

1  Id. at 1137-38 (citations to Chambers decision omitted and all brackets in original except for first

2  set of brackets).

3        The conduct in this case is arguably more egregious than the conduct in Haeger.  Whereas

4  in Haeger, Goodyear withheld clearly relevant evidence that may or may not have impacted the

5  merits of the case and ultimate settlement, see 793 F.3d at 1130 ("The court also noted that while

6  it would be impossible to determine how the litigation would have proceeded if Goodyear had

7  made the proper disclosures, the case more likely than not would have settled much earlier, and,

8  the Haegers believe, for considerably more money."), in this case, defendants fabricated evidence,

9  filed the false evidence with three different federal courts, filed false complaints with the Northern

10  District of California, suborned perjury, misled and/or tricked a third-party witness into signing a

11  declaration that was false, and violated (and continue to violate) the preliminary injunction.  See

12  supra at § II.  Here, the frequency and severity of defendants' pattern of bad faith conduct

13  displayed toward plaintiffs and three different federal courts, and the resulting need to ensure that

14  such abuses are not repeated, see Chambers, 501 U.S. at 56, 111 S.Ct. at 2139, clearly warrant

15  the imposition of the entirety of plaintiffs' attorney's fees and costs in this case – not just those

16  fees tied to defendants' misconduct.  Nevertheless, plaintiffs seek only 75% of the total attorney's

17  fees incurred in this case.  (See Suppl. Fees Motion at 3).

18            1.    **Applicable Law**.

19        Fee awards are calculated using the "lodestar" method, which is obtained by multiplying

20  the number of hours reasonably expended on litigation by a reasonable hourly rate.  See Perdue

21  v. Kenny A. ex rel. Winn, 559 U.S. 542, 551, 130 S.Ct. 1662, 1672 (2010) ("the lodestar figure has,

22  as its name suggests, become the guiding light of our fee-shifting jurisprudence") (internal citations

23  omitted).  "[T]here is a 'strong presumption' that the lodestar figure is reasonable.  See id. at 554,

24  130 S.Ct. at 1673.  This strong presumption, however, "may be overcome in those rare

25  circumstances in which the lodestar does not adequately take into account a factor that may

26  properly be considered in determining a reasonable fee."  Id.; Moreno v. City of Sacramento, 534

27  F.3d 1106, 1111 (9th Cir. 2008) (after computing the lodestar figure, the "district court may then

28  adjust upward or downward based on a variety of factors.").  These factors include:  (1) the time

1  and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to

2  perform the legal service properly; (4) the preclusion of other employment by the attorney due to

3  acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time

4  limitations imposed by the client or the circumstances; (8) the amount involved and the results

5  obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the

6  case; (11) the nature and length of the professional relationship with the client; and (12) awards

7  in similar cases. See Kerr v. Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th Cir.1975);  Gonzalez,

8  729 F.3d at 1209 n. 11

9      Ultimately, a "reasonable" number of hours equals "[t]he number of hours ... [which] could

10  reasonably have been billed to a private client."  Moreno, 534 F.3d at 1111.  The fee applicant

11  bears the burden of documenting the appropriate hours expended in the litigation and must submit

12  evidence in support of those hours for which it seeks payment.  See Gates, 987 F.2d at 1397

13  (1992) ("The fee applicant bears the burden of documenting the appropriate hours expended in

14  the litigation and must submit evidence in support of those hours worked.").

15              2.    **Reasonableness of Requested Billing Rates**.

16      In addition to computing a reasonable number of hours, the district court must determine

17  a reasonable hourly rate to use for attorneys and paralegals in computing the lodestar amount.

18  Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006); Welch v. Metro. Life Ins. Co., 480

19  F.3d 942, 946 (9th Cir. 2007) ("[B]illing rates should be established by reference to the fees that

20  private attorneys of an ability and reputation comparable to that of prevailing counsel charge their

21  paying clients for legal work of similar complexity.") (internal quotation marks omitted).  "Generally,

22  when determining a reasonable hourly rate, the relevant community is the forum in which the

23  district court sits."  Prison Legal News v. Schwarzenegger, 608 F.3d 446, 454 (9th Cir.2010)

24  (internal quotation marks and citation omitted); Jordan v. Multnomah Cnty., 815 F.2d 1258, 1262

25  (9th Cir. 1987) ("The prevailing market rate in the community is indicative of a reasonable hourly

26  rate.").  "Within this geographic community, the district court should "tak[e] into consideration the

27  experience, skill, and reputation of the attorney."  Dang v. Cross, 422 F.3d 800, 813 (9th Cir. 2005)

28  (internal quotation marks and citations omitted).  The fee applicant has the burden of producing

1    "satisfactory evidence" that the rates he requests meet these standards.  See id. at 814.

2    Defendants do not challenge the reasonableness of the hourly rates requested by plaintiffs'

3    counsel.  (See, generally, InHouse Fee. Opp'n; Def'ts Second Fees Suppl. Opp'n; Lear Decl.).

4    In addition, plaintiffs have submitted evidence corroborating the reasonableness of their requested

5    billing rates.  (See Van Dalsem Decl. at ¶¶ 11-13, 15 & Exhs. F, G, H, I, K, & L).  Based on

6    plaintiffs' evidence and the court's own experience with the rates in these types of cases, see

7    Ingram v. Oroudjian, 647 F.3d 925, 928 (9th Cir. 2011) (agreeing with other circuit courts that "it

8    is proper for a district court to rely on its own familiarity with the legal market" in determining a

9    reasonable rate), the court finds that the hourly rates requested by plaintiffs' counsel are

10   reasonable.

11   Plaintiffs request hourly rates of between $275-290 for paralegals, (see Van Dalsem Decl.

12   at ¶ 14), $150 for "professionals with specialized experience in electronic document management

13   and production[,]" (id.), and $365 for Jonathan Land, the head of litigation support.  (See id.;

14   Suppl. Fees Motion at 20).  The evidence plaintiffs have put forth, (see Van Dalsem Decl. at Exh.

15   J), however, appears to be insufficient to establish the reasonableness of the requested rates for

16   paralegals.

17   In Bistro Exec., Inc., v. Rewards Network, Inc., CV 04-4640 (C.D. Cal. 2007), the court

18   reduced the hourly rate for case assistants, which was $60 over the median billing rate.  (See Van

19   Dalsem Decl., Exh. J at 179).  There, plaintiffs' counsel provided the International Paralegal

20   Management Association's Annual Compensation Survey for Paralegals/Legal Assistants and

21   Managers as evidence of the reasonableness of the requested rates.  (See id.).  Relying on the

22   survey, the court awarded fees for support staff commensurate with the market rates for those

23   positions in the Los Angeles – Long Beach area.  (See id.).  Here, plaintiffs have not provided any

24   such evidence, (see, generally, Van Dalsem Decl.), nor do any of the courts in the other cases

25   plaintiffs put forth discuss the reasonableness of the rates for plaintiffs' legal support staff.

26   Attorney's fees "can include separately billed paralegal fees, so long as these fees are

27   consistent with market rates and practices."  Perez v. Cate, 632 F.3d 553, 556 (9th Cir. 2011)

28   (internal quotation marks and citation omitted).  Given plaintiffs' failure to provide sufficient

1    evidence as to what the appropriate rate for legal support staff is in the Los Angeles area, the
2    court will utilize the approach, with one exception, taken by the court in In re HPL Techs., Inc. Sec.
3    Litig., 366 F.Supp.2d 912 (N.D. Cal. 2005).  In that case, the court looked at the Laffey Matrix, "a
4    well-established objective source for rates [in the legal profession,]" id. at 921, to determine the
5    appropriate market rate for legal professionals for a particular locality.  See id. at 922 n. 1
6    (determining rate in the San Francisco bay area).  The Laffey Matrix provides hourly rates for
7    attorneys (based on years of experience) and paralegals and law clerks on a yearly basis in the
8    District of Columbia area.  The mean rate for paralegals and law clerks for the relevant time period
9    here, June 1, 2013 to May 31, 2014, was $145.  (See Department of Justice, Laffey Matrix, 2003-
10   2014) (available at http://www.justice.gov/usao/dc/divisions/Laffey_Matrix%202014.pdf) (last
11   accessed on November 28, 2015).

12           While the Laffey Matrix considers only hourly rates in the District of Columbia and
13   surrounding areas, the court will adjust the Laffey Matrix numbers by using the relevant locality
14   rate for the Los Angeles region.  However, instead of the Judicial Locality Pay Tables, which was
15   used by the court in In re HPL Techs., see 366 F.Supp.2d at 922 n. 1, this court will apply the
16   Occupational Employment Statistics provided by the U.S. Bureau of Labor Statistics.  The
17   Occupational Employment Statistics may be a more accurate measure because it makes a like-
18   for-like comparison, that is, mean paralegal hourly rates in the District of Columbia region with the
19   Los Angeles region.  In contrast, salaries for federal judicial employees may respond to different
20   market demands than paralegals.  The Occupational Employment Statistics have a mean hourly
21   rate of $32.80 for paralegals and other legal professionals in the District of Columbia region and
22   $30.21 in the Los Angeles region.  (See May 2014 Metropolitan and Nonmetropolitan Area
23   Occupational Employment and Wage Estimates) (available at
24   http://www.bls.gov/oes/current/oes_47900.htm#23-0000) (last accessed on November 28, 2015).
25   As such, the multiplier that the court will use is .921 ($30.21/$32.80).  This results in an hourly rate
26
27
28

1  of $135 for paralegals, far below plaintiffs' requested rates between $275 to $290.[35]  See Viveros

2  v. Donahoe, 2013 WL 1224848, *2 (C.D. Cal. 2013) ("When a fee applicant fails to meet her

3  burden of establishing the reasonableness of the requested rates, the court may exercise its

4  discretion to determine reasonable hourly rates based on its experience and knowledge of

5  prevailing rates in the community.").

6            3.      **Reasonableness of Requested Hours**.

7            The next step in establishing the lodestar amount is determining the reasonableness of the

8  hours expended in pursuing the action.  See Blum v. Stenson, 465 U.S. 886, 888, 104 S.Ct. 1541,

9  1544 (1984) ("The initial estimate of a reasonable attorney's fee is properly calculated by

10  multiplying the number of hours reasonably expended on the litigation times a reasonable hourly

11  rate.") (citation omitted).  As a general rule, courts "'should defer to the winning lawyer's

12  professional judgment as to how much time he was required to spend on the case.'"  Chaudhry

13  v. City of Los Angeles, 751 F.3d 1096, 1111 (9th Cir.), cert. denied, 135 S.Ct. 295 (2014) (quoting

14  Moreno, 534 F.3d at 1112).  "Typically, '[a]n attorney's sworn testimony that, in fact, [he] took the

15  time claimed . . . is evidence of considerable weight on the issue of the time required."  Holt v.

16  Kormann, 2012 WL 5829864, *6 (C.D. Cal. 2012) (internal quotation marks omitted).

17  Nevertheless, the court is tasked with conducting its own independent review.  See Gates, 987

18  F.2d at 1401 (court has duty "to independently review plaintiffs' fee request even absent defense

19  objections").

20            According to plaintiffs, their counsel spent a total of 3010.4 hours litigating this case from

21  October 25, 2012, to the filing of the instant Motion, (see Suppl. Fees Motion at 17; Van Dalsem

22  Decl. at Exh. E), totaling $1,587,833.00 in attorney's fees and $230,472.17 in costs.  (See Van

23  Dalsem Decl. at Exh. E).  This amounts to a grand total of $1,818,305.17.  (See id.).  Of that

24  amount, plaintiffs seek to recover 75% of the total fees and costs or $1,363,728.88, the amount

25

26      [35]  Because the court lacks a point of comparison to judge the reasonableness of the rate

27  requested for Jonathan Land as head of litigation support and because of the limited hours he
    billed on the matter (4.3 hours), (see Van Dalsem Decl. at Exh E), the court will adopt plaintiffs'

28  requested rate of $365 for Jonathan Land.

plaintiffs estimate is associated with defendants' litigation misconduct. (See Suppl. Fees Motion at 1; see Van Dalsem Decl. at ¶ 7). Plaintiffs have provided detailed invoices of the attorney's fees associated with this case. (See Van Dalsem Decl. at Exh. D). The invoices provide descriptions of how time was spent by each attorney and legal support staff for each billing period. (See id.). Plaintiffs have also provided the total amounts billed by each attorney and support staff throughout the litigation. (See id. at Exh. E).

Defendants make several arguments why plaintiffs' lodestar is unreasonable. First, defendants assert repeatedly that only a fraction of the hours billed were done in furtherance of the Motion. (See Lear Decl. at ¶¶ 7-11[36]; InHouse's Fees Opp'n at 23-25). In essence, defendants are simply asserting the linkage argument discussed above. See supra at § III.B. But as noted above, the frequency and severity of defendants' misconduct, see supra at § II., coupled with the resulting need to ensure that such abuses are not repeated, see Chambers, 501 U.S. at 56, 111 S.Ct. at 2139, clearly warrant the imposition of full attorney's fees and costs in this case.

Nevertheless, plaintiffs seek only 75% of the total attorney's fees incurred, (see Suppl. Fees Motion at 3), and the court's independent review of the billing statements accords with plaintiffs' contention that 25% of the time billed was generated as part of the normal course of litigation. (See Van Dalsem Decl. at ¶ 7; see id. at Exh. D). However, the court does not agree with plaintiffs' approach of making an across-the-board 25% reduction. (See id. at ¶ 7). Considering the varying hourly rates for each attorney and support staff, it is more appropriate to reduce the number of hours for each attorney and support staff by 25% and compute the fees accordingly. See, e.g., Carter v. Caleb Brett LLC, 741 F.3d 1071, 1074 (9th Cir.), amended, 757 F.3d 866 (9th Cir. 2014) (remanding award of attorney's fees where the court did not distinguish between each billing employee, finding the across-the-board "approach [ ] difficult to understand given that the associate, who billed at the lower rate, billed five times as many hours as the more senior counsel"); (see Van Dalsem Decl. at Exh. E). Accordingly, using exhibit E as a framework, the

---

[36] Paragraphs 7 and 8 of the Lear Decl. are inadmissible to the extent they call for a legal conclusion and provide legal argument.

attorney's fees are modified as follows:

| Name | Title | Requested | | | Awarded | | |
|---|---|---|---|---|---|---|---|
| | | Hourly Rate | Hours | Subtotal | Hourly Rate | Hours | Total |
| Van Dalsem | Partner | $915 | 174.6 | $159,759 | $915 | 131.0 | $119,819 |
| Quinto | Partner | $850 | 19.7 | $16,745 | $850 | 14.8 | $12,559 |
| Proctor | Partner | $765 | 424.6 | $324,819 | $765 | 318.5 | $243,614 |
| Lifrak | Partner | $765 | 73.8 | $56,457 | $765 | 55.4 | $42,343 |
| Posner | Partner | $765 | 8.8 | $6,732 | $765 | 6.6 | $5,049 |
| Keech | Associate | $465 | 1078.6 | $501,549 | $465 | 809.0 | $376,162 |
| | | $500 | 431.6 | $215,800 | $500 | 323.7 | $161,850 |
| Zhang | Associate | $500 | 40 | $20,000 | $500 | 30.0 | $15,000 |
| | | $535 | 8 | $4,280 | $535 | 6.0 | $3,210 |
| Choe | Associate | $300 | 72.9 | $21,870 | $300 | 54.7 | $16,403 |
| | | $430 | 360.2 | $154,886 | $430 | 270.2 | $116,165 |
| | | $465 | 112.1 | $52,127 | $465 | 84.1 | $39,095 |
| O'Connor | Paralegal | $275 | 144.6 | $39,765 | $135 | 108.5 | $14,641 |
| Jacobs | Paralegal | $290 | 6.5 | $1,885 | $135 | 4.9 | $658 |
| Musto | Paralegal | $275 | 3.6 | $990 | $135 | 2.7 | $365 |
| Swift | Paralegal | $275 | 10.1 | $2,778 | $135 | 7.6 | $1,023 |
| Kleinman | Paralegal | $275 | 2.7 | $743 | $135 | 2.0 | $273 |
| Pullen | Paralegal | $275 | 0.2 | $55 | $135 | 0.2 | $20 |
| Vasquez | Lit. Support | $150 | 11.1 | $1,665 | $135 | 8.3 | $1,124 |
| Espinoza | Lit. Support | $150 | 9.7 | $1,455 | $135 | 7.3 | $982 |
| Jovel | Lit. Support | $150 | 7.2 | $1,080 | $135 | 5.4 | $729 |
| Kerce | Lit. Support | $150 | 3 | $450 | $135 | 2.3 | $304 |
| Alcantara | Lit. Support | $150 | 1.5 | $225 | $135 | 1.1 | $152 |
| Silveira | Lit. Support | $150 | 1 | $150 | $135 | 0.8 | $101 |
| Land | Lit. Support | $365 | 4.3 | $1,570 | $365 | 3.2 | $1,177 |
| | | | 3010.4 | $1,587,833 | | **2257.8** | **$1,172,816** |

Second, defendants take issue with the method by which plaintiffs' counsel entered its billable hours. (See Lear Decl. at ¶¶ 12-17). Defendants contend that plaintiffs' lodestar should be reduced because the block-billing method by which plaintiffs' counsel recorded their time "makes it impossible to discern or allocate how much time was spent on each task[,]" (id. at ¶ 12), or "evaluate whether the time spent on such tasks was reasonable." (Id. at ¶ 13). Consequently, defendants argue, the court should reduce the amount of those blocked billed hours by 20 percent. (See id. at ¶ 12).

Block billing frustrates the ability of a court to evaluate the reasonableness of the time spent on each task. See Mendez, 540 F.3d at 1128 (noting that block billing "frustrat[es] the Court's

1    efforts to determine whether the fees were, in fact, reasonable."). This method of billing "lump[s]

2    together multiple tasks, making it impossible to evaluate their reasonableness." Role Models Am.,

3    Inc. v. Brownlee, 353 F.3d 962, 971 (D.C. Cir. 2004). For example, one entry dated October 30,

4    2012, includes 8.6 hours for preparing, reviewing, and revising discovery requests and deposition

5    notices and conferencing with the case team regarding those actions; conferencing with a

6    subpoenaed third party regarding production and revision of discovery; researching multiple

7    deposition notices to a corporate party in federal litigation and conferencing with the case team

8    regarding said research; and preparing, reviewing, and revising follow-up meet and confer

9    correspondence and correspondence regarding forensic imaging of defendants' electronic media

10   and conferencing with the case team regarding said actions. (See Van Dalsem Decl., Exh. D at

11   23). Many of plaintiffs' billing records are similarly infirm. (See, e.g., id. at 22-23, 28-32, 37-40,

12   45-49, 54-56, 61-62, 64-67, 71-74, 78-82, 87-90, 95-98, 102-07, 111-15, 119-21, 126-34 & 138-

13   46). Without more specificity, it is impossible to determine the amount of time spent on each task

14   and whether the time spent on the specific task was reasonable. See Sunstone Behavioral

15   Health, Inc. v. Alameda Cnty. Med. Ctr., 646 F.Supp.2d 1206, 1214 (E.D. Cal. 2009) ("When

16   reviewing such instances of block-billing, it is incumbent upon the court to compare the hours

17   expended against the tasks and assess the reasonableness of those tasks.") (internal quotation

18   marks and citation omitted).

19        Block billing, however, "does not justify an across-the-board reduction or rejection of all

20   hours." Mendez, 540 F.3d at 1129. Rather, any reduction should be tailored to "those hours that

21   were actually billed in block format." Welch v. Metro. Life Ins. Co., 480 F.3d 942, 948 (9th Cir.

22   2007). Here, plaintiffs' billing statements included hundreds of individual entries in block billing

23   format. (See, e.g., Van Dalsem Decl., Exh. D at 22-23, 28-32, 37-40, 45-49, 54-56, 61-62, 64-67,

24   71-74, 78-82, 87-90, 95-98, 102-07, 111-15, 119-21, 126-34 & 138-46). Defendants challenge

25   1341.3 of the 2609.3 total billed hours, (see Lear Decl. at ¶¶ 14 & 16), or approximately 51.4% of

26   the hours billed, and ask for a 20% reduction of the total fees. (See id.).

27        A careful review of plaintiffs' billing statements indicates that only 16.6% (or 500.9 hours)

28   of the entries were not in block billed format, i.e., billing statements which included only one task

1    in the description.  (See Van Dalsem Decl., Exh. D at 22-23, 28, 29, 31, 32, 38-40, 45-49,54-56,

2    61, 62, 64-67, 71-74, 78-82, 87-90, 95-98, 102-107, 111-15, 119-21, 126-32, 138-140 & 142-46).

3    In other words, 83% of all billed fees were in block billed format, i.e. (3010.4-500.9)/3010.4).

4    Given the prevalence of block billing, the court believes a 10% reduction to 83% of the total fees

5    is appropriate.  See Moreno, 534 F.3d at 1112 ("the district court can impose a small reduction,

6    no greater than 10 percent – a 'haircut' – based on its exercise of discretion").  Accordingly, the

7    court will reduce plaintiffs' award by $97,344 ($1,172,816 x .83 x .1).

8            Finally, defendants assert that there was significant duplication in many of the entries

9    submitted and that some of those entries included "unexplained redactions[.]" (Lear Decl. at ¶ 15).

10   These redundancies include "multiple attorneys holding numerous conferences among themselves

11   or with the client, preparing for the same depositions, and drafting/working on the same

12   pleadings." (Id.).

13           There are a number of entries where billing descriptions are completely redacted.  (See,

14   e.g., Van Dalsem Decl., Exh. D at 30, 104, 105 & 130).  It is unclear how the court can evaluate

15   the reasonableness of such entries when the entire subject matter is concealed.  The party

16   seeking fees is responsible for accurate and specific accounting, see Gates, 987 F.2d at 1397,

17   yet plaintiffs do not attempt to make an argument as to why such redactions were necessary.

18   (See, generally, Suppl. Fees Motion; Fees Reply; Van Dalsem Decl.); see, e.g., Avgoustis v.

19   Shinseki, 639 F.3d 1340, 1344 (Fed. Cir. 2011) (collecting cases and noting that "no court of

20   appeals has held that disclosure of the general subject matter of a billing statement under

21   fee-shifting statutes violates attorney-client privilege").  "Put simply, professionals may not properly

22   avoid scrutiny of their fees by redacting the description of the billing entry."  In re Las Vegas

23   Monorail Co., 458 B.R. 553, 558 (Bankr. D. Nev. 2011) (internal quotation and alteration marks

24   omitted).  Consequently, the court will completely exclude the 13.4 hours (adjusted to 10.05 hours

25   given the 25% reduction in hours), amounting to $5,974 in fees, where the entirety of the billing

26   description has been redacted.  (See Van Dalsem Decl., Exh. D at 30, 104, 105 & 130) (billing 2.4

27   hours at a rate of $850 per hour for David Quinto; 2.7 hours at a rate of $765 per hour for B. Dylan

28   Proctor & 8.3 hours at a rate of $465 for Julia Choe).

1    The court is also troubled by the partial redactions made to a significant number of the

2    billing entries.  (See, e.g., Van Dalsem Decl., Exh. D at 38) ("Review [redacted], emails re: same,

3    work on [redacted] issues."); (id. at 61) ("Team meeting; [redacted]; provide research to RK."); (id.)

4    ("Review and analyze [redacted] and research regarding same."); (id. at 55) ("TC with [redacted]

5    and R. Keech [redacted].").  Plaintiffs' billing statements contain entries with partially redacted

6    descriptions claiming approximately 335 hours.  (See, e.g., id. at 21, 22, 28-32, 38, 40, 45, 47, 54-

7    56, 61, 62, 64-66, 71, 72, 74, 78, 80, 81, 103, 105-107, 111-15, 121, 128, 130-33 & 138-46).

8    However, the Ninth Circuit has held that similarly ambiguous entries withstand scrutiny.  See

9    Democratic Party of Wash. State v. Reed, 388 F.3d 1281, 1286 (9th Cir. 2004) (allowing recovery

10   for "Counsel call to discuss [REDACTED]" and "Research Supreme Court case law involving

11   [REDACTED]" because those "redactions [did] not impair the ability of the court to judge whether

12   the work was an appropriate basis for fees").  Having carefully reviewed the redacted entries, the

13   court is persuaded that the entries are of the kind the Ninth Circuit has deemed appropriate, as

14   they do not hinder the court from analyzing the propriety of the work, and are not so voluminous

15   as to concern the court that the hours were spent doing unnecessary or improper work.  See id.

16   (allowing redactions that may have, for example, concealed research done "chasing after ghosts"

17   of potential claims or problems because "[a]ny judge who practiced law can tell when the ghost

18   busting is out of hand").  Accordingly, the court will not reduce the lodestar amount for billing

19   entries that contain partially redacted billing descriptions.

20        Similarly, the court finds that the billing descriptions, which defendants assert are

21   inadequate, (see Lear Decl., Exh. 4 at 1-30), are not so poorly described that the court cannot

22   determine whether plaintiffs should be compensated for the requested time.  For example, while

23   defendants object to a July 3, 2013, entry which states "[r]eview and revise multiple filings[,]" (Van

24   Dalsem Decl., Exh. D at 102), as inadequate, (see Lear Decl., Exh. 4 at 23), the court has no

25   difficulty identifying this entry as relating to the four filings submitted that day, all of which directly

26   related to defendants' litigation misconduct.  (See Plaintiffs' Reply In Support of Motion to Dismiss

27   Counterclaims, Dkt. No. 146; Reply In Support of Motion to Strike Affirmative Defenses, Dkt. No.

28   147; Plaintiffs' Reply In Support of Motion for Terminating Sanctions and Other Sanctions Against

1  Defendants Sis-Joyce International Co., Ltd. and Alice "Annie" Lin, Dkt. No. 148; Plaintiffs'

2  Evidentiary Objections to the Declaration of Alice Lin In Support of Defendants' Opposition to

3  Plaintiffs' Notice of Motion and Motion for Terminating Sanctions and Other Sanctions, Dkt. No.

4  149); see also Gustafson v. U.S. Bank, 2014 WL 302242, *6 (C.D. Cal. 2014) (awarding attorney's

5  fees where "the categories of billing entries perfectly track Defendants' responses to Plaintiff's

6  pleadings and other filings").   Although there may be some ambiguities in plaintiffs' billing

7  descriptions, (see, e.g., Van Dalsem Decl., Exh. D at 90, 146 & 130), the court is well acquainted

8  with the history of this case and the significant number of docket entries.   Under the

9  circumstances, the court is persuaded that plaintiffs' documentation is sufficient to enable the court

10  to assess the reasonableness and purpose of the time spent.   See Fox v. Vice, 131 S.Ct. 2205,

11  2216 (2011) ("The fee applicant . . . must . . . submit appropriate documentation . . . [b]ut trial

12  courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal

13  in shifting fees . . . is to do rough justice, not to achieve auditing perfection.  So trial courts may

14  take into account their overall sense of a suit, and may use estimates in calculating and allocating

15  an attorney's time.").

16       With regard to defendants' argument that many billing entries include redundant or

17  duplicative entries, (see Lear Decl., Exh. 4 at 1-30), the court finds that plaintiffs' fee request is

18  appropriate here as well.   See Jefferson v. Chase Home Fin., 2009 WL 2051424, *4 (N.D. Cal.

19  2009) ("Under federal law, the Court has the discretion to reduce the hours if it determines that

20  inefficiency or overstaffing was a problem[.]").   "Other than simply directing the court to particular

21  billing entries, defendant[s] provide[ ] no persuasive reason why having two or three attorneys

22  [perform any of those particular tasks] was unreasonable."   Sunstone Behavioral Health, 646

23  F.Supp.2d at 1214.  For example, defendants challenge several entries that reflect work done by

24  two or more attorneys reviewing the same documents.  (See Lear Decl., Exh. 4 at 1) ("RQK also

25  billed for reviewing documents produced in response to subpoena on the same day"); (id. at 27)

26  ("BDP and RQK also billed for reviewing Lin letter regarding counsel"); (id. at 16) ("BV also billed

27  for review of 9th Cir. argument order").   Other challenges take issue with the "many hours already

28  billed" for specific tasks.  (See, e.g., id. at 3) ("many hours already billed for Payoneer depo prep");

1  (id. at 15) ("many hours already billed for renewed motion to dismiss "); (id. at 25) ("hours already

2  billed for preparing for hearing").  "[D]uplicative work, however, is not a justification for cutting a

3  fee, unless the lawyer does unnecessarily duplicative work."  Mendez, 540 F.3d at 1129 (internal

4  quotations omitted) (emphasis in the original).  Taking depositions, preparing filings related to

5  multiple sanctions motions, and preparing the multiple requests to compel production – tasks

6  made necessary by defendants' flagrant misconduct in this case – are significant time consuming

7  exercises.  None of defendants' criticisms related to the alleged duplication of work provides a

8  reason as to why the hours billed on a particular item were unnecessary or excessive here.  (See,

9  generally, Lear Decl.; id., Exh. 4 at 1-30); see Moreno, 534 F.3d at 1113 ("Findings of duplicative

10  work should not become a shortcut for reducing an award without identifying just why the

11  requested fee was excessive and by how much.").  The court will not reduce the lodestar figure

12  for those tasks defendants contend are "redundant" or "duplicative."

13         4.    **Reasonableness of Costs**.

14         In general, fees claimed for costs and expenses that are customarily billed by private

15  attorneys to fee-paying clients may be awarded as attorney's fees.  See Davis, 976 F.2d at 1546

16  n. 4 & 1557; United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990)

17  ("Out-of-pocket litigation expenses are reimbursable as part of the attorneys' fee").  Plaintiffs

18  contend that they have incurred $230,472.17 in costs, including photocopying, legal research,

19  translation, and travel expenses incurred for travel to depositions.  (See Suppl. Fees Motion at 23;

20  Van Dalsem Decl. at ¶ 5; id. at Exh. E).  As in the case of attorney's fees, plaintiffs seek 75% of

21  the amount as attributable to defendants' misconduct, or $172,854.  (See Suppl. Fees Motion at

22  23).  As in the case of plaintiffs' request for attorney's fees, defendants do not challenge any of

23  the costs sought by plaintiffs.  (See, generally, Def'ts Second Fees Suppl. Opp'n; Lear Decl.).

24         The court has reviewed the monthly summary of costs and, with the exception of costs for

25  online research, believes they are reasonable.  Plaintiffs' expense entries for online research

26  include a notation that such costs are "based on standard Westlaw or Lexis, without any applicable

27  discount," (Van Dalsem Decl, Exh. D at 24, 33, 42, 50, 75, 83, 91, 99), but there is no indication

28  as to whether plaintiffs' counsel bill their clients for online legal research and, if so, at what rate,

1   i.e., the standard or discounted Westlaw or Lexis rates.  Thus, the court will exclude $111,591.29

2   in costs incurred for online research, but awards 75% of the remaining costs – $ 89,161 – as set

3   forth below:

| A | B | C | D |
|---|---|---|---|
| Date | Costs | Excluded Costs | Reasonable Costs |
|  | Exh. E. | Exh. D | Column B - Column C |
| Oct-12 | $7,538.30 | $6,115.29 | $1,423.01 |
| Nov-12 | $5,919.82 | $2,915.00 | $3,004.82 |
| Dec-12 | $14,117.30 | $7,154.00 | $6,963.30 |
| Jan-13 | $24,566.74 | $9,764.00 | $14,802.74 |
| Feb-13 | $5,763.54 | $0.00 | $5,763.54 |
| Mar-13 | $23,011.46 | $20,262.00 | $2,749.46 |
| Apr-13 | $20,224.35 | $6,374.00 | $13,850.35 |
| May-13 | $27,126.80 | $17,449.00 | $9,677.80 |
| Jun-13 | $22,426.70 | $9,507.00 | $12,919.70 |
| Jul-13 | $5,159.55 | $0.00 | $5,159.55 |
| Aug-13 | $20,832.53 | $16,294.00 | $4,538.53 |
| Sep-13 | $6,167.04 | $0.00 | $6,167.04 |
| Oct-13 | $35,739.75 | $15,757.00 | $19,982.75 |
| Nov-13 | $11,878.29 | $0.00 | $11,878.29 |
|  |  | Subtotal | $118,880.88 |
|  |  | **Reasonable Costs** | **$89,161** |

       5.    **Summary of Reasonable Attorney's Fees and Costs**.

       In sum, the court accepts plaintiffs' proposed lodestar percentage of 75% with the reduction of the hourly rates for plaintiffs' paralegals.  This results in a lodestar amount to $1,172,816, which will be reduced by 10% or $97,344, to account for defendants' objections to plaintiffs' block-billed hours.  The lodestar will also be reduced $5,974 for the completely redacted billing descriptions.  Finally, the court will apply the proposed lodestar percentage of 75% to costs, but excludes overhead costs associated with online legal research, which reduces the costs by $111,591.29.  The total for plaintiffs' reasonable attorney's fees and costs is $1,158,659 ($1,172,816 - $97,344 - $5,974 + $89,161).

## CONCLUSION

       The severity and frequency of defendants' bad faith misconduct is as egregious as anything this court has ever seen or read in any of the cases.  Defendants' pattern of bad faith litigation misconduct shows that defendants do "not take [their] oath to tell the truth seriously and . . . will

1  say anything at any time in order to prevail in this litigation[.]"  <u>Anheuser-Busch</u>, 69 F.3d at 352.

2  Defendants provide shifting explanations depending on the day or attorneys that happen to

3  represent them.  For example, Alice Lin testified at her October 2013, deposition that she wrote

4  each of the Win, Luong, and Chen declarations in Chinese, and her sister and Sis-Joyce

5  employee, Annie Lin translated them through an online translation program.  (<u>See</u> Alice Lin Oct.

6  2013 Dep. at 281).  But then in a declaration, submitted to the court the day after that deposition,

7  Alice Lin declared that she did not authorize or instruct anyone acting under her authority or behalf

8  to create the declarations.  (<u>See</u> Alice Lin Opp'n Decl. at ¶ 29) ("I did not draft the declarations

9  themselves, do not know how the signatures were obtained, and did not know whether they were

10  falsified.").

11      Defendants' briefing reveals no sense of remorse or understanding of the gravity of their

12  actions.  (<u>See</u>, <u>generally</u>, Opp'n; Def'ts Second Fees Suppl. Opp'n.); <u>see also</u> <u>Sun World</u>, 144

13  F.R.D. at 390 (terminating sanctions issued without alternative sanctions considered where litigant

14  "committed a fraud on the court" by submitting fabricated evidence and "there is no sign of

15  repentance or any indication that this pattern of behavior would cease if this case were allowed

16  to proceed").  Instead, defendants try to shift the blame to others, be it another employee or sibling

17  (<u>i.e.</u> Annie) or a previous attorney.  For example, defendants' prior counsel, Jew, sought to

18  withdraw as counsel because he believed that his "continued employment will result in violation

19  of the Rules of Professional Conduct," and defendants' "continued defiance of the[ir] counsel's

20  legal advice by refusing to follow it," (Jew Motion Decl. at ¶¶ 8-9), including Alice Lin's repeated

21  refusal to turn over to plaintiffs items clearly enjoined under the preliminary injunction.  (<u>See</u> Jew

22  Reply Decl. at ¶ 9).  Rather than admit her own violation of a court order, Alice Lin, now

23  represented by her fourth counsel in this case, protests that Jew "never should have filed" the

24  Luong, Chen, or Win declarations that she originally prepared in Chinese.  (<u>See</u> Def'ts Second

25  Fees Suppl. Opp'n at 2).

26      The court could go further, but it need not.  Plaintiffs have demonstrated by clear and

27  convincing evidence that defendants fabricated a declaration for a phantom witness (Alice Win),

28  forged a declaration (Jess Chen / Jessie Xu), falsified and fraudulently procured a declaration

(Amy Huong), filed these false declarations with different federal courts, obstructed the discovery process by filing fraudulently procured complaints with the Northern District of California, lied under oath, and violated the court's preliminary injunction.

Based on the foregoing, IT IS ORDERED THAT:

1.  Plaintiffs' Renewed Motion for Terminating or Other Sanctions **(Document No. 195)** is **granted** as follows.  The court hereby exercises its inherent power and strikes defendants answer, dismisses their counterclaims, orders the entry of default judgment against defendants' on plaintiffs' claims, and orders defendants to pay plaintiffs attorney's fees and costs in the amount of $1,158,659.

2.  No later than **December 16, 2015**, plaintiffs' counsel shall lodge a proposed form of judgment that takes into account this order as well as the requirements set forth in the court's preliminary injunction.  Any objections to the proposed judgment shall be filed no later than **December 18, 2015**.  If any objections are filed to the proposed judgment, plaintiffs shall file a reply to the objections no later than **December 21, 2015**.

Dated this 14th day of December, 2015.

_____
/s/
Fernando M. Olguin
United States District Judge